IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Nautic Partners L.L.C., Chisholm Partners IV, L.P., Fleet Equity Partners VI, L.P., Fleet Venture Resources, Inc., Kennedy Plaza Partners II, L.L.C., and Scott Hilinski,<br><br>Plaintiffs,<br><br>v.<br><br>Zurich American Insurance Company,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. _____

**Jury Trial Demanded**

## COMPLAINT

Plaintiffs, Nautic Partners LLC, Chisholm Partners IV, LP, Fleet Equity Partners VI, LP, Fleet Venture Resources, Inc., Kennedy Plaza Partners II, LLC, and Scott Hilinski (collectively, "Plaintiffs"), by their undersigned counsel, allege as their Complaint against Defendant, Zurich American Insurance Company ("Zurich" or "Defendant"), as follows:

## JURISDICTION AND VENUE

1.     This court has jurisdiction pursuant to 28 U.S.C. § 1332, since the action is between citizens of different states and the amount in controversy exceeds $75,000. As alleged below, this action seeks compensatory and punitive damages and a declaratory judgment regarding Zurich's legal duty to pay defense fees and costs and to indemnify Plaintiffs for any settlements or judgments that have been incurred and/or that will be incurred in the future by Plaintiffs in defending against the underlying lawsuits described below. The legal defense fees and costs that have been incurred to date already substantially exceed $75,000 and Plaintiffs expect to incur additional defense fees and costs in the future.

2.    This court has jurisdiction over Plaintiffs' claims for declaratory relief pursuant to 28 U.S.C. § 2201(a).  As alleged in detail below, there is an actual case or controversy as between Plaintiffs and Defendant that is within the subject matter of this court's jurisdiction.

3.    Upon information and belief, Defendant has minimum contacts with this District sufficient to support personal jurisdiction over Zurich in the District of Delaware. Zurich is licensed to sell insurance in Delaware, has transacted business in this State by, among other things, insuring and contracting to insure persons and businesses that were formed under the laws of and did business in Delaware at the time of such contracting.

4.    Venue is proper in the District of Delaware pursuant to 28 U.S.C. § 1391(a) and (c) because Defendant transacts business in Delaware, therefore subjecting Defendant to personal jurisdiction in the District of Delaware.

## THE PARTIES

5.    Plaintiff, Nautic Partners L.L.C. ("Nautic"), is a limited liability company organized under the laws of Delaware with its principal place of business in Providence, Rhode Island.  Nautic is a private equity firm which manages investments in middle market companies doing business in the healthcare, business servicing, manufacturing, communications and other fields.

6.    Plaintiff, Chisholm Partners IV, L.P. ("Chisholm"), is a limited partnership organized under the laws of Delaware with its principal place of business in Providence, Rhode Island.  Chisholm is a private equity fund managed by Nautic which invests in other businesses on behalf of investors in the fund.

7.      Plaintiff, Fleet Equity Partners VI, L.P. ("Fleet Equity"), is a limited partnership organized under the laws of Delaware with its principal place of business in Providence, Rhode Island.  Fleet Equity is a private equity fund managed by Nautic which invests in other businesses on behalf of investors in the fund.

8.      Plaintiff, Fleet Venture Resources, Inc. ("Fleet Venture"), is a limited partnership organized under the laws of Rhode Island with its principal place of business in Providence, Rhode Island.  Fleet Venture is a private equity fund managed by Nautic which invests in other businesses on behalf of investors in the fund.

9.      Plaintiff, Kennedy Plaza Partners II, L.L.C. ("Kennedy Plaza"), is a limited liability company organized under the laws of Delaware with its principal place of business in Providence, Rhode Island.  Kennedy Plaza is a private equity fund managed by Nautic which invests in other businesses on behalf of investors in the fund.

10.     Plaintiff, Scott Hilinski ("Hilinski"), was at times relevant herein a member of the Board of Directors of Meridian Health Care Management, Inc. ("Meridian"). Hilinski is also a Managing Director of Nautic.  Hilinski is, and at all times relevant herein was, a citizen of the state of Massachusetts.

11.     Upon information and belief, Defendant, Zurich is a New York corporation which is headquartered in Schaumburg, Illinois.  Zurich is in the business, *inter alia*, of selling and underwriting liability insurance policies.

## STATEMENT OF FACTS

### The Zurich Policy

12.     Plaintiffs Nautic, Chisholm, Fleet Equity, Kennedy Plaza, and Hilinski are named insureds under a certain Private Equity Partnership Liability Insurance Policy (the

"Zurich Policy" or "Policy") issued by defendant, Zurich, under policy no. EOC 3830398.  A true and correct copy of the Zurich Policy is attached hereto as Exhibit A.

   13. The Zurich Policy is a claims made and reported policy that was issued to Nautic on its behalf and on behalf of, *inter* alia, its employees and funds it managed.  The Zurich Policy was effective during the policy period of June 30, 2005 to June 30, 2006 (the "Policy Period").

   14. Upon information and belief, the Zurich Policy was designed to afford coverage specifically tailored to the needs of private equity firms such as the Plaintiffs.

   15. With regard to claims made against insured persons during the Policy Period, the Policy provides a limit of liability of $10,000,000 for each loss resulting from a covered claim for a wrongful act, including any amount that the insureds are legally obligated to pay on account of a covered claim, including legal defense fees and costs, and in the aggregate for all such loss.

   16. The Zurich Policy contains various exclusions from coverage, including the following:

> The Insurer shall not be liable under this Policy to make any payment in connection with any Claim against any Insured for any Insured gaining any profit, remuneration, or pecuniary advantage to which such Insured which by judgment or final adjudication or an alternative dispute resolution proceeding adverse to the Insured establishes the Insured was not legally entitled; however, this exclusion shall not apply to any Defense Costs incurred in connection with any such Claim.

Zurich Policy Section V(A)(6) and Endorsement No. 2.

   17. Plaintiffs agreed under the Zurich Policy not to settle any claim without Zurich's consent.  Zurich agreed to advance covered defense costs on a current basis prior to the disposition of a covered claim.

**The Meridian Investment**

18.    In or about July 1999, Chisholm Partners IV, LP, Fleet Equity Partners VI, LP, Fleet Venture Resources, Inc., and Kennedy Plaza Partners II, LLC, (the "Investing Plaintiffs") invested in preferred stock of Meridian.    Meridian is a provider of network management, medical management and operations management services primarily for the healthcare industry.

19.    As a result of the investment, Hilinski became a member of the Board of Directors of Meridian.  Following the investment in Meridian, the day-to day affairs of Meridian continued to be managed by Meridian's officers.

**The Meridian Merger**

20.    In or about August 2005, e4e, Inc. ("e4e") entered into an agreement and plan of reorganization with Meridian, through which e4e acquired Meridian in a reverse triangular merger ("the Meridian Merger").  As a result of the Meridian Merger, the Investing Plaintiffs' stock in Meridian was converted into a right to receive cash, convertible notes and stock in e4e and the repayment of certain loans that the Investing Plaintiffs had previously made to Meridian.

**The Meridian Lawsuit**

21.    During the Policy Period of the Zurich Policy, Plaintiffs were named as defendants in a lawsuit captioned *e4e, Inc. v. Meridian Health Care Management, Inc. et al.* (the "Meridian Lawsuit"), which was filed on January 9, 2006.  A true and correct copy of the Complaint in the Meridian Lawsuit is attached hereto as Exhibit B.

22.    Plaintiff in the Meridian Lawsuit has asserted that officers of Meridian committed a fraud by using funds of Meridian customers to cover expenses of the Meridian business and that this fraud was concealed from e4e.  The Meridian Lawsuit plaintiff asserted

claims for, *inter alia*, fraud, negligent misrepresentation, innocent misrepresentation and breach of contract. The Meridian Lawsuit plaintiff seeks, *inter alia*, compensatory, exemplary, general and punitive damages and seeks rescission and restitution.

23.    The Meridian Lawsuit is ongoing. Plaintiffs have incurred substantial defense fees and costs defending the Meridian Lawsuit and expect to incur substantial additional defense fees and costs in the future. To date, Plaintiffs have incurred over $1 million in defense fees and costs in connection with the Meridian Lawsuit.

24.    On January 13, 2006, Plaintiffs timely notified Zurich of the Meridian Lawsuit and requested that Zurich provide coverage under the Zurich Policy.

25.    Zurich acknowledged receipt of this notification of the Meridian Lawsuit by correspondence dated February 8, 2006.

26.    Zurich issued an amended letter on April 19, 2006. In the April 19, 2006 correspondence, Zurich acknowledged that: Hilinski is an insured person under the Zurich Policy and will be afforded coverage; Nautic will be afforded a defense under the Zurich Policy as a parent company; and Chisholm, Fleet Equity, and Kennedy Plaza are insured organizations under the Zurich Policy and will be afforded a defense. While Zurich reserved rights under the Zurich Policy, Zurich did not disclaim coverage for any loss or defense costs incurred by Plaintiffs Nautic, Chisholm, Fleet Equity, Kennedy Plaza, and/or Hilinski.

27.    The Zurich Policy's exclusion for "ill-gotten gains" can only be triggered once there has been a final adjudication adverse to the insureds establishing that the insureds were not legally entitled to a particular profit. Zurich violated that provision by taking the position in its April 19 letter that Zurich would not indemnify Plaintiffs for any settlement offer

which in part comprised the consideration received by Plaintiffs in the Meridian Merger before any final adjudication of the issue has been rendered.

**The Customer Lawsuits**

28.     During the Policy Period of the Zurich Policy, Plaintiffs were named as defendants in a lawsuit captioned *Northridge Medical Group, Inc. v. Nautic Partners, L.L.C. et al.* (the "Northridge Lawsuit"), which was filed on February 14, 2006. A true and correct copy of the Complaint in the Northridge Lawsuit is attached hereto as Exhibit C.

29.     Plaintiff in the Northridge Lawsuit has alleged that it is a customer of Meridian and that it lost money due to the fraud perpetrated on Meridian by its officers. The Northridge Lawsuit plaintiff has asserted, *inter alia*, claims for fraud, negligent misrepresentation, conspiracy and breach of contract. The Northridge Lawsuit plaintiff seeks, *inter alia*, compensatory and punitive damages.

30.     On March 8, 2006, Plaintiffs timely notified Zurich of the Meridian Lawsuit and requested that Zurich provide coverage under the Policy.

31.     Zurich acknowledged receipt of notification of the Northridge Lawsuit in correspondence dated March 13, 2006. In the March 13, 2006 correspondence Zurich acknowledged that:  Hilinski is an insured person under the Policy and will be afforded coverage; Nautic will be afforded coverage as the parent company under the Zurich Policy; and Chisholm, Fleet Equity, and Kennedy Plaza are insured organizations under the Policy and will be afforded coverage.

32.     While Zurich reserved rights under the Policy, Zurich did not disclaim coverage for any loss or defense costs incurred by the Plaintiffs Nautic, Chisholm, Fleet Equity, Kennedy Plaza, and/or Hilinski.

33.    During the Policy Period, Plaintiffs were named in a lawsuit captioned *Family/Seniors Medical Group, Inc. v. Meridian Healthcare Management, Inc. et al.* (the "Family/Seniors Lawsuit"), which was filed on April 3, 2006. A true and correct copy of the Complaint in the Family/Seniors Lawsuit is attached as Exhibit D hereto.

34.    Plaintiff in the Family/Seniors Lawsuit has asserted that it was a customer of Meridian and that it was damaged by the fraud perpetrated on Meridian by its officers. The Family/Seniors Lawsuit plaintiff asserted claims for, *inter alia,* intentional misrepresentation, conspiracy, conversion and breach of contract. The Family/Seniors plaintiff seeks, *inter alia,* compensatory, exemplary and punitive damages, restitution, and an accounting.

35.    On April 25, 2006 and again on May 3, 2006, Plaintiffs timely notified Zurich of the Family/Seniors Lawsuit and requested that Zurich provide coverage under the Zurich Policy. Zurich has not formally responded to such notice.

**The California Court Decision**

36.    On July 18, 2006, the Court ruled from the bench that service of process on Nautic, Chisholm, Fleet Equity, Fleet Venture, Kennedy Plaza, and Hilinski in the Northridge Lawsuit and the Family/Seniors Lawsuit should be quashed. The Court noted specifically that the plaintiffs in the Northridge Lawsuit and the Family/Seniors Lawsuit had "failed to meet the burden of proof of showing events [of] specific tortious conduct by Mr. Hilinksi having an impact on the California plaintiffs." The Court reasoned that it had not been "shown by competent evidence" that Hilinski was a "perpetrator of the harm that appears to manifestly have been done to Meridian."

37.    On August 18, 2006, the Court entered an order in the Northridge Lawsuit and the Family/Seniors Lawsuit quashing service of process on the plaintiffs. The plaintiff in the Northridge Lawsuit has appealed that ruling.

8

38.     Plaintiffs incurred substantial defense fees and costs prior to the dismissal, and they expect to continue to incur defense fees and costs in defending the Northridge Lawsuit and the Family/Seniors Lawsuit.  To date, Plaintiffs have incurred approximately $270,000 in defense fees and costs in connection with the Northridge Lawsuit and the Family/Seniors Lawsuit.

**Zurich's Refusal to Provide Settlement Authority**

39.     On June 1, 2006, Plaintiffs and Zurich, among others, held a meeting to discuss the status of the Meridian Lawsuit, the Northridge Lawsuit and the Family/Seniors Lawsuit, and the possibility of settling the underlying litigation.  At that meeting, Plaintiffs specifically requested settlement authority from Zurich.

40.     Thereafter, Plaintiffs have repeatedly requested from Zurich authority to settle the Meridian Lawsuit, the Northridge Lawsuit and the Family/Seniors Lawsuit.

41.     On August 18, 2006, Zurich was informed of a specific opportunity to settle the Meridian Lawsuit at a time that was advantageous to both Plaintiffs and Zurich.

42.     Zurich failed to respond to that request for settlement authority for over three weeks.  Ultimately, Zurich refused to pay anything near the full settlement amount demanded by the plaintiff in the Meridian Lawsuit.

43.     On September 6, 2006, Plaintiffs and Zurich participated in a conference call during which Plaintiffs expected to receive settlement authority from Zurich.  On that conference call, representatives of Zurich stated that they needed an additional week in order to obtain the necessary settlement authority.  Another conference call was scheduled with Zurich for the morning of September 13, 2006 to discuss such settlement authority.

44.    Despite the fact that the September 13 conference call had been scheduled for over a week and was, in fact, adjourned by one hour at Zurich's request, Zurich's representatives refused to participate in that call.

45.    Plaintiffs have an opportunity to settle the Meridian Lawsuit for a sum that is well within the limits of the Zurich Policy.  Zurich has been aware of that settlement opportunity since at least August 18, 2006.  Zurich continues to refuse to indemnify Plaintiffs for the amount needed to settle the underlying litigation.

**Zurich's Failure to Pay Defense Costs**

46.    On June 2, 2006, August 11, 2006, September 1, 2006 and September 11, 2006, Plaintiffs sent to Zurich legal bills setting forth defense fees and costs that had been incurred in defending against the Meridian Lawsuit, the Northridge Lawsuit and the Family/Seniors Lawsuit.  No part of these bills has yet been paid by Zurich.

47.    During the September 6, 2006 conference call, Plaintiffs expressed to Zurich their displeasure with the fact that Zurich had not reimbursed Plaintiffs for the well over $1.2 million in defense costs that Plaintiffs had spent defending the Meridian Lawsuit, the Northridge Lawsuit and the Family/Seniors Lawsuit, which is over and above the $250,000 Policy retention amount.

48.    On the September 6, 2006 call, Zurich promised Plaintiffs that it would make a prompt good faith payment to reimburse Plaintiffs for the defense costs expended.  To date, Zurich has still not reimbursed Plaintiffs for any of the defense costs incurred, despite acknowledging its duty to defend Zurich's failure to pay these defenses costs is contrary to the requirements of the Zurich Policy which require that defense costs be paid on a current basis.

49.    Significantly, although Zurich's counsel instructed Plaintiffs to direct all such bills to their law firm for processing, the bills sent to Zurich's counsel on June 2, 2006 were not even transmitted to Zurich for almost three months.

50.    Zurich has violated its obligation under the Zurich Policy to reimburse defense costs on a current basis.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

51.    The preceding allegations in paragraphs 1 through 50 are repeated and incorporated by reference herein.

52.    The Zurich Policy constitutes a valid and enforceable contract.

53.    All conditions precedent to Zurich's duty to defend claims asserted against Plaintiffs have been satisfied, waived or are otherwise inapplicable.

54.    Plaintiffs have performed their obligations under the Zurich Policy.

55.    Pursuant to the Zurich Policy, Plaintiffs timely notified Zurich of the Meridian Lawsuit, the Northridge Lawsuit and the Family/Seniors Lawsuit, and requested that Zurich provide coverage.  In response, Zurich acknowledged its duty to  defense and to pay defense costs on a current basis.

56.    Despite Plaintiffs' repeated requests for reimbursement, Zurich has not reimbursed Plaintiffs any part of the over $1.2 million incurred by Plaintiffs for defense fees and costs in defending against the Meridian Lawsuit, the Northridge Lawsuit and the Family/Seniors Lawsuit.

57.    Zurich's breach of the Zurich Policy has had the direct and proximate result of depriving Plaintiffs of the benefits of their liability insurance coverage under the Zurich

11

Policy, for which Plaintiffs paid substantial premiums. By depriving Plaintiffs of their right to defense fees and costs in defending against the Meridian Lawsuit, the Northridge Lawsuit and the Family/Seniors Lawsuit, Zurich has damaged Plaintiffs in the amount of at least $1.2 million, exclusive of ongoing legal fees and costs, interest and costs, by forcing Plaintiffs to pay for defense costs and fees in defending against these litigations.

## SECOND CLAIM FOR RELIEF

(Declaratory Judgment on Duty to Defend)

58.     The preceding allegations in paragraphs 1 through 57 are repeated and incorporated by reference herein.

59.     Pursuant to the Zurich Policy, Plaintiffs timely notified Zurich of the Meridian Lawsuit, the Northridge Lawsuit and the Family/Seniors Lawsuit, and requested that Zurich provide coverage under the Zurich Policy. In response, Zurich acknowledged its duty to defend and to pay defense costs on a current basis.

60.     Despite Plaintiffs' repeated requests for reimbursement, Zurich has not reimbursed Plaintiffs for any part of the over $1.2 million incurred by Plaintiffs for defense fees and costs in defending against the Meridian Lawsuit, the Northridge Lawsuit and the Family/Seniors Lawsuit.

61.     An actual controversy exists concerning Zurich's obligations under the Zurich Policy. Plaintiffs contend that Zurich is obligated to cover defense fees and costs incurred by Plaintiffs as a result of the claims asserted against them in the Meridian Lawsuit, the Northridge Lawsuit and the Family/Seniors Lawsuit.

62.     Unless Zurich is required promptly to reimburse Plaintiffs for the full defense fees and costs (subject to the Policy's retention amount) incurred in connection with the

Meridian Lawsuit, the Northridge Lawsuit and the Family/Seniors Lawsuit, Plaintiffs' ability to defend themselves against these litigations will be permanently impaired.

63.    A declaratory judgment is necessary in order to establish the respective rights and obligations of Plaintiffs and Zurich, and each of them, arising out of the Zurich Policy and/or the conduct of Zurich with respect to Plaintiffs' requests for defense fees and costs under the Zurich Policy.

64.    Consistent with 28 U.S.C. § 2201, the Court should thus declare the respective rights and obligations of the parties under the Zurich Policy and award Plaintiffs the full amount of their defense fees and costs incurred to date, after taking into account the retention amount.

**THIRD CLAIM FOR RELIEF**

(Declaratory Judgment on Duty to Indemnify)

65.    The allegations in paragraphs 1 through 64 above are repeated and incorporated by reference herein.

66.    An actual controversy exists concerning Zurich's obligations under the Zurich Policy. Plaintiffs contend that Zurich is obligated to cover any loss suffered by Plaintiffs as a result of the claims asserted against them in the Meridian Lawsuit, the Northridge Lawsuit and the Family/Seniors Lawsuit, including indemnifying Plaintiffs for the amount of any settlements of these lawsuits within the limits of the Policy.

67.    In particular, Plaintiffs have an opportunity to reach a settlement of the Meridian Lawsuit within the policy limits of the Zurich Policy. Unless Zurich is required promptly to provide Plaintiffs with full settlement authority to resolve the Meridian Lawsuit, the

Northridge Lawsuit and the Family/Seniors Lawsuit, plaintiffs' ability to do so will be permanently impaired.

68.     Moreover, Zurich's refusal, as articulated in its April 19, 2006 letter, to pay any settlement that may, in part, comprise return of any of the consideration received in the Meridian Merger violates the provision of the Zurich Policy which precludes Zurich from taking such a position until there is a final adjudication that Plaintiffs are not legally entitled to such consideration. To date, the only judicial determination suggests the opposite – *i.e.*, that Plaintiffs had no knowledge of the alleged fraud and thus they were fully entitled to the consideration they received.

69.     A declaratory judgment is necessary in order to establish the respective rights and obligations of Plaintiffs and Zurich, and each of them, arising out of the Zurich Policy and/or the conduct of Zurich with respect to Plaintiffs' requests for coverage under the Zurich Policy and in particular Plaintiffs' requests for settlement authority.

70.     Consistent with 28 U.S.C. § 2201, the Court should thus declare the respective rights and obligations of the parties under the Zurich Policy.

## FOURTH CLAIM FOR RELIEF

### (Bad Faith Refusal to Provide Coverage)

71.     The allegations in paragraphs 1 through 70 are repeated and incorporated by reference herein.

72.     On March 13, 2006 (with respect to the Northridge Lawsuit) and on April 19, 2006 (with respect to the Meridian lawsuit), Zurich acknowledged that it would provide a defense and coverage to Plaintiffs pursuant to the Zurich Policy.

14

73.    Despite Plaintiffs' repeated requests for reimbursement of defense costs and for settlement authority, and despite Zurich's acknowledgement that it would provide a defense and coverage to Plaintiffs, Zurich has refused to pay for the defense fees and costs borne by Plaintiffs in defending against the Meridian Lawsuit, the Northridge Lawsuit and the Family/Seniors Lawsuit and has unreasonably refused to provide settlement authority.

74.    Zurich's failure to honor its obligations under the Zurich Policy is without any reasonable justification and was taken in bad faith.

WHEREFORE, Plaintiffs demand judgment as follows:

1.    Damages in an amount of not less than $1.2 million, plus interest, for breach by Zurich of its obligations under the Zurich Policy to pay legal fees and costs incurred in connection with the Meridian Lawsuit, the Northridge Lawsuit and the Family/Seniors Lawsuit and to reimburse Plaintiffs for the legal fees and costs expended to date in defending the those actions.

2.    A declaration that Zurich is obligated under the Zurich Policy to pay legal defense fees and costs incurred by Plaintiffs in defending the Meridian Lawsuit, the Northridge Lawsuit and the Family/Seniors Lawsuit on a current basis and to indemnify Plaintiffs for any settlement of or judgment in these lawsuits within the policy limits of the Zurich Policy.

3.    Compensatory and punitive damages in an amount to be determined by the jury for Zurich's bad faith refusal to reimburse Plaintiffs for the costs expended, to date, defending the Meridian Lawsuit, the Northridge Lawsuit and the Family/Seniors Lawsuit and its refusal to provide settlement authority in connection with that litigation.

4.    The full costs of this action, including reasonable attorney's fees, costs and expenses incurred.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____

Alan J. Stone (#2677)
Jay N. Moffitt (#4742)
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200

Attorneys for Plaintiffs Nautic Partners L.L.C., Chisholm Partners IV, L.P., Fleet Equity Partners VI, L.P., Fleet Venture Resources, Inc., Kennedy Plaza Partners II, L.L.C., and Scott Hilinski

Of Counsel:

PATTERSON BELKNAP WEBB & TYLER LLP
Stephen P. Younger (SY 0120)
Niraj J. Parekh (NP 5903)
1133 Avenue of the Americas
New York, New York 10036
212-336-2000

Dated:  September 21, 2006

537254

16

Exhibit A

*REVISED*

# Private Equity Partnership Liability Insurance
## Declarations

**Ⓩ**

**ZURICH**

**Zurich American Insurance Company**

Policy No: EOC 3830398 03

Renewal No: EOC 3830398 02

Item 1.  **Parent Company:**    NAUTIC PARTNERS, LLC
50 KENNEDY PLAZA
PROVIDENCE, RHODE ISLAND  02903

Item 2.  **Policy Period:**

From: 06/30/2005        To: 06/30/20006
12:01 a.m. Local Time at the Principal Address stated in Item 1.

Item 3.  Limit of Liability:

$10,000,000 Aggregate for all **Loss**, combined, for the **Policy Period** (including **Defense Costs**).

Item 4.  Retention:
A.  Non-Indemnifiable **Loss**:     $0
B.  Indemnifiable **Loss**:         $250,000

Item 5.  Premium:        $189,500.00

Item 6.  Additional Insureds:     _____

_____

Item 7.  Extended Reporting Period:

A.  Additional Premium:    125% of annualized Policy Premium
B.  Period:                1 year

Item 8.  Prior and Pending Litigation Date:  _____

Item 9.  Endorsements attached at inception:     See Endorsement No. 1 – 12 as attached

THIS POLICY PROVIDES CLAIMS-MADE COVERAGE.  **CLAIMS MUST FIRST BE MADE AGAINST THE INSURED** DURING THE **POLICY PERIOD** OR THE EXTENDED REPORTING PERIOD, IF PURCHASED.

THE PAYMENT OF **DEFENSE COSTS** REDUCES THE LIMIT OF LIABILITY.

PLEASE READ THE ENTIRE POLICY CAREFULLY.

In witness whereof, the Insurer issuing this policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by the duly authorized representative of the Insurer.

ZURICH AMERICAN INSURANCE COMPANY

_Ronald Gof_
Authorized Representative

_11/29/05_
Date

_Thomas A. Bradley_
President

_[signature]_
Corporate Secretary

U-PEP-D-100-A CW  (4/01)
Page 1 of 1

# Fraud Warnings



**ZURICH**

AR    Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in any application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

CO    It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the insurance company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado division of insurance within the department of regulatory agencies.

DC    *It is a crime to provide false or misleading information to an Insurer for the purpose of defrauding the Insurer or any other person. Penalties include imprisonment and/or fine. In addition, an Insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant*

FL    Any person who knowingly and with intent to injure, defraud, or deceive any Insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

KY    ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME.

LA    *Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.*

ME    *It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the insurance company. Penalties may include imprisonment, fines or a denial of insurance benefits.*

NE    *No misrepresentations or warranty made by the Insured or on his behalf in the negotiation or application of this Policy or contract of insurance shall defeat or void the Policy or contract or effect the insurance company's obligation under the Policy or contract unless such misrepresentation or warranty:*

    *1.  Was material;*

    *2.  Was made knowingly with the intent to deceive;*

    *3.  Was relied and acted upon by the insurance company; and,*

    *4.  Deceived the insurance company to its injury*

    *The breach of a warranty or condition in any contract or policy of insurance shall not void the Policy or allow the insurance company to avoid liability unless such breach exists at the time of the loss and contributes to the loss.*

NJ    Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

NM    ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL AND CRIMINAL PENALTIES.

NY    ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION.

OH    An person who, with intent to defraud or knowing that he is facilitating a fraud against an Insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

OK    WARNING: Any person who knowingly, and with intent to injure, defraud or deceive any Insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

PA    Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such persons to criminal and civil penalties.

UT    For your protection, Utah law requires the following appear on this form:

Any person who knowingly presents false or fraudulent underwriting information, files or causes to be filed a false or fraudulent claim for disability compensation or medical benefits, or submits a false or fraudulent report of billing for health care fees or other professional services is guilty of a crime and may be subject to fines and confinement in state prison.

VA    *It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the insurance company. Penalties include imprisonment, fines and denial of insurance benefits.*

# Private Equity Partnership Liability Insurance



**ZURICH**

Various provisions in the Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered.

Words and phrases that appear in bold have special meaning. Refer to Section IV. Definitions.

In consideration of the payment of the premium by the **Insureds** and in reliance upon the statements by **Insureds** in the **Application**, which is made a part hereof, the company providing this insurance (herein called the Insurer) agrees with the **Insureds**, subject to the Declarations and the limitations, conditions, provisions and terms of this Policy (including any endorsements hereto), as follows:

## I. INSURING AGREEMENTS

### COVERAGE A:    DIRECTORS, OFFICERS, GENERAL PARTNERS AND OUTSIDE POSITION LIABILITY

1. The Insurer shall pay on behalf of the **Insured Persons** all **Loss** resulting from any **Claim** first made against them during the **Policy Period** or the Extended Reporting Period (if applicable) for a **Wrongful Act** occurring prior to the end of the **Policy Period**, including a **Wrongful Act** resulting from service in an **Outside Position** as described in Section IV.H.6. below.

2. The Insurer shall pay on behalf of the **Company** and any entity general partner of the **Company** all **Loss** which the **Company** or any entity general partner of the **Company** pays as indemnification to any of the **Insured Persons** resulting from any **Claim** first made against the **Insured Persons** during the **Policy Period** or the Extended Reporting Period (if applicable) for a **Wrongful Act** occurring prior to the end of the **Policy Period**, including a **Wrongful Act** resulting from service in an **Outside Position** as described in Section IV.H.6. below.

### COVERAGE B:    COMPANY LIABILITY

The Insurer shall:

1. pay on behalf of any **Private Company** all **Loss** resulting from any **Claim**, and

2. pay on behalf of any **Public Company** all **Loss** resulting from any **Professional Liability Claim**, **Securities Claim** or **Employment Practices Claim**,

first made against the **Company** during the **Policy Period** or the Extended Reporting Period (if applicable) for a **Wrongful Act** occurring prior to the end of the **Policy Period**.

## II. DEFENSE AND SETTLEMENT

It shall be the duty of the **Insureds** and not the duty of the Insurer to defend any **Claim**.

The **Insureds** agree not to settle or offer to settle any **Claim**, incur any **Defense Costs**, or otherwise assume any contractual obligation, or admit any liability with respect to any **Claim**, without the Insurer's written consent. The Insurer shall not be liable for any settlement, **Defense Costs**, assumed obligation, or admission to which it has not consented. The **Insureds** shall promptly send to the Insurer all settlement demands or offers received by the **Insureds** from the claimant(s).

The Insurer shall have the right and shall be given the opportunity to effectively associate with the **Insureds** with respect to any **Claim** submitted for coverage under this Policy.

The **Insureds** agree to provide the Insurer with all information, assistance and cooperation which the Insurer reasonably requests and agree that in the event of a **Claim** the **Insureds** will do nothing that shall prejudice the Insurer's position or its potential or actual rights of recovery. The Insurer may make any investigation it deems necessary.

The Insurer shall advance covered **Defense Costs**, on a current basis, prior to disposition of the respective **Claim**, provided that to the extent it is finally established that any such **Defense Costs** are not covered under this Policy, the **Insureds**, severally according to their interests, agree to repay the Insurer such **Defense Costs**.

The Insurer and the **Insureds** shall not unreasonably withhold any consent referenced in this section.

III. LIMIT OF LIABILITY AND RETENTIONS

A. More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest of the following times, regardless of whether such times are before or during the **Policy Period**:

   1. the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** is first made, or

   2. the time at which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to the paragraph below.

   No **Employment Practices Claim** otherwise covered under this Policy shall be excluded from coverage solely because such **Claim** is based upon, arises from, or relates to any fact, circumstance, situation or **Wrongful Act** underlying or alleged in any investigative or adjudicatory proceeding before the Equal Employment Opportunity Commission or similar federal, state or local governmental body (EEOC Proceeding) if the EEOC Proceeding (a) is brought by any person(s) who did not bring the covered **Claim**, and (b) is brought before inception of the **Policy Period**.

B. The amount shown in Item 3. of the Declarations shall be the maximum aggregate liability of the Insurer for all **Loss** resulting from all **Claims** first made during the **Policy Period**, whether covered under one or more Insuring Agreements.

C. The Insurer's liability with respect to **Loss** arising from each **Claim** shall apply only to that part of **Loss** which is excess of the applicable Retention set forth in Item 4. of the Declarations, and such Retention shall be borne by the **Insureds** uninsured and at their own risk.

D. The Retention for Non-Indemnifiable **Loss**, as set forth in Item 4.A. of the Declarations shall apply to **Loss** incurred by natural person **Insureds** for which the **Company** is neither permitted nor required by common or statutory law to indemnify, or for which the **Company** fails to indemnify by reason of its insolvency. The Retention for Indemnifiable **Loss**, as set forth in Item 4.B. of the Declarations, shall apply to all other **Loss**.

E. With respect to each **Loss** on account of **Securities Claims**, the Retention applies only to **Defense Costs**, not damages, judgments, settlements, or other **Loss**; provided, however, that if the **Securities Claim** is fully and finally resolved with prejudice with respect to the **Insureds** without any **Insured** becoming legally obligated to pay any monetary damages or settlement or judgment amounts on account of the **Securities Claim**, no Retention shall apply with respect to any **Loss** (including **Defense Costs**) on account of the **Securities Claim**.

F. Payments by the Insurer of any **Loss**, including without limitation **Defense Costs**, shall reduce the Limit of Liability.

IV. DEFINITIONS

For purposes of this Policy:

A. **Application** means:

   1. the application for this Policy or for any policy issued by the Insurer of which this Policy is a renewal, and;

   2. any attachments and materials submitted therewith, which shall be retained on file by the Insurer.

B. **Additional Insureds** means any entity listed or otherwise referred to in Item 6. of the Declarations or an entity listed or otherwise scheduled by endorsement to this Policy.

C. **Claim(s)** means:

   1. a written demand for monetary, non-monetary or injunctive relief;

   2. a civil proceeding commenced by the service of a complaint or similar proceeding;

   3. a criminal proceeding commenced by the return of an indictment;

   4. a formal or informal (a) administrative or regulatory proceeding, or (b) civil, criminal, administrative or regulatory investigation (including without limitation any proceeding before, or investigation by, the Equal Employment Opportunity Commission, the Securities and Exchange Commission or a Grand Jury); or

   5. an arbitration proceeding;

   against any of the **Insured Persons** or, with respect to Coverage B against any **Company**, for a **Wrongful Act**, including any appeal therefrom.

D.  **Company** means:

    1.  the **Parent Company**;

    2.  any **Portfolio Company**;

    3.  any **Subsidiary**; and

    4.  any investment fund while directly or indirectly owned or controlled by the **Parent Company**, whether created before or during the **Policy Period**;

including any such entity as a debtor in possession under United States bankruptcy law or an equivalent status under the law of any other country.

E.  **Defense Costs** means that part of **Loss** consisting of reasonable and necessary costs, charges, fees (including but not limited to attorney's fees and experts' fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, officers, or employees of the **Company**) incurred in defending or investigating **Claims** and the premium for appeal, attachment, or similar bonds; provided, however, the Insurer has no obligation to apply for or to furnish any such bond.

F.  **Employment Practices Claim** means a **Claim** which, in whole or in part, is by or on behalf of any past, present or prospective employee of the **Company** for any actual, alleged or constructive wrongful dismissal, discharge, or termination of employment; employment-related misrepresentations or omissions; violation of any federal, state or local statute, regulation, ordinance, common law, or public policy concerning employment or discrimination in employment; sexual or other illegal workplace harassment in the workplace (including without limitation offensive, intimidating, coercive or unwelcome conduct, advances, contact, or communications); wrongful deprivation of career opportunity, employment or promotion, including without limitation failure to make partner or principal; failure to grant tenure; wrongful discipline or evaluation; failure to adopt adequate employment or workplace policies and procedures; wrongful demotion or adverse change in the terms, conditions or status of employment; illegal retaliation against employees; employment-related libel, slander, defamation, or invasion of privacy; wrongful reference; employment-related wrongful infliction of emotional distress, mental anguish or humiliation; negligent hiring, supervision, or retention of employees; or other employment-related torts.

G.  **Executive Officer** means, with respect to a **Company**, its natural person general partners, managing partners, chairperson, chief executive officer, president, managing members, chief financial officer, in-house general counsel, and any other equivalent executives.

H.  **Insured Person(s)** means:

    1.  with respect to any **Company** that is a corporation, all natural persons who were, now are, or shall become duly elected or appointed directors, officers, advisory board members, principals, or operating executives of such **Company**;

    2.  with respect to any **Company** that is a partnership: (a) all natural persons or entities who were, now are, or shall become, general partners of such **Company**; (b) all natural persons who were, now are, or shall become, appointed or elected to a management position with such **Company** in accordance with such **Company's** partnership agreement; and (c) all duly elected or appointed directors, officers, and general partners of any entity that was, now is, or shall become, a general partner of such **Company**, but only with respect to such entity's activities as a general partner of the **Company**;

    3.  with respect to any **Company** that is a limited liability company, all persons who were, now are, or shall become, duly elected, appointed, or selected directors, officers, managing members, managers, or members of the Board of Managers of such **Company** or equivalent executive; and

    4.  with respect to any **Claim** involving a (a) **Private Company**, or (b) **Securities Claim**, **Professional Liability Claim** and **Employment Practices Claim** involving a **Public Company**, all natural persons who were, now are, or shall become, employees thereof, provided such persons shall not be considered **Insureds** or **Insured Persons** for purposes of Section V.A.4. below;

    5.  with respect to any **Company** of a form of outside the United States, the functional equivalent of any position described in Section IV.H.1. through IV.H.4. above; and

    6.  with respect to **Outside Position** coverage, any natural person described in Section IV.H.1. through IV.H.3. above in an **Outside Position**, provided such person is an **Insured Person** of the **Parent Company** or a **Subsidiary** that is not a **Portfolio Company**.

I.  **Insured(s) means:**

   1.  the **Company;** and

   2.  **Insured Person(s).**

J.  **Interrelated Wrongful Acts** means **Wrongful Acts** which have as a common nexus any fact, circumstance, situation, event, transaction, or series of causally connected facts, circumstances, situations, events, or transactions.

K.  **Loss** means the amount which the **Insureds** become legally obligated to pay on account of any covered **Claim,** including without limitation damages, judgments, pre-judgment and post-judgment interest, back pay and front pay, settlements and **Defense Costs,** but shall not include:

   1.  taxes or criminal or civil fines or penalties imposed by law;

   2.  the cost of any non-monetary relief including without limitation any costs associated with compliance with any injunctive relief of any kind or nature imposed by a judgment or settlement, and the cost to provide reasonable accommodations pursuant to the Americans with Disabilities Act, as amended;

   3.  any amount not indemnified by the **Company** for which the **Insureds** are absolved from payment by reason of any covenant, agreement or court order;

   4.  matters deemed uninsurable under the law pursuant to which this Policy shall be construed.

   **Loss** shall also include punitive, exemplary or multiple damages or liquidated damages awarded pursuant to the Age Discrimination in Employment Act or the Equal Pay Act, to the extent such damages are insurable under the law of any jurisdiction that has a substantial relationship to the **Insureds,** the **Insurer,** the **Claim** or the **Wrongful Acts** alleged therein.

L.  **Outside Entity means:**

   1.  any non-profit entity that is not a **Company;** and

   2.  any for-profit entity specifically included as an **Outside Entity** by endorsement to this Policy.

M.  **Outside Position** means the position of director, officer, trustee, general partner, managing member, or equivalent position in any **Outside Entity** held by any natural person as described in Section IV.H.6., provided and so long as such service is part of such person's regularly assigned duties with the **Company** or is at the specific written request or direction of the **Company.**

N.  **Parent Company** means the entity named in Item 1. of the Declarations.

O.  **Policy Period** means the period from the effective date and hour of this Policy to the Policy expiration date and hour as set forth in Item 2. of the Declarations, or its earlier termination date and hour, if any.

P.  **Pollutants** means any substance located anywhere in the world exhibiting any hazardous characteristics as defined by, or identified on, a list of hazardous substances issued by, the United States Environmental Protection Agency, or any state, county, municipality, or locality counterpart thereof. Such substances shall include, without limitation, solids, liquids, gaseous or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals, or waste materials. **Pollutants** shall also mean any other air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, or noise.

Q.  **Portfolio Company means:**

   any entity while the **Parent Company** directly or indirectly, individually or collectively (1) owns at least a 10% equity interest in such entity solely for investment purposes consistent with the **Parent Company's** standard investment guidelines, and (2) controls the operation or management of such entity by reason of a contract with or ownership of equity interest in such entity; provided the value of the **Parent Company's** direct and indirect investment in any such entity is less than 20% of the **Parent Company's** total equity as of the inception of the **Policy Period.**

R.  **Private Company** means any **Company** that is not a **Public Company** as defined under Section IV.U.

S.  **Professional Liability Claim** means a **Claim** which, in whole or in part, is based upon, arises from or relates to:

   1.  a **Wrongful Act** in the rendering or failure to render **Professional Services** for others for compensation; or

    2.  the **Parent Company** or any **Subsidiary** owning, controlling, managing, operating, investing in, or otherwise transacting business with a **Portfolio Company.**

T.  **Professional Services** means financial, economic, investment consulting, administrative, or management services, which are rendered by or on behalf of the **Company** for compensation.

U.  **Public Company** means any **Company** having equity or debt securities issued by the **Company:** (1) are listed or publicly traded on any securities exchange, NASDAQ or other organized securities quotation system; (2) are registered securities under the Securities Act of 1933, as amended; or (3) are directly or beneficially owned by 200 or more persons or entities.

V.  **Securities Claim** means a **Claim** which, in whole or in part: (1) alleges or investigates a possible violation of the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the securities laws of any state, or any rules or regulations promulgated thereunder; (2) alleges or investigates a possible **Wrongful Act** in connection with the purchase or sale of, or offer to purchase or sell, any securities issued by the **Company,** whether such purchase, sale or offer occurs with respect to the **Company's** issuance of securities or in the after-market; or (3) is brought by a securityholder of the **Company** in his, her, or its capacity as such, whether directly, as a class action or as a derivative action on behalf of the **Company.**

W.  **Subsidiary** means any entity in which, at any time during the <u>Policy</u> <u>Period</u> greater than 50% of the outstanding voting securities or voting rights representing the present right to vote for the election of or to select such entity's directors, general partners, managers or equivalent position are owned or controlled, directly or indirectly, individually or collectively, by the **Parent Company.**

X.  **Takeover means:**

    1.  the acquisition by any person or entity or group of persons or entities acting in concert of securities which result in ownership or voting control by such person(s) or entity(ies) of greater than 50% of the outstanding securities of the **Parent Company** representing the present right to vote for the election of directors;

    2.  the merger or consolidation of the **Parent Company** into another entity such that the **Parent Company** is not the surviving entity;

    3.  the acquisition of substantially all of the assets of the **Parent Company** by another entity; or

    4.  the appointment of a trustee (other than a debtor in possession), conservator, receiver, or administrator to manage the affairs of the **Parent Company;**

provided **Takeover** shall not include any direct or indirect reincorporation of the **Parent Company** in another jurisdiction.

Y.  **Wrongful Act** means any actual or alleged error, omission, misstatement, misleading statement, neglect, breach of duty, or negligent act (1) by any of the **Insured Persons** while acting in their capacity as such, and (2) solely with respect to Coverage B, by the **Company.**

## V.  EXCLUSIONS

A.  **Claims Against Any Insured**

The Insurer shall not be liable under this Policy to make any payment in connection with any **Claim** against any **Insured:**

    1.  for actual or alleged bodily injury, emotional distress, mental anguish, sickness, disease or death, or damage to or destruction of tangible property, including loss of use thereof; provided this exclusion shall not apply to emotional distress or mental anguish in an **Employment Practices Claim;**

    2.  for:

        a.  any **Wrongful Act** or any fact, circumstance or situation which has been the subject of any written notice given prior to the **Policy Period** under any other policy; or

        b.  any other **Wrongful Act** whenever occurring which, together with a **Wrongful Act** that has been the subject of such written notice, would constitute **Interrelated Wrongful Acts;**

    3.  for violation of the responsibilities, obligations, or duties imposed by the Employee Retirement Income Security Act of 1974 as amended (ERISA) or any regulations promulgated thereunder, upon fiduciaries of any pension, profit sharing, health and welfare or other employee benefit plan or trust established or maintained for the purpose of providing benefits to employees of the **Company;** however, this exclusion shall not apply to any **Claim** for an actual or alleged violation of section 510 of ERISA;

4.    by, on behalf of, or at the direction of any of the Insureds, in any capacity, except where such Claim is:

   a.    brought derivatively by a security holder of the Company who, when such Claim is first made, is acting independently of all of the Insureds;

   b.    an Employment Practices Claim;

   c.    brought by Insured Persons for contribution or indemnity, if the Claim directly results from another Claim covered under this Policy;

   d.    brought for the benefit of the bankruptcy estate of any Company, by any representative thereof, or brought by or on behalf of a bankruptcy or insolvency trustee, examiner, or receiver for any Company, or any assignee of such trustee, examiner or receiver;

   e.    brought by or on behalf of any Subsidiary or Portfolio Company after the date such entity ceased being a Subsidiary or Portfolio Company as defined in Section IV. above, if the Claim is brought without the participation or assistance of any Insured Person of the Parent Company, or of any other Company; or

   f.    brought by any Insured Person of any Portfolio Company if the Claim is brought without the participation or assistance of any Insured Person of the Company other than such Portfolio Company;

5.    for any deliberately fraudulent act or omission or any Wrongful Act committed with actual knowledge of its wrongful nature or with intent to cause damage, if a final judgment or adjudication adverse to such Insured expressly establishes such a deliberately fraudulent act or omission or such a Wrongful Act; however, this exclusion shall not apply to Defense Costs incurred in connection with any such Claim;

6.    for any Insured gaining in fact any profit, remuneration, or pecuniary advantage to which such Insured was not legally entitled; however, this exclusion shall not apply to any Defense Costs incurred in connection with any such Claim;

7.    for services as directors, officers, general partners, employees or equivalent executive of any entity other than the Company; however, this exclusion shall not apply to coverage specifically granted herein for any Outside Position;

8.    for an accounting of profits in fact made from the purchase or sale by such Insured Person of securities of the Company within the meaning of Section 16(b) of the Securities Exchange Act of 1934 or amendments thereto, or similar provisions of any federal, state, or local statutory law or common law;

9.    for the payment by a Company of allegedly inadequate consideration in connection with such Company's purchase of securities issued by any Company; however, this exclusion shall not apply to (a) Coverage A, or (b) Defense Costs under Coverage B incurred in connection with such Claim;

10.    based upon, arising from, or relating to (a) the actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape, or disposal of Pollutants into or on real or personal property, water, or the atmosphere; or (b) any direction or request that any Insured test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize Pollutants, or any voluntary decision to do so; including but not limited to any Claim for financial loss to any Company, its security holders or its creditors based upon, arising from, or relating to the matters described in (a) or (b) of this exclusion; however, this exclusion shall not apply to any Employment Practice Claim for retaliation in connection with an Insured Person's actual or threatened disclosure of the matters described in (a) or (b) of this exclusion;

11.    based upon, arising from, or relating to any litigation pending, or order, decree or judgment entered for or against any Insured on or prior to the Prior and Pending Litigation Date set forth in Item 8. of the Declarations, or the same or any substantially similar fact, circumstance or situation underlying or alleged therein; or

12.    for Wrongful Acts of any Subsidiary or Portfolio Company or their Insured Persons occurring at a time when such entity was not a Subsidiary or Portfolio Company.

B.    Claims Against the Company

The Insurer shall not be liable under this Policy to make any payment of Loss incurred by the Company in connection with any Claim against the Company:

1.    for any actual or alleged violation of (a) any law governing workers' compensation, unemployment insurance, social security, disability, or similar law, (b) the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), (c) the Fair Labor Standards Act (except the Equal Pay Act), (d) the National Labor Relations Act, (e) the Occupational Safety

and Health Act of 1970 (OSHA), or (f) the Workers' Adjustment and Retraining Notification Act (WARN), or (g) any similar federal, state or local law; however, this exclusion shall not apply to any **Employment Practices Claim** based upon a claimant's exercise of a right pursuant to any such laws;

2.  for the insolvency or bankruptcy of any **Company**;

3.  for libel, slander, defamation, product or trade disparagement, violation of a person's right of privacy, false arrest, detention, imprisonment, wrongful entry, or eviction; however, this exclusion shall not apply to any **Employment Practices Claim**;

4.  based upon, arising from, or relating to any oral or written promise or guarantee of the future value of any investment product; however, this exclusion shall not apply to any promise or guarantee of past performance;

5.  for breach of any express oral or written contract or agreement; however, this exclusion shall not apply (a) to the extent the **Company** would have been liable in the absence of the contract or agreement, or (b) to any **Professional Liability Claim**;

6.  to the extent such **Loss** in an **Employment Practices Claim** constitutes:

    a.  compensation earned by the claimant for actual work performed in the course of employment to the extent such compensation is owed to the claimant pursuant to an oral or written express, implied or quasi contract or promissory estoppel, but not paid by the **Company**, including any unpaid salary, bonus, hourly pay, overtime pay, stock options or similar securities, severance pay, retirement benefits, vacation days or sick days; however, this exclusion shall not apply to any back pay, front pay, or damages otherwise owed to the claimant;

    b.  medical or insurance benefits to which the claimant allegedly was entitled or would have been entitled had the **Company** provided the claimant with a continuation or conversion of insurance;

    however, this exclusion shall not apply to **Defense Costs**.

C.  Severability

For the purpose of determining the applicability of any Exclusion set forth above:

1.  the **Wrongful Act** of any of the natural person **Insureds** shall not be imputed to any of the other natural person **Insureds**; and

2.  only the **Wrongful Act** of any **Executive Officer** shall be imputed to the **Company** or any entity **Insured Person**.

VI.  NOTICE

The **Insureds** shall, as a condition precedent to their rights under this Policy, give to the Insurer written notice of any **Claim** made against the **Insureds** as soon as practicable after the earlier of any **Executive Officer**, or the **Company's** risk manager, or in-house general counsel first learns of such **Claim**, but in no event later than sixty (60) days after expiration of the **Policy Period** or during the **Extended Reporting Period** (if applicable).

If during the **Policy Period** or the **Extended Reporting Period** (if applicable) the **Insureds** first become aware of a specific **Wrongful Act** which may reasonably give rise to a future **Claim** covered under this Policy and during such **Policy Period** or **Extended Reporting Period** (if applicable), shall give written notice to the Insurer of:

A.  the names of the potential claimants and a description of the specific **Wrongful Act** which forms the basis of their potential **Claim**;

B.  the identity of the specific **Insureds** allegedly responsible for such specific **Wrongful Act**;

C.  the consequences which have resulted or may result from such specific **Wrongful Act**;

D.  the nature of the potential monetary damages or non-monetary relief which may be sought in consequence of such specific **Wrongful Act**; and

E.  the circumstances by which the **Insureds** first became aware of such specific **Wrongful Act**;

then any **Claim** which arises out of such **Wrongful Act** shall be deemed to have been first made during the **Policy Period** in which such written notice was received by the Insurer. No coverage is provided for fees and expenses incurred prior to the time such notice results in a **Claim**.

All notices under any provision of this Policy shall be in writing and given by prepaid express courier, certified mail, or fax properly addressed to the appropriate party. Notice to the **Insureds** may be given to the **Parent Company** at the address as shown in Item 1. of the Declarations. Notice to the Insurer of any **Claim** or **Wrongful Act** shall be given to the Insurer at the following address:

Diversified Financial Institutions Claims
Attn: Claim Director
Zurich U.S. – Specialties
P.O. Box 307010
Jamaica, New York 10006

All other notices to the Insurer under this Policy shall be given to the following address:

Diversified Financial Institutions
One Liberty Plaza, 30th Floor
New York, New York 10006

Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or one day following the date such notice is sent, whichever is earlier.

VII. EXTENDED REPORTING PERIOD

If either the Insurer or the **Parent Company** fails or refuses to renew this Policy, or if the **Parent Company** cancels this Policy, then any **Insured** shall have the right, upon payment of an additional premium calculated at the percent set forth in Item 7.A. of the Declarations of the annualized Policy premium as set forth in Item 5. of the Declarations, to extend the period of time, as set forth in Item 7.B. of the Declarations, during which any **Claim** made after cancellation or expiration of the **Policy Period** and during the Extended Reporting Period shall be considered made during the **Policy Period**, provided such **Claim** arises out of a **Wrongful Act** that takes place prior to the effective date of cancellation or the expiration of the **Policy Period**. The right to this Extended Reporting Period coverage shall lapse unless written notice of an election to purchase this coverage, and the additional premium due, is given by the **Parent Company** and received by the Insurer within thirty (30) days following the cancellation or nonrenewal of the Policy. If such written notice is not mailed to the Insurer within thirty (30) days or the premium is not paid when due, then the **Insured** shall not at a later date be entitled to purchase an Extended Reporting Period.

The election of the Extended Reporting Period shall not in any way reinstate or increase the Limit of Liability in Item 3. of the Declarations. The Limit of Liability applicable to the Extended Reporting Period shall be the Limit of Liability remaining under this Policy for the **Policy Period**.

If the Insureds invoke this Extended Reporting Period in accordance with the above, neither the Insurer nor the Insureds shall be entitled to cancel the Extended Reporting Period. The entire additional premium for the Extended Reporting Period shall be deemed fully earned and non-refundable as of the inception date of the Extended Reporting Period.

VIII. ESTATES, LEGAL REPRESENTATIVES AND SPOUSES

If a **Claim** against a natural person **Insured** includes a **Claim** against such **Insured's** lawful spouse solely by reason of (A) such spouse's legal status as a spouse of the **Insured**, or (B) such spouse's ownership interest in property which the claimant seeks as recovery for alleged **Wrongful Acts** of the **Insured**, all loss which such spouse becomes legally obligated to pay by reason of such **Claim** shall be treated for purposes of this Policy as **Loss** which the **Insured** becomes legally obligated to pay on account of the **Claims** made against the **Insured**. All terms and conditions of this Policy, including without limitation the Retention amount, applicable to **Loss** incurred by such **Insured** in the **Claim** shall also apply to such spousal loss. This coverage extension does not apply to the extent the **Claim** alleges any wrongful act or omission by the **Insured's** spouse.

This Policy shall afford coverage for **Claims** for the **Wrongful Acts** of any natural person **Insured** that are made against the estates, heirs, legal representatives, or assigns of such **Insured** who is deceased, incompetent, insolvent, or bankrupt to the extent that in the absence of such death, incompetence, insolvency, or bankruptcy, such **Claim** would have been covered by this Policy.

IX. CONDITIONS

A. Other Insurance and Indemnification

1. If any **Loss** is insured under any other valid and collectible policy, this Policy shall apply only to the extent the amount otherwise covered under this Policy exceeds the amount paid under such other insurance whether such other insurance isstated to be primary, contributory, excess, contingent, or otherwise, unless such other insurance is written only as specific excess insurance over this Policy. Without limiting the foregoing, this Policy shall be specifically excess any similar insurance maintained by a **Portfolio Company** to the extent any amount is covered under both this Policy and such other similar insurance, whether such other similar insurance is stated to be primary, contributory, excess, contingent, or otherwise.

2. Coverage under this Policy for any **Claim** against **Insured Persons** in an **Outside Position** shall be specifically excess of any indemnification payment from any valid and collectible insurance provided by the **Outside Entity** with respect to such **Claim**. Payment by the Insurer or any affiliate of the Insurer under another policy as a result of a **Claim** against an **Insured Person** in an **Outside Position** shall reduce, by the amount of such payment, the Insurer's Limit of Liability under this Policy with respect to such **Claim**.

B. Policy Termination

This Policy shall terminate:

1. upon expiration of the **Policy Period** as set forth in Item 2. of the Declarations; or

2. the effective date of termination specified in written prior notice by the **Parent Company** to the Insurer; or

3. 10 (ten) days after receipt by the **Parent Company** of a written notice of termination from the Insurer for failure to pay a premium when due.

The Insurer shall refund the unearned premium computed at customary short rates if the **Parent Company** terminates this Policy.

Payment or tender of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of termination.

C. Change in Exposure

1. In the event of a **Takeover** of the **Parent Company**, coverage under this Policy shall continue until this Policy is otherwise terminated, but only with respect to **Claims** for **Wrongful Acts** occurring prior to the effective date of the **Takeover**, unless the Insurer is notified in writing of the **Takeover** prior to the **Takeover** effective date, and agrees in writing to provide coverage for **Wrongful Acts** occurring on or after such effective date, and the **Parent Company** accepts any special terms, conditions, exclusions, or additional premium charge required by the Insurer.

2. If an entity ceases to be a **Subsidiary** or **Portfolio Company** before, during, or after the inception date of the **Policy Period**, coverage with respect to such entity and its **Insured Persons** shall continue until termination of the **Policy Period**, but only with respect to **Claims** for **Wrongful Acts** occurring before the date such entity ceased to be a **Subsidiary** or **Portfolio Company**.

3. If during the **Policy Period** the **Parent Company** directly or indirectly creates, acquires, or invests in an entity which as a result of such creation, acquisition, or investment becomes a **Portfolio Company**, the **Parent Company** shall give written notice with full particulars of such creation, acquisition, or investment to the Insurer as soon as practicable but in no event later than ninety (90) days thereafter.

D. Company Authorization Clause

By acceptance of this Policy the **Insureds** agree that the **Parent Company** will act on their behalf with respect to the giving of all notices to the Insurer, the receiving of notices from the Insurer, the agreement to and acceptance of endorsements, the payment of the premium, and the receipt of any return premium.

E. Assistance, Cooperation and Subrogation

The **Insureds** agree to provide the Insurer with such information, assistance, and cooperation as the Insurer or its counsel may reasonably request, and agree that in the event of a **Claim**, the **Insureds** will do nothing that shall prejudice the Insurer's position or its potential or actual rights of recovery.

In the event of any payments under this Policy, the Insurer shall be subrogated to the **Insureds'** rights of recovery against any person or entity. The Insureds shall execute all papers required and shall do everything that may be reasonably necessary to secure and preserve such rights including the execution of such documents as are necessary to enable the Insurer effectively to bring suit in their name, and shall provide all other assistance and cooperation which the Insurer may reasonably require.

Any amounts recovered after payment hereunder, through subrogation or otherwise, shall be apportioned in the following order:

1. first, to any interest (including the **Insured**) who has paid any amount in excess of the Limit of Liability provided under this Policy;

2. next, to the Insurer; and

3. then to any interest (including the **Insured**) as are entitled to claim the remainder, if any.

The expenses of all recovery proceedings shall be apportioned among the recipients of the recovery in the ratio of their respective recoveries.

F.   Assignments and Action Against the Insurer

No action shall lie against the Insurer unless, as a condition precedent thereto, the **Insureds** shall have fully complied with all of the terms and conditions of this Policy, nor until the amount of the **Insureds'** obligation to pay shall have been determined by judgment, by arbitration, or successful mediation, or by written agreement. Nothing contained herein shall give any person or entity any right to join the Insurer as a party to any **Claim** against the **Insureds** to determine their liability, nor shall the Insurer be impleaded by the **Insureds** or its legal representative in any **Claim**. Assignment of interest under this Policy shall not bind the Insurer unless its consent is endorsed hereon.

G.   Entire Agreement

By acceptance of this Policy, the **Insureds** agree that this Policy embodies all agreements existing between them and the Insurer or any of its agents relating to this insurance. Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer shall not effect a waiver or a change in any part of this Policy or estop the Insurer from asserting any right under the terms of this Policy, nor shall the terms be waived or changed except by written endorsement issued by the Insurer to form a part of this Policy.

H.   Territory

This Policy extends to **Claims** made anywhere in the world.

I.   Application Severability

In granting coverage under this Policy, the Insurer has relied upon the statements and representations in the **Application**. The **Insureds** represent that all such statements and representations are true and shall be deemed material to the acceptance of the risk or hazard assumed by the Insurer under this Policy.

The **Insureds** agree that in the event that any such statements and representations are untrue, this Policy shall not afford any coverage with respect to any of the following **Insureds**:

1. any natural person **Insured** who knew as of the effective date of such coverage the facts that were not truthfully disclosed in the **Application**;

2. any entity **Insured** to the extent it indemnifies any natural person **Insured** referenced in 1., above; and

3. any entity **Insured**, if any **Executive Officer** thereof knew as of the effective date of such coverage the facts that were not truthfully disclosed in the **Application**.

J.   Valuation and Currency

All premiums, Limit of Liability, Retention, Loss, and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated, or another element of **Loss** under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States of America dollars at the rate of exchange published in The Wall Street Journal on the date the final judgment is entered, the amount of the settlement is agreed upon, or the other element of **Loss** is due, respectively.

K.  Bankruptcy

If a liquidation or reorganization proceeding is commenced by or against the **Company** pursuant to the United States Bankruptcy Code, as amended, or any similar state or local law, the **Insureds** hereby (1) waive and release any automatic stay or injunction which may apply in such proceeding to this Policy or its proceeds under such Bankruptcy Code or law, and (2) agree not to oppose or object to any efforts by the Insurer or any **Insured** to obtain relief from any such stay or injunction.

L.  Payment Priority

If the amount of any covered **Loss**, which is otherwise due and owing by the Insurer under this Policy, exceeds the then remaining Limit of Liability applicable to such **Loss**, the Insurer shall pay such **Loss** (subject to such Limit of Liability) in the following priority:

1.  First, the Insurer shall pay any such **Loss**, which is incurred by natural person **Insureds** and which is covered under Insuring Agreement I.A.1;

2.  Second, only if and to the extent the payment under Paragraph 1. above does not exhaust the applicable Limit of Liability, the Insurer shall pay any such remaining **Loss** covered under this Policy.

Subject to the foregoing paragraph, the Insurer shall, upon receipt of a written request from the **Parent Company**, delay any payment of covered **Loss** otherwise due and owing under Insuring Agreement A.(2) or Insuring Agreement B., or solely with respect to **Insured Persons**, under Insuring Agreement I.A.1, until such time as the **Parent Company** designates, provided the Insurer's liability with respect to any such delayed **Loss** payment shall not be increased, and shall not include any interest, on account of such delay.

M.  Arbitration

Only if requested by the **Insureds**, the Insurer shall submit any dispute, controversy, or **Claim** arising out of or relating to this Policy or the breach, termination, or invalidity thereof, to final and binding arbitration pursuant to such rules and procedures as the parties may agree. If the parties cannot so agree, the American Arbitration Association, in accordance with its then prevailing commercial arbitration rules, shall administer the arbitration. The arbitration panel shall consist of one arbitrator selected by the **Insureds**, one arbitrator selected by the Insurer, and a third independent arbitrator selected by the first two arbitrators. In any such arbitration, each party will bear its own legal fees and expenses.

# Important Notice


**ZURICH**

### Service of Suit

In the event of failure of the Insurer to pay any amount claimed to be due hereunder, the Insurer, at the request of the Insureds, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this condition constitutes or should be understood to constitute a waiver of the Insurer's rights to commence an action in any court of competent jurisdiction in the United States to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or any state in the United States. It is further agreed that service of process in such suit may be made upon General Counsel, Law Department, Zurich American Insurance Company, 1400 American Lane, Schaumburg, Illinois 60196-1056, or his or her representative, and that in any suit instituted against the Insurer upon this policy, the Insurer will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provisions therefore, the Insurer hereby designates the Superintendent, Commissioner, or Director of Insurance, or other officer specified for that purpose in the statute, or his or her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insureds or any beneficiary hereunder arising out of this policy of insurance and hereby designates the above named General Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

### In Witness Clause

In return for the payment of premium, and subject to the terms of the policy, the Insurer agrees with the Insureds to provide insurance as stated in this policy. This policy shall not be valid unless countersigned by the duly authorized Representative of the Insurer.

In Witness Whereof, this Insurer has executed and attested these presents, and where required by law, has caused this policy to be countersigned by its duly authorized Representative.


*Thomas A. Bradley*

President


Corporate Secretary


U-PEP-202-A CW (12/03)
Page 1 of 1

**Zurich American Insurance Company**

Private Equity Partnership Liability
Insurance

NUCLEAR ENERGY LIABILITY EXCLUSION

| Parent Company: | Policy Number: | Effective Date: | Endorsement Number: 1 |
|---|---|---|---|
| NAUTIC PARTNERS, LLC | EOC 3830398 03 | 06/30/2005 | |

**This endorsement changes the Policy. Please read it carefully.**

It is agreed that this Policy shall not apply to any **Claim** based on, arising out of, or in any way attributable to:

1.  under any liability coverage, to Personal Injury or **Property Damage**;

    a.  with respect to which any **Insured** under the policy is also an **Insured** under a nuclear energy liability policy issued by the Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an **Insured** under any such policy but for its termination upon exhaustion of its limit of liability; or

    b.  resulting from the **Hazardous Properties of Nuclear Material** and with respect to which (i) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (ii) the **Insured** is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, with any person or organization.

2.  under any medical payments coverage, to expenses incurred with respect to Personal Injury resulting from the **Hazardous Properties of Nuclear Material** and arising out of the operation of a Nuclear Facility by any person or organization.

3.  under any liability coverage, to Personal Injury or **Property Damage** resulting from the **Hazardous Properties of Nuclear Material**, if:

    a.  the **Nuclear Material** (i) is at any **Nuclear Facility** owned by, or operated by or on behalf of, an **Insured** or (ii) has been discharged or dispersed therefrom;

    b.  the **Nuclear Material** is contained in **Spent Fuel** or **Waste** at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an **Insured**; or

    c.  the **Personal Injury** or **Property Damage** arises out of the furnishing by an **Insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **Nuclear Facility**, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to Property Damage to such a Nuclear Facility and any property thereat.

Page 1 of 2

4.  As used in this exclusion:

a.  **Hazardous Properties** include radioactive, toxic or explosive properties;

b.  **Nuclear Material** means **Source Material, Special Nuclear Material,** and **By-Product Material;**

c.  **Source Material, Special Nuclear Material,** and **By-Product Material** have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

d.  **Spent Fuel** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a **Nuclear Reactor;**

e.  **Waste** means any waste material (a) containing **By-Product Material** other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its **Source Material** content, and (b) resulting from the operation by any person or organization of any **Nuclear Facility** included under paragraphs (1) and (2) of the definition of **Nuclear Facility.**

f.  **Nuclear Facility** means:

    i)  any **Nuclear Reactor;**

    ii)  any equipment or device designed or used for (i) separating the isotopes of uranium or plutonium, (ii) processing or utilizing **Spent Fuel,** or (iii) handling, processing or packaging **Waste;**

    iii)  any equipment or device used for the processing, fabricating or alloying of **Special Nuclear Material** if at any time the total amount of such material in the custody of the **Insured** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

    iv)  any structure, basin, excavation, premises or place prepared or used for the storage or disposal of **Waste;**

    and includes the site on which any of the foregoing is located, all operations conducted on such site and premises used for such operations;

g.  **Nuclear Reactor** means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

h.  **Property Damage** includes all forms of radioactive contamination of property.

All other terms and conditions remain unchanged.

_Ronald R_____          _11/29/05_
Authorized Representative                 Date

All headings herein are for convenience only. This policy shall be interpreted and applied without regard to such headings.

Zurich American Insurance Company

Private Equity Partnership Liability
Insurance

AMENDED EXCLUSIONS

| Parent Company: | Policy Number: | Effective Date: | Endorsement Number: 2 |
|---|---|---|---|
| NAUTIC PARTNERS, LLC | EOC 3830398 02 | 06/30/2005 | |

**This endorsement changes the Policy. Please read it carefully.**

Section V. A. 2 is hereby deleted in its entirety and replaced with the following:

2.  Zurich shall not be liable for any claim against an Insured Person for any wrongful act or any fact, circumstance or situation which has been the subject of any written notice under any other policy for which this is a <u>renewal or replacement</u>.

Section V.A.4. is hereby deleted in its entirety and replaced with the following:

4.  by, on behalf of, or at the direction of any of the Insureds, in any capacity, except where such Claim is:

a.  brought derivatively by a security holder of the Company who, when such Claim is first made, is acting independently of all of the Insureds;

b.  an Employment Practices Claim;

c.  brought by Insured Persons for contribution or indemnity, if the Claim directly results from another Claim covered under this Policy;

d.  brought for the benefit of the bankruptcy estate of any Company, by any representative thereof, or brought by or on behalf of a bankruptcy or insolvency trustee, examiner, or receiver for any Company, or any assignee of such trustee, examiner or receiver;

e.  brought by or on behalf of any Subsidiary after the date such entity ceased being a Subsidiary as defined in Section IV. above, if the Claim is brought without the participation or assistance of any Insured Person of the Parent Company, or of any other Company;

f.  suits brought outside the United States; or

g.  brought by the Advisory Board or Advisory Board Member not deemed to be an Executive.

Section V.A.6. is hereby deleted in its entirety and replaced with the following:

for any Insured gaining any profit, remuneration, or pecuniary advantage to which such Insured which by a judgment or final adjudication or an alternative dispute resolution proceeding adverse to the Insured establishes the Insured was not legally entitled; however, this exclusion shall not apply to any Defense Costs incurred in connection with any such Claim;

Section V.A.8 is hereby deleted in its entirety.

Section V.A.10 is hereby amended to include the following:

... "Coverage for non-indemnifiable insured person for pollution claim"

Section V.A.12. is hereby deleted in its entirety and replaced with the following:

12. for Wrongful Acts of any Subsidiary or its Insured Persons occurring at a time when such entity was not a Subsidiary.

Section V.B.2 is hereby deleted in its entirety.

Section V.B.5 is hereby deleted in its entirety and replaced with the following:

5.  for intentional breach of any written contract or agreement; however, this exclusion shall not apply to: (a) liability for **Loss** which would have attached in the absence of such contract or agreement, or (b) any actual or alleged breach of contract, describing or calling for **Professional Services,** or involving or relating to any **Company** or **Portfolio Company,** or involving or relating to any contract or agreement defined herein.

All other terms and conditions remain unchanged.

_____
Authorized Representative

_____
Date

Page 2 of 2

**Zurich American Insurance Company**

Private Equity Partnership Liability
Insurance

AMENDED DEFINITIONS

| Parent Company:<br><br>NAUTIC PARTNERS, LLC | Policy Number:<br><br>EOC 3830398 03 | Effective Date:<br><br>06/30/2005 | Endorsement Number: 3 |
|---|---|---|---|

**This endorsement changes the Policy. Please read it carefully.**

It is hereby agreed that:

Section IV.B. is hereby deleted in its entirety.

Section IV.C. is hereby deleted in its entirety and replaced with the following:

C.  **Claim(s)** means:

1.  a written demand for monetary, non-monetary or injunctive relief;

2.  a civil proceeding commenced by the service of a complaint or similar proceeding;

3.  a criminal proceeding commenced by the return of an indictment;

4.  a formal or informal (a) administrative or regulatory proceeding, or (b) civil, criminal, administrative or regulatory investigation (including without limitation any proceeding before, or investigation by, the Equal Employment Opportunity Commission, the Securities and Exchange Commission or a Grand Jury); or

5.  an arbitration proceeding; **Employment Practices Claims; Securities Claims; or Professional Liability Claims.**

against any of the **Insured Persons** or, with respect to Coverage B against any **Company**, for a **Wrongful Act**, including any appeal therefrom.

Section IV.D. is hereby deleted in its entirety and replaced with the following:

D.  **Company** means:
1.  the **Parent Company**;
2.  any **Insured Organization**;
3.  any **Subsidiary**;
4.  any **Newly Created Investment Fund.**
5.  Each successor entity to a **Company** listed above
6.  Acquisition Vehicles
7.  Weybosset, Inc.

including any such entity as a debtor in possession under United States bankruptcy law or an equivalent status under the law of any other country.

Section IV.F. is hereby deleted in its entirety and replaced with the following:

F.  **Employment Practices Claim** means a **Claim** which, in whole or in part, is by or on behalf of any past, present or prospective employee of the **Company** or **Portfolio Company** for any actual, alleged or constructive wrongful dismissal, discharge, or termination of employment; employment-related misrepresentations or omissions; violation of any federal, state or local statute, regulation, ordinance, common law, or public policy concerning employment or discrimination in employment; sexual or other illegal workplace harassment in the workplace (including without limitation offensive, intimidating, coercive or unwelcome conduct, advances, contact, or communications); wrongful deprivation of career opportunity, employment or promotion, including without limitation failure to make partner or principal; failure to grant

Page 1 of 5

tenure; wrongful discipline or evaluation; failure to adopt adequate employment or workplace policies and procedures; wrongful demotion or adverse change in the terms, conditions or status of employment; illegal retaliation against employees; employment-related libel, slander, defamation, or invasion of privacy; wrongful reference; employment-related wrongful infliction of emotional distress, mental anguish or humiliation; negligent hiring, supervision, or retention of employees; or retaliation and alleged breach of an implied employment contract and breach of covenant of good faith and fair dealings in the employment contract; other employment-related torts.

Section IV. H is amended to include:

7.    any natural person (non-employee) acting on behalf of Nautic under contract where indemnified by Nautic

Section IV.H. 1 is hereby deleted in its entirety and replaced with the following:

1.    with respect to any **Company** that is a corporation, all natural persons who were, now are, or shall become duly elected or appointed directors, officers, advisory board members, advisory committee members, internet advisory board members, principals, or operating executives of such **Company**;

however; with respect to any **Claim** involving any **Company**, all natural persons who were, now are, or shall become employees thereof, provided such persons shall not be considered **Insureds** or **Insured Persons** for purposes of this **Section**

Section IV.H. 2 is hereby deleted in its entirety and replaced with the following:

2.    with respect to any **Company** that is a partnership:  (a) all natural persons or entities who were, now are, or shall become, general partners of such **Company**; (b) all natural persons who were, now are, or shall become, appointed or elected to a management position within such **Company** in accordance with such **Company's** partnership agreement; (c) all natural persons who were, now are, or shall become, appointed or elected to an advisory committee or an internet advisory board in accordance with such **Company's** partnership agreement; and (d) all duly elected or appointed directors, officers, and general partners of any entity that was, now is, or shall become, a general partner of such **Company**, but only with respect to such entity's activities as a general partner of the **Company**.

however; with respect to any **Claim** involving any **Private Company**, all natural persons who were, now are, or shall become employees thereof, provided such persons shall not be considered **Insureds** or **Insured Persons** for purposes of  this **Section**

Section IV.H. 3 is hereby deleted in its entirety and replaced with the following:

with respect to any **Company** that is a limited liability company, all persons who were, now are, or shall become, duly elected, appointed, or selected directors, officers, managers, managing members, advisory committee members,  or members of the Board of Managers of such **Company** or equivalent executive.

however; with respect to any **Claim** involving any **Private Company**, all natural persons who were, now are, or shall become employees thereof, provided such persons shall not be considered **Insureds** or **Insured Persons** for purposes of  this **Section**

Section IV.H. 4 is hereby deleted in its entirety and replaced with the following:

with respect to any **Claim** involving any **Private Company**, all natural persons who were, now are, or shall become employees thereof, provided such persons shall not be considered **Insureds** or **Insured Persons** for purposes of Section V.A.4. below.

Section IV.H. 6 is hereby deleted in its entirety and replaced with the following:

with respect to **Outside Position** coverage, any natural person described in Section IV.H.1. through IV.H.3. above while serving in an **Outside Position**, and any natural person serving in an **Outside Position** at the request of any **Company**, provided that a natural person serving in an **Outside Position** on a **Public Company** is only an **Insured Person** with respect to that service if the **Parent Company** provides written notice to **Insurer** within 90 days of the person's assumption of that **Outside Position**.

Section IV.I. is deleted in its entirety and replaced with the following:
    **I. Insured(s) means:**
    1.  the Company; and
    2.  **Insured Person(s);** and
    3.  each family wealth planning entity that is organized as a trust, limited liability company or limited partnership, but only when affiliated with an **Insured Person** and only to the extent that such entity invests in an **Investment Fund** or other Insured Entity.

Section IV. K is amended to include:

    Punitive damages shall be covered hereunder to the fullest extent permitted by law. Where the "Insured" reasonably determines that punitive damages are insurable under the applicable law, the Insurer shall not challenge that interpretation of insurability.

Section IV.L. is hereby deleted in its entirety and replaced with the following:

    **L. Outside Entity means:**
    1.      any non-profit entity that is not a **Company;**
    2      any **Portfolio Company** or other for-profit entity that is not a **Company.**

Section IV. M is amended to include:

    any Nautic representative (non-employee) serving on an Outside Entity on behalf of NAUTIC

Section IV.Q. is hereby deleted in its entirety and replaced with the following:

    Q. **Portfolio Company** means any corporation, partnership, limited liability company or other type of organization in which any investment fund listed in Endorsement No. 5 or any **Newly Created Investment Fund** maintains or maintained an equity or debt investment and/or has or had the present right to select, appoint or elect one or more directors, general partners, managers or equivalent positions.

Section IV.S. is hereby deleted in its entirety and replaced with the following:

    S. **Professional Liability Claim** means a Claim which, in whole or in part, is based upon, arises from or relates to:

    1. a **Wrongful Act** in the rendering or failure to render **Professional Services** for others for compensation or other consideration; or
    2. the **Company** owning, controlling, managing, operating, investing in, or otherwise transacting business with a **Portfolio Company.**

Section IV.T. is hereby deleted in its entirety and replaced with the following:

    T. **Professional Services** means
    1. financial, economic, investment consulting, administrative, or management services, which are rendered by or on behalf of the **Company** for compensation or other consideration
    2. management and administrative services provided by Nautic Partners LLC to Fleet Boston pursuant to the terms of the Indemnification Agreement in the Fleet Boston Agreement dated June 30, 2000.

Section IV.U is hereby deleted in its entirety and replaced with the following:

    U. **Public Company** means any Company having equity or debt securities issued by the **Portfolio Company:** (1) are listed or publicly traded on any securities exchange, NASDAQ or other organized securities quotation system; (2) are registered securities under the Securities Act of 1933, as amended; or (3) are directly or beneficially owned by 500 or more persons or entities.

Section IV.V. is hereby deleted in its entirety and replaced with the following:

V. **Securities Claim** means a Claim which, in whole or in part: (1) alleges or investigates a possible violation of the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the securities laws of any state, or any rules or regulations promulgated thereunder; (2) alleges or investigates a possible **Wrongful Act** in connection with the purchase or sale of, or offer to purchase or sell, any securities issued by the **Company** or **Portfolio Company**, whether such purchase, sale or offer occurs with respect to the **Company's** or **Portfolio Company's** issuance of securities or in the after-market; or (3) is brought by a securityholder of the **Company** or **Portfolio Company** in his, her, or its capacity as such, whether directly, as a class action or as a derivative action on behalf of the **Company** or **Portfolio Company.**

Section IV.W is hereby deleted in its entirety and replaced with the following:

**Subsidiary** means any entity in which, at any time during the **Policy Period** greater than 50% of the outstanding voting securities or voting rights representing the present right to vote for the election of or to select such entity's directors, general partners, managers or equivalent position are owned or controlled, directly or indirectly, individually or collectively, by the **Parent Company** or any **Insured Organization. Subsidiary** shall not include any **Portfolio Company.**

Section IV.X. is hereby deleted in its entirely and replaced with the following:

X. **Takeover** means:

1. the acquisition by any person or entity or group of persons or entities, not affiliated with any **Company** and acting in concert, of securities which result in ownership or voting control by such person(s) or entity(ies) of greater than 50% of the outstanding securities of any **Company** representing the present right to vote for the election of directors;

2. the merger or consolidation of any **Company** into another entity not affiliated with any **Company** such that the **Company** is not the surviving entity;

3. the acquisition of substantially all the assets of any **Company** by another entity not affiliated with any **Company**;

provided **Takeover** shall not include any direct or indirect reincorporation of any **Company** in another jurisdiction.

Section IV.Y. is hereby deleted in its entirely and replaced with the following:

Y. **Wrongful Act** means any actual or alleged error, act, omission, misstatement, misleading statement, neglect, or breach of duty, committed or attempted (1) by any of the **Insured Persons** while acting in their capacity as such, and (2) solely with respect to Coverage B, by the **Company.**

Section IV. DEFINITIONS is hereby amended to add the following:

New Definitions.

The following definitions are added to the policy.

**Insured Organizations** means any entity listed under Policy Declaration 6 or Endorsement No. 4

**Newly Created Investment Fund** means any investment fund created by the **Company** during the **Policy Period. Newly Created Investment Funds** and their **Insured Persons** shall be **Insureds** under the Policy, but only with respect to **Wrongful Acts** taking place after the creation of the **Newly Created Investment Fund.** However, if (i) the offering size of any **Newly Created Investment Fund** or the aggregate amount of the offerings of all **Newly Created Investment Funds** exceeds 150% of the previous **Fund** or (ii) the investment objectives (as set forth in the private placement memorandum, prospectus or similar document issued by the **Insured Organizations**) of any **Newly Created Investment Fund** differ materially from the investment objectives of the investment fund(s) scheduled in Endorsement No. 4, then the **Parent Company** as a condition precedent to coverage with respect to such new

Insureds, shall give written notice of such **Newly Created Investment Fund** to the Insurer as soon as practicable but in no event more than ninety (90) days after the effective date of the offering or private placement memorandum or similar document, together with such information as the Insurer may require, and shall pay any additional premium so required by the Insurer. If the **Parent Company** fails to comply with such condition precedent, coverage otherwise afforded by this provision shall terminate as of ninety (90) days after the effective date of such acquisition or assumption.

All other terms and conditions remain unchanged.

| | |
|---|---|
| _Konald G. A_ | _11/29/05_ |
| **Authorized Representative** | **Date** |

All headings herein are for convenience only. This policy shall be interpreted and applied without regard to such headings.

Zurich American Insurance Company

Private Equity Partnership Liability Insurance

AMENDED DEFINITIONS

| Parent Company:<br><br>NAUTIC PARTNERS, LLC | Policy Number:<br><br>EOC 3830398 03 | Effective Date:<br><br>06/30/2005 | Endorsement Number: 4 |
|---|---|---|---|

**This endorsement changes the Policy. Please read it carefully.**

It is agreed that :

This Policy does not apply to any **Claim** made against any **Insured** based upon, arising out of or attributable to any demand, suit or proceeding pending, or order, decree or judgment entered regarding Highwood Partners, LP v. IOS Brands, et al., Civil Action No. 19556-NC; and Choice One Communications litigation filed 11/20/01 and any related affiliate and / or subsidiary, or any **Wrongful Act** underlying or alleged therein, including any **Interrelated Wrongful Acts**.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Signed by:_____          _____
         Authorized Representative                        Date

11/29/05

Page 1 of 1

**Zurich American Insurance Company**

Private Equity Partnership Liability
Insurance

---

EXTENDED REPORTING PERIOD

| Parent Company: | Policy Number: | Effective Date: | Endorsement Number: 5 |
|---|---|---|---|
| NAUTIC PARTNERS, LLC | EOC 3830398 03 | 06/30/2005 | |

**This endorsement changes the Policy. Please read it carefully.**

It is agreed that Section IV. DEFINITIONS as amended by Endorsement No. 3 to Include Insured Organizations:

**Insured Organizations** shall mean the following:

Silverado II, LP
Silverado II Corp.
Silverado III, LP
Silverado III Corp.
Silverado IV Corp.
Silverado V Corp.
Silverado Fund Partners, LLC
Fleet Equity Partners V, LP
Fleet Equity Partners VII, LP
Nautic Partners V, LLC (formerly Navis Partners V, LLC)
Nautic Management V, LP (formerly Navis Management V, LP)
Nautic Partners, LLC
Chisholm Management IV, LP
Chisholm IV, LLC
Chisholm Management Partners IV, LP
Fleet Venture Partners I
Fleet Venture Partners II
Fleet Venture Partners III
Fleet Venture Partners IV, LP
Fleet Equity Partners V, LP
Fleet Equity Partners VI, LP
Fleet Equity Partners VII, LP
Nautic Partners V, LP (formerly Navis Partners V, LP)
Chisholm Partners II, LP
Chisholm Partners III, LP
Chisholm Partners IV, LP
Chisholm Fund Partners, LP
Kennedy Plaza Partners
Kennedy Plaza Partners II, LLC
Kennedy Plaza Partners III, LLC
Investment Fund Partners, LP

All other terms and conditions remain unchanged.

_Ronald G_
_____
Authorized Representative

_11/29/05_
_____
Date

Zurich American Insurance Company

Private Equity Partnership Liability Insurance

EXTENDED REPORTING PERIOD

| Parent Company: NAUTIC PARTNERS, LLC | Policy Number: EOC 3830398 03 | Effective Date: 06/30/2005 | Endorsement Number: 6 |
|---|---|---|---|

**This endorsement changes the Policy. Please read it carefully.**

It is agreed that Section VII. EXTENDED REPORTING PERIOD is deleted in its entirety and replaced with the following:

VII. EXTENDED REPORTING PERIOD

If either the Insurer or the **Parent Company** fails or refuses to renew this Policy, or if the **Parent Company** cancels this Policy, then any **Insured** shall have the right, upon payment of an additional premium calculated at the percent set forth in Item 7.A. of the Declarations of the annualized Policy premium as set forth in Item 5. of the Declarations, to extend the period of time, as set forth in Item 7.B. of the Declarations, during which any **Claim** made after cancellation or expiration of the **Policy Period** and during the Extended Reporting Period shall be considered made during the **Policy Period**, provided such **Claim** arises out of a **Wrongful Act** that takes place prior to the effective date of cancellation or the expiration of the **Policy Period**. The right to this Extended Reporting Period coverage shall lapse unless written notice of an election to purchase this coverage, and the additional premium due, is given by the **Parent Company** and received by the Insurer within sixty (60) days following the cancellation or nonrenewal of the Policy. If such written notice is not mailed to the Insurer within sixty (60) days or the premium is not paid when due, then the **Insured** shall not at a later date be entitled to purchase an Extended Reporting Period.

The election of the Extended Reporting Period shall not in any way reinstate or increase the Limit of Liability in Item 3. of the Declarations. The Limit of Liability applicable to the Extended Reporting Period shall be the Limit of Liability remaining under this Policy for the **Policy Period**.

If the **Insureds** invoke this Extended Reporting Period in accordance with the above, neither the Insurer nor the **Insureds** shall be entitled to cancel the Extended Reporting Period. The entire additional premium for the Extended Reporting Period shall be deemed fully earned and non-refundable as of the inception date of the Extended Reporting Period.

All other terms and conditions remain unchanged.

_Ronald Enf_
Authorized Representative

_11/29/05_

All headings herein are for convenience only. This policy shall be interpreted and applied without regard to such headings.

Page 1 of 1

Zurich American Insurance Company

Private Equity Partnership Liability
Insurance

AMENDED CONDITIONS

| Parent Company: | Policy Number: | Effective Date: | Endorsement Number: 7 |
|---|---|---|---|
| NAUTIC PARTNERS, LLC | EOC 3830398 03 | 06/30/2005 | |

**This endorsement changes the Policy. Please read it carefully.**

Section IX.A.1. Is hereby deleted in its entirety and replaced with the following:

1. If any **Loss** is insured under any other valid and collectible policy, this Policy shall apply only to the extent the amount otherwise covered under this Policy exceeds the amount paid under such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent, or otherwise, unless such other insurance is written only as specific excess insurance over this Policy.

Section IX.A.2. is hereby deleted in its entirety and replaced with the following:

2. Coverage under this Policy for any **Claim** against **Insured Persons** in an **Outside Position** shall be specifically excess of any indemnification payment from any valid and collectible insurance provided by the **Outside Entity** with respect to such **Claim**.

Section IX.C.1. is hereby deleted in its entirety and replaced with the following:

1. In the event of a **Takeover** of any **Company**, coverage under this Policy for that **Company** and its **Insured Persons** shall continue until this Policy is otherwise terminated, but only with respect to **Claims** for **Wrongful Acts** occurring prior to the effective date of the **Takeover**, unless the Insurer is notified in writing of the **Takeover** prior to the **Takeover** effective date and agrees in writing to provide coverage for **Wrongful Acts** occurring on or after such effective date, and the **Company** accepts any special terms, conditions, exclusions, or additional premium charge required by the Insurer.

Section IX.C.3 is hereby deleted.

Section IX.F. is hereby deleted in its entirety and replaced with the following:

F. Assignments and Action Against the Insurer

No action shall be taken against the Insurer unless, as a condition precedent thereto, there shall have been compliance with the terms of this policy, by the **Insured**, and the amount of the **Insured's** obligation to pay shall have been established by: (i) judgment against the **Insured**, (ii) written agreement of the **Insured** and Insurer, or (iii) non-binding arbitration.

Section IX.H. is hereby deleted in its entirety and replaced with the following:

H. Territory

This Policy extends to **Claims** brought anywhere in the world.

Section IX. L. is hereby deleted in its entirety and replaced with the following:

L.    Payment Priority

If the amount of any covered **Loss**, which is otherwise due and owing by the Insurer under this Policy, exceeds the then remaining Limit of Liability applicable to such **Loss**, the Insurer shall pay such **Loss** (subject to such Limit of Liability) in the following priority:

1.    First, the Insurer shall pay any such **Loss**, which is incurred by natural person **Insureds** and which is covered under Insuring Agreement I.A.1;

2.    Second, only if and to the extent the payment under Paragraph 1. above does not exhaust the applicable Limit of Liability, the Insurer shall pay any such remaining **Loss** covered under this Policy.

Subject to the foregoing paragraph, the Insurer shall, upon receipt of a written request from the **Parent Company**, delay any payment of covered **Loss** otherwise due and owing under Insuring Agreement A.(2) or Insuring Agreement B – thus no delay in payment to non-indemnified Insured Persons

_Ronald G. Spe_____          _11/29/05_____
Authorized Representative                        Date

All headings herein are for convenience only.  This policy shall be interpreted and applied without regard to such headings.

Page 2 of 2

**Zurich American Insurance Company**

Private Equity Partnership Liability
Insurance

AMENDED DEFINITION

| Parent Company:<br><br>NAUTIC PARTNERS, LLC | Policy Number:<br><br>EOC 3830398 03 | Effective Date:<br><br>06/30/2005 | Endorsement Number: 8 |
| --- | --- | --- | --- |

**This endorsement changes the Policy. Please read it carefully.**

Item 6 on the Declaration Page shall be entitled "Insured Organizations" instead of "Additional Insureds"

All other terms and conditions remain unchanged.

_Ronald G. _____         11/29/05
_____         _____
       **Authorized Representative**                         **Date**

All headings herein are for convenience only. This policy shall be interpreted and applied without regard to such headings.

**Zurich American Insurance Company**

Private Equity Partnership Liability
Insurance

AMENDED INSURING AGREEMENT

| Parent Company:<br>**NAUTIC PARTNERS, LLC** | Policy Number:<br>EOC 5978746  03 | Effective Date:<br>07/18/2005 | Endorsement Number: **9** |
|---|---|---|---|

**This endorsement changes the Policy.  Please read it carefully.**

Section I.B. is hereby deleted in its entirety and replaced with the following:

COVERAGE B:  COMPANY LIABILITY

The Insurer shall pay on behalf of the **Company** all **Loss** resulting from any **Claim** first made against the **Company** during the **Policy Period** or the Extended Reporting Period (if applicable) for a **Wrongful Act** occurring prior to the end of the **Policy Period**.

All other terms and conditions remain unchanged.

_Ranald G. Sy_ _____
**Authorized Representative**

_11/29/05_ _____
**Date**

All headings herein are for convenience only.  This policy shall be interpreted and applied without regard to such headings.

Page 1 of 1

Zurich American Insurance Company

Private Equity Partnership Liability
Insurance

AMENDED INSURING AGREEMENT

| Parent Company:<br><br>NAUTIC PARTNERS, LLC | Policy Number:<br><br>EOC 3830398 03 | Effective Date:<br><br>06/30/2005 | Endorsement Number: 10 |
|---|---|---|---|

**This endorsement changes the Policy. Please read it carefully.**

### Private Equity Partnership Liability Insurance

It is agreed that Section IV.L. is amended to include the following:

    4. Medical Staffing Network

With regard to the coverage provided by this endorsement, Items 3 and 4 of the declaration page are deleted in their entirety and replaced with the following:

Item 3.  Limit of Liability:

    $3,000,000        Aggregate for all **Loss**, combined, for the Policy Period (including **Defense Costs**).

Item 4.  Retention:
    A.  Non-Indemnifiable **Loss**:    $0
    B.  Indemnifiable **Loss**:    $500,000

It is further agreed that the Limit of Liability provided by this endorsement is part of and not in addition to the Limit of Liability provided in Item 3 of the declaration page which shall not be increased by this endorsement.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Signed by: _Ranald Gi._____    _11/29/05_____
    Authorized Representative           Date

**Zurich American Insurance Company**

**Private Equity Partnership Liability Insurance**

AMENDED INSURING AGREEMENT

| Parent Company: | Policy Number: | Effective Date: | Endorsement Number: 11 |
|---|---|---|---|
| NAUTIC PARTNERS, LLC | EOC 3830398 03 | 06/30/2005 | |

**This endorsement changes the Policy. Please read it carefully.**

It is hereby agreed that:

Section III. EXCLUSIONS is amended by adding the following:

V.     This policy does not apply to any "Loss" arising from or in connection with any "Claim" based upon, arising out of or attributable to any demand, suit or proceeding pending, or order, or judgment entered against the "Insured" on or prior to 06/30/2002 or the same or substantially the same fact, circumstance or situation underlying or alleged therein.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Signed by: _Konalel Gi. _____     _10/29/05_

Authorized Representative     Date

Page 1 of 1

Zurich American Insurance Company

Private Equity Partnership Liability
Insurance

AMENDED INSURING AGREEMENT

| Parent Company:<br><br>NAUTIC PARTNERS, LLC | Policy Number:<br><br>EOC 3830398 03 | Effective Date:<br><br>06/30/2005 | Endorsement Number: 12 |
|---|---|---|---|

**This endorsement changes the Policy. Please read it carefully.**

It is hereby agreed that:

Section IV.H. is hereby amended to include the following:

H.  **Insured Person(s)** means:

8.  with respect to **Outside Position** coverage, shall apply for Habib Gorgi serving on the board of FTD, Inc.

Section IV.U. is hereby amended to include the following:

U.  **Public Company** means:

FTD, Inc.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Signed by: _Ronald R. _____     _11/29/05_
      Authorized Representative                Date

Page 1 of 1

Exhibit B

1   BRADFORD C. LEWIS (CSB NO. 131334)
2   DONALD W. SEARLES (CSB NO. 135705)
    FENWICK & WEST LLP
3   Silicon Valley Center
    801 California Street
    Mountain View, CA 94041
4   Telephone: (650) 988-8500
    Facsimile: (650) 938-5200
5

6   Attorneys for Plaintiff
    e4e, Incorporated

7

**CONFORMED COPY**
OF ORIGINAL FILED
Los Angeles Superior Court

JAN 0 9 2006

John A. Clarke, Executive Officer/Clerk
By _____, Deputy
        J. SUNGA

8       SUPERIOR COURT OF THE STATE OF CALIFORNIA

9            COUNTY OF LOS ANGELES

10

**BY FACSIMILE**

11   e4e, Incorporated,

12         Plaintiff,

13       v.

14   Meridian Health Care Management, Inc.,
    Nautic Partners LLC, Scott Hilinski,
15   Michael J. Alper, Chisholm Partners, IV,
    L.P., Fleet Equity Partners VI, L.P., Fleet
16   Venture Resources, Inc., Kennedy Plaza
    Partners II, LLC,
17   and Does 1-10.

18

19         Defendants.

Case No.   B C 3 4 5 6 1 7

**COMPLAINT FOR RELIEF BASED ON RESCISSION, FRAUD IN THE INDUCEMENT, FAILURE TO FULFILL CONDITION PRECEDENT, MISTAKE, NEGLIGENT MISREPRESENTATION, INNOCENT MISREPRESENTATION, STATE SECURITIES FRAUD, FRAUD, CONSPIRACY TO COMMIT FRAUD, BREACH OF CONTRACT, UNJUST ENRICHMENT AND IMPOSITION OF A CONSTRUCTIVE TRUST**

[JURY TRIAL DEMANDED]

20

21       Plaintiff e4e, Incorporated ("e4e") for its Complaint for rescission of an Agreement and

22   Plan of Reorganization entered August 2, 2005, fraud in the inducement, failure to fulfill

23   condition precedent, mistake, negligent misrepresentation, innocent misrepresentation, state

24   securities fraud, common law fraud, conspiracy to commit fraud, breach of contract, unjust

25   enrichment and imposition of a constructive trust against Defendants Meridian Health Care

26   Management, Inc., Nautic Partners LLC, Scott Hilinski, Michael J. Alper, Chisholm Partners,

27   IV, L.P., Fleet Equity Partners VI, L.P., Fleet Venture Resources, Inc., and Kennedy Plaza

28   Partners II, LLC, (collectively, "Defendants"), alleges as follows:

Plaintiff e4e, Inc.'s Complaint for Rescission

## NATURE OF THE ACTION

1
2     Plaintiff e4e, Incorporated ("e4e") brings this action to rescind that certain written
3  Agreement and Plan of Reorganization entered into on August 2, 2005 (the "Agreement") by
4  and among e4e, Defendant Meridian Health Care Management, Inc. ("Meridian") and the
5  Meridian Acquisition Corporation, pursuant to which e4e acquired all of the issued and
6  outstanding shares of the preferred stock of Meridian in exchange for valuable consideration
7  totaling more than five million dollars.

8     Prior to the execution of the Agreement, four investment funds actively managed by
9  Defendant Nautic Partners, LLC -- Defendants Chisholm Partners, IV, L.P., Fleet Equity
10  Partners VI, L.P., Fleet Venture Resources, Inc., and Kennedy Plaza Partners II, LLC --
11  constituted the majority shareholders of Meridian and held all of the issued and outstanding
12  preferred stock of Meridian (the four investment funds are collectively referred to herein as "the
13  Majority Shareholders").

14     The Agreement contained a number of material representations concerning the business
15  and financial conditions of Meridian, the truth and accuracy of which e4e reasonably relied upon
16  in deciding to enter into the Agreement.  Those material representations included, without
17  limitation, that: (1) the Meridian Financial Statements provided as exhibits to the Agreement
18  were prepared in accordance with GAAP and fairly presented Meridian's condition and the
19  results of operations for the periods ending December 31, 2004 and June 30, 2005; (2) Meridian
20  had no material liability or obligation of any nature that was not reflected or reserved against in
21  its financial statements; and (3) neither the Agreement, the exhibits, schedules nor any of the
22  certificates or documents delivered by Meridian contained any untrue statement of material fact
23  or omitted to state any material fact.

24     As e4e has recently discovered, each of those representations were false.  In truth and in
25  fact, Meridian, through its directors, officers, shareholders, employees, and agents, both known
26  and unknown, (collectively "Defendants") had been engaged in a long-standing and continuing
27  scheme to defraud several of its customers by knowingly misappropriating and stealing millions
28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   of dollars in customer funds that had been entrusted to and had been under the control of

2   Meridian.   This scheme, which was in existence from at least late 2003 through August 10,

3   2005 (the "Closing Date"), and involved the misappropriation and theft of several hundred

4   thousand dollars in customer funds per month throughout 2004 and part of 2005, was not

5   disclosed by Defendants to e4e prior to the execution of the Agreement.   Nor was this scheme

6   disclosed in the Meridian Financial Statements or any other records provided to e4e by

7   Defendant Meridian during the course of the negotiations and due diligence leading up the

8   Agreement.   As a result, Defendants were able to falsely portray the financial condition,

9   business prospects and legal liabilities of Meridian in a favorable light and to thereby

10  fraudulently induce e4e to enter into the Agreement.   In fact, the amount of money that

11  Defendants misappropriated and stole from Meridian's customers as part of their scheme

12  *exceeds* the total consideration paid by e4e to acquire Meridian.   As a result of the enormity of

13  Defendants' fraud, e4e's investment in Meridian has been rendered entirely worthless.

14          In December 2005, e4e finally learned of the true facts.   e4e now seeks to rescind the

15  Agreement in light of the knowing, reckless and negligent misrepresentations and omissions and

16  other fraudulent and deceitful conduct of the Defendants.   e4e also seeks the immediate

17  imposition of a constructive trust on the Defendants' monies so that e4e can be made whole, as

18  well as the award of exemplary damages and attorney's fees so as to appropriately punish the

19  Defendants for their fraud and deceit.

20                                              **PARTIES**

21          1.      Plaintiff e4e is a corporation organized under the laws of Delaware, and at all

22  times herein mentioned was a resident of Santa Clara County, California, with its principal place

23  of business at Santa Clara, California.  e4e is in the business of providing outsourcing services,

24  business process services, software engineering services, and transaction processing services to

25  companies on a worldwide basis.

26          2.      Defendant Meridian Health Care Management, Inc. ("Meridian") is a corporation

27  organized under the laws of Delaware, and at all times relevant herein was a resident of Los

28

Plaintiff e4e, Inc.'s Complaint for Rescission              3

1  Angeles County, California, with its principal place of business at Woodland Hills, California.

2  Meridian is in the business of providing network management, medical management, financial

3  management, and operations management services primarily for the health care industry.

4      3.    Defendant Nautic Partners LLC ("Nautic") is a limited liability corporation

5  organized under the laws of Delaware, and at all times relevant herein was a resident of

6  Providence, Rhode Island, with its principal place of business at Providence, Rhode Island.

7  Although the precise nature of the legal relationship between Nautic, Chisholm Partners IV, L.P.,

8  Fleet Equity Partners VI, L.P., Fleet Venture Resources, Inc., and Kennedy Plaza Partners II,

9  LLC is unknown, at the time of the acquisition of Meridian by e4e, Nautic actively managed the

10 Majority Shareholders and, specifically, their investment in Meridian preferred stock.

11     4.    At all times relevant herein, defendant Scott Hilinski ("Hilinski") was a Managing

12 Director of Nautic, and a principal agent of the Majority Shareholders.  In doing the things

13 alleged herein, defendant Hilinski was acting within the course and scope of his authority as an

14 agent and employee of Nautic, and with the permission and consent of Nautic and the Majority

15 Shareholders.  At all times relevant herein, Hilinski was also a member the Board of Directors of

16 Meridian, and in doing the things alleged herein was acting in the course and scope of his actual

17 and apparent authority as an agent and board member of Meridian, and with the permission and

18 consent of Meridian.

19     5.    At all times relevant herein, defendant Michael Alper was the President and CEO

20 of Meridian, as well as a member of Meridian's Board of Directors.  In doing the things alleged

21 herein, defendant Alper was acting within the course and scope of his employment as an

22 employee of Meridian, and within the course and scope of his actual and apparent authority

23 imparted to him by Defendants Hilinski, Nautic and the Majority Shareholders.

24     6.    Defendant Chisholm Partners, IV, L.P. ("Chisholm"), is a limited partnership

25 organized under the laws of Delaware, and at all times relevant herein was a resident of

26 Providence, Rhode Island, with its principal place of business at Providence, Rhode Island.  At

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1  the time of the acquisition of Meridian by e4e described below, Chisholm was one of the Majority

2  Shareholders.

3         7.     Defendant Fleet Equity Partners VI, L.P. ("Fleet Equity"), is a limited partnership

4  organized under the laws of Delaware, and at all times relevant herein was a resident of

5  Providence, Rhode Island, with its principal place of business at Providence, Rhode Island. At

6  the time of the acquisition of Meridian by e4e described below, Fleet Equity was one of the

7  Majority Shareholders.

8         8.     Defendant Fleet Venture Resources, Inc. ("Fleet Venture"), is a limited partnership

9  organized under the laws of Rhode Island, and at all times relevant herein was a resident of

10  Providence, Rhode Island, with its principal place of business at Providence, Rhode Island. At

11  the time of the acquisition of Meridian by e4e described below, Fleet Venture was one of the

12  Majority Shareholders.

13         9.     Defendant Kennedy Plaza Partners II, LLC ("Kennedy"), is a limited partnership

14  organized under the laws of Delaware, and at all times relevant herein was a resident of

15  Providence, Rhode Island, with its principal place of business at Providence, Rhode Island. At

16  the time of the acquisition of Meridian by e4e described below, Kennedy was one of the Majority

17  Shareholders.

18        10.    Plaintiff does not presently know the true names and capacities of the defendants

19  sued herein as Does 1 through 10, inclusive. Plaintiff will seek leave of court to amend this

20  complaint to allege said defendants' true names and capacities as soon as plaintiff ascertains

21  them. Plaintiff is informed and believes and thereon alleges, that each of the fictitiously named

22  defendants is responsible in some manner for the occurrences herein alleged, and that plaintiff's

23  damages as herein alleged were proximately caused by those defendants. Each reference in this

24  complaint to "defendant," "defendants," or a specifically named defendant refers also to Does 1

25  through 10.

26  ///

27  ///

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

<u>**VENUE**</u>

11.     Venue in this Court is proper under Sections 395 and 395.5 of the California Code of Civil Procedure, and other applicable law, on the grounds that defendant Meridian's principal place of business is in Los Angeles County and that defendants Alper's place of residence is in Los Angeles County.

<u>**FACTS COMMON TO ALL CAUSES OF ACTION**</u>

12.     In approximately June 2003, Meridian lost one of its most significant customers, which had been responsible for over 40% of Meridian's annual total revenues. The loss of that customer proved to be a devastating event which caused Meridian to incur significant losses and negative cash flow from operations, a fact that was well known to Meridian's Board of Directors as well as to its outside investors, including Nautic, Hilinski and the Majority Shareholders.

13.     In late 2003, shortly after the loss of Meridian's most significant customer, and in an attempt to cover Meridian's monthly expenses, defendant Alper and Meridian's Chief Financial Officer placed a telephone call to defendant Hilinski. During that telephone call, defendant Alper requested defendant Hilinski to have Nautic and the Majority Shareholders make an additional cash investment into Meridian in order to fund the shortfall from operations caused by the loss of Meridian's most significant customer. Hilinski refused to make any further investments in Meridian. During that telephone call defendant Alper and Meridian's Chief Financial Officer told Hilinski that Meridian would be forced to cover monthly expenses by "paying" itself an unauthorized "advance" on its management fees. All three individuals, Hilinksi, Alper and Meridian's Chief Financial Officer, knew that such an "advance" was simply a euphemism for misappropriation and theft of customer funds. Notably, none of them voiced an objection at that time to the planned course of conduct.

14.     Thereafter, on a monthly basis, throughout 2004 and part of 2005, Meridian's Chief Financial Officer routinely directed his subordinates to make unauthorized transfers of customer funds to Meridian. Those unauthorized transfers were generally hundreds of thousands of dollars each month and had a material effect on Meridian's financial statements. Those false

1  and fraudulent financial statements, which failed to disclose Meridian's scheme to defraud its

2  customers and the millions of dollars of undisclosed liabilities and which falsely portrayed the

3  strength of Meridian's financial condition, were prepared by Meridian's Chief Financial Officer

4  knowing of their falsity and that they would be presented to prospective purchasers, including

5  e4e.

6       15.    In an effort to prevent the discovery of their fraudulent scheme, Meridian

7  discontinued the practice of having annual audits of its financial statements conducted by

8  independent outside auditors.  For the years ending December 31, 2001 and 2002, Meridian had

9  annual audits of its financial statements performed by Deloitte & Touche LLP, one of the four

10  largest international independent accounting firms.  These audits were performed under the

11  direction and supervision of Meridian's Board of Directors.  These audits resulted in clean or

12  unqualified opinions on Meridian's financial statements.  An audit of Meridian's financial

13  statements was a prudent control by the Board of Directors to protect the financial interests of

14  Nautic and the other Majority Shareholders.

15       16.    An audit of Meridian's financial statements was commenced by Deloitte & Touche

16  for the year ending December 31, 2003.  The theft of funds from Meridian's customers

17  commenced in the last quarter of 2003.  Meridian's Board of Directors, which included defendant

18  Hilinski, who, as a Managing Director of Nautic was acting as the principal representative and

19  agent of the Majority Shareholders, ordered Deloitte & Touche to not complete its audit, despite

20  the fact that substantial work had already been done. Hilinski and the Meridian Board also did not

21  engage another independent accounting firm to perform an audit of Meridian's financial

22  statements for the year ended December 31, 2003.

23       17.    Meridian's Board of Directors did not attempt to engage an independent

24  accounting firm to audit its financial statements for the following year ending December 31,

25  2004, the year in which the majority of the funds were taken from Meridian's customers.

26  Meridian did not have adequate internal financial controls and its Board of Directors did not

27  require the Company to have an annual audit, and the Board failed to perform any meaningful

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   oversight on the Company's financial reporting process for over a two year period prior to the

2   sale to e4e. Hilinski and the Meridian Board failed to increase its oversight of Meridian's

3   financial reporting in the absence of the two annual audits.

4         18.    Defendant Hilinski and other members of the Board of Directors knew the

5   Meridian financials statements were false, or acted with reckless indifference to their truth or

6   falsity and thus were complicit in the fraud perpetrated on Meridian's customers by having

7   stopped the prudent practice of having annual audits of Meridian's financial statements.

8   Hilinski's and the Meridian Board's decision to stop the annual audits coincided with the start of

9   the fraudulent activity.

10        19.    During this same period, beginning in early 2004, defendants Hilinski, who took a

11   leading role on behalf of the Majority Shareholders, and Alper were actively involved in

12   attempting to sell Meridian to third parties. As part of their sales efforts, both Alper and Hilinski

13   knowingly presented prospective purchasers, including e4e, with Meridian's financial statements

14   which falsely portrayed Meridian's financial condition. In so doing, both defendants Alper and

15   Hilinski acted with knowledge of the falsity of Meridian's financial statements or with reckless

16   indifference to the truth and accuracy of the statements contained therein.

17        20.    On or about May 5, 2005, defendants Hilinski and Alper met with representatives

18   of e4e in Santa Clara, California, as part of their efforts to sell Meridian. At that meeting,

19   defendants Hilinski and Alper provided to e4e's representatives a Meridian Informational

20   Memorandum that contained the aforementioned false and fraudulent Meridian financial

21   information. In actual and reasonable reliance on the information provided by Hilinski and Alper,

22   e4e entered into a letter of intent to acquire Meridian.

23        21.    As a further part of the negotiations leading to the sale of Meridian, and in effort to

24   conceal and prevent the discovery of Meridian's scheme to defraud its customers, and Meridian's

25   true financial condition, defendant Hilinski, on information and belief, caused Nautic to agree to

26   pay defendant Alper and Meridian's Chief Financial Officer a substantial cash bonus as a

27   "success fee" for their respective roles in the sale of Meridian to e4e, once the transaction closed.

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

Defendant Hilinski also encouraged and ultimately convinced e4e to give defendant Alper and

Meridian's Chief Financial Officer valuable stock options in e4e, as well as lucrative employment

contracts with substantial "retention bonuses."

22.     During this period of negotiations, defendant Alper, in an effort to conceal and

prevent the discovery of Meridian's true financial condition, actively obstructed e4e's due

diligence investigation by failing to disclose the scheme to defraud, by presenting false financial

statements and other books and records of Meridian to e4e, and by attempting to prevent e4e from

directly communicating with Meridian's Chief Financial Officer and other Meridian employees

who had been engaged in misappropriating customer funds.

23.     Thereafter, on or about August 2, 2005, at Mountain View, California, e4e, in

actual and reasonable reliance on the aforesaid false and fraudulent representations concerning

Meridian's financial condition, entered into a written Agreement and Plan of Reorganization

("Agreement") with Meridian whereby e4e would acquire Meridian through a reverse triangular

merger. The consideration for the merger involved: (i) the conversion of the Majority

Shareholders' preferred stock of Meridian into the right to receive cash payments, convertible and

non-interest-bearing promissory notes, and e4e's common stock; and (ii) the assumption and

payment by e4e of certain Meridian indebtedness, including the repayment to the Majority

Shareholders of $3,750,000 in loans to Meridian, and payment of a bank loan and line of credit in

the aggregate amount of $1,262,738.48. The merger transaction closed on August 10, 2005 (the

"Closing").

24.     Defendants Alper, Hilinski and Nautic had reviewed and approved the terms of

Agreement and were fully aware of the terms and conditions of the Agreement and the

representations contained therein.

25.     The Agreement, which was executed by defendant Alper on behalf of Meridian,

contained several material representations concerning the financial condition of Meridian which

were intended to induce and did in fact induce e4e to enter into the Agreement. Specifically, the

Agreement represented as of the Closing that:

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

a.  Meridian's balance sheet as of December 31, 2004 and income statement
    and statement of cash flows for the year then ended, and its balance sheet
    as of June 30, 2005 and income statement for the six-month period ended
    June 30, 2005 (the "Financial Statements"): (a) are in accordance with the
    books and records of Meridian; (b) fairly present Meridian's financial
    condition as of the closing dates indicated and the results of operations for
    the specified periods ending; and (3) except as to the lack of footnotes and
    subject to normal year-end adjustments, have been prepared in accordance
    with generally accepted accounting principles applied on a consistent
    basis ("GAAP") [Agreement Par. 2.8];

b.  Meridian has no material debt, liability or obligation of any nature, that
    was not disclosed in the Schedule of Exceptions to the Agreement or
    disclosed in its Financial Statements [Agreement Par. 2.11];

c.  Meridian was in full compliance in all material respect with all applicable
    laws. ordinances, regulations and rules applicable to it [Agreement Par.
    2.13];

d.  Meridian had withheld and paid to the appropriate government entity all
    amounts required to be withheld from employees of Meridian and was not
    liable for any arrears of taxes, penalties or other sums for failure to pay
    such sums [Agreement Par. 2.15.2]

e.  The books, records and accounts of Meridian (a) are in all material
    respects true, complete and accurate, (b) have been maintained in
    accordance with good business practices on a basis consistent with prior
    years, (c) are stated in reasonable detail and accurately and fairly reflect
    the transactions and dispositions of the assets of Meridian, and (d)
    accurately and fairly reflect the basis for the Financial Statements.
    [Agreement Par. 2.19];

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

f.   Neither the Agreement, the exhibits and schedules (which included the

Financial Statements), nor any of the certificates or documents to be

delivered by Meridian, taken together, contained any untrue statement of a

material fact or omits to state any material fact [Agreement Par. 2.22];

26.    On or about August 4, 2005, Meridian delivered to e4e Meridian's Financial

Statements, purportedly prepared in accordance with Meridian's books and records and generally

accepted accounting principles.  At the Closing, Meridian delivered a Compliance Certificate to

e4e signed by Alper as President of Meridian.  The Compliance Certificate stated that all of the

representations and warranties in the Agreement were true and complete, including but not

limited to the representations described in paragraph 25 above, the truth and accuracy of which

were a condition to holding the Closing.

27.    The foregoing representations in Paragraphs 25 and 26 were in fact false. The true

facts, and as the defendants Meridian, Nautic, Alper, and Hilinski then and there well knew and

believed, or acted with reckless indifference to the truth and accuracy thereof, were that the

financial condition of Meridian was materially worse than represented in Meridian's Financial

Statements, as Meridian had misapplied and stolen millions of dollars from customer accounts

over which it had control beginning in 2003 and continuing through 2004 and part of 2005.

These misapplied funds and their corresponding liabilities were not reflected on the Meridian

Financial Statements, the Schedule of Exceptions, nor any other certificate or document delivered

by Meridian to e4e at the time of the closing. The Meridian Financial Statements also falsely

underreported the amount of expenses incurred by Meridian during these periods. The Meridian

books and records were similarly falsified to hide the misapplied and stolen funds, and Meridian's

actual expenses during this period were falsified and underreported in a corresponding fashion.

Because of its theft of millions of dollars from its customers, Meridian's representation that it was

in compliance with all applicable laws was similarly false.  Meridian had also failed to pay the

Internal Revenue Service and other governmental entities payroll taxes withheld from employee

1    salaries for at least two quarters in 2005 and was liable for these unpaid employment taxes at the

2    time of Closing.

3        28.    e4e intends service of the summons and complaint in this action to serve as notice

4    of rescission of the Agreement, and hereby demands that Defendants restore to it the

5    consideration furnished by e4e, specifically the restoration of e4e's shares, repayment of money

6    used to pay off Meridian bank loans and other indebtedness, and other proceeds conveyed to

7    Defendants Nautic, Hilinski and the Majority Shareholders and their investors and limited

8    partners. e4e also demands that Defendants recompense it for consequential damages, including

9    but not limited to loss of market capitalization, expenses attributable to actual or potential

10   litigation with third parties as a result of Defendants' acts, and funds paid to finance Meridian's

11   operations and bank loans. In connection with any rescission, e4e offers to restore any

12   consideration it received from Defendants.

13       29.    e4e has no adequate remedy at law to redress all of the injuries it has suffered, and

14   will continue to suffer, as a result of Defendants' fraudulent and deceitful conduct. Accordingly,

15   e4e seeks the immediate imposition of a constructive trust on the monies that Defendants

16   Hilinski, Nautic and the Majority Shareholders wrongfully acquired from e4e as a result of

17   Defendants' fraud and other improper conduct alleged herein. Unless Defendants, and their

18   directors, officers, shareholders, agents, servants, employees and all other persons in active

19   concert or privity or in participation with them, are preliminarily and permanently enjoined from

20   dissipating those monies, e4e's request for the imposition of constructive trust as part of the final

21   judgment herein would be rendered ineffectual.

22                              **FIRST CAUSE OF ACTION**

23               **(Fraud in the Inducement; as against all Defendants)**

24       30.    e4e realleges and incorporates herein Paragraphs 1 through 29.

25       31.    On or about the Closing Date, at Santa Clara, California, Defendants Meridian,

26   Nautic, Hilinski, Alper, and the Majority Shareholders through their agents and representatives,

27   knowing the representations to be false and with the intent to deceive e4e, or acting with reckless

28

Plaintiff e4e, Inc.'s Complaint for Rescission          12

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

indifference to the truth or falsity of the representations, falsely and fraudulently represented to

e4e in order to induce e4e to enter into the Agreement, that:

    a.   Meridian's Financial Statements were in accordance with the books and records

of Meridian and fairly presented Meridian's financial condition as of the closing

dates indicated and the results of operations for the specified periods ending and,

except as to the lack of footnotes and subject to normal year-end adjustments,

were prepared in accordance with GAAP;

    b.   Meridian had no material debt, liability or obligation of any nature, that was not

disclosed in the Schedule of Exceptions to the Agreement or disclosed in its

Financial Statements;

    c.   Meridian had complied and was in full compliance with all applicable laws,

ordinances, regulations, and rules, the violation of which could reasonably be

expected to have a Material Adverse Effect upon it;

    d.   Meridian had withheld and paid to the appropriate government entity all amounts

required to be withheld from employees of Meridian and was not liable for any

arrears of taxes, penalties or other sums for failure to pay such sums;

    e.   Meridian's books, records and accounts were in all material respects true,

complete and accurate, were maintained in accordance with good business

practices on a basis consistent with prior years, were stated in reasonable detail

and accurately and fairly reflect the transactions and dispositions of the assets of

Meridian, and accurately and fairly reflected the basis for the Financial Statement;

and

    f.   Neither the Agreement, the exhibits and schedules, nor any of the certificates or

documents to be delivered by Meridian, taken together, contained any untrue

statement of a material fact or omitted to state any material fact.

32.     The above representations were false, as described in paragraph 27 herein.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

33.     At the time Defendants made their representations, and at all times prior to December 1, 2005, e4e did not know the representations were false, but believed them to be true and actually and reasonably relied on them. Meridian created financial statements that appeared accurate and correct, and nothing said by Defendants during the merger discussions led e4e to believe otherwise. In addition, Defendants presented e4e with a Compliance Certificate that stated that all of the representations and warranties in the Agreement were true and complete, including but not limited to the representations described in paragraphs 25 and 26 above, the truth and accuracy of which were a condition to holding the Closing.

34.     Had e4e known the true facts, it would not have entered into the Agreement and would not have rendered or accepted performance there under.

35.     As a result of Defendants' misrepresentations, e4e entered the Agreement and was damaged.

36.     e4e seeks rescission of the Agreement because it has no other adequate remedy at law.  If the Agreement is not rescinded, e4e will suffer irreparable harm and injury because e4e will be deprived of its bargain and will face unanticipated legal claims from customers because of Defendant Meridian's misappropriation and theft of customer funds and false financial reporting and because of Defendants' failure to appraise e4e of the wrongdoing prior to the acquisition.

37.     By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of Plaintiff, and Plaintiff is entitled to restitution from Defendants and disgorgement of all profits, benefits, and other consideration obtained by Defendants through their wrongful conduct.

38.     In doing the things herein alleged, Defendants acted willfully and with the intent to cause injury to a prospective buyer such as e4e. Defendants are therefore guilty of malice, oppression, and fraud as defined under Civil Code section 3294(c), in conscious disregard of e4e's rights, thereby warranting an assessment of punitive damages in an amount appropriate to punish defendants and deter others from engaging in similar misconduct.

## SECOND CAUSE OF ACTION

**(Agreement Void for Failure to Fulfill Condition Precedent; as against all Defendants)**

39.     e4e realleges and incorporates herein Paragraphs 1 through 29.

40.     Section 8 of the Agreement makes e4e's obligations "subject to the fulfillment or satisfaction as of the Closing," of certain conditions precedent. The parties to the Agreement intended that Agreement would not take effect without the prior fulfillment of these precise and express conditions precedent.

41.     One of the conditions precedent, specified in Section 8.1 of the Agreement, is the accuracy of all of the representations and warranties of Meridian made in the Agreement, including without limitation those representations and warranties described in paragraphs 25 and 26 herein.

42.     The Agreement further provides that the Agreement may be terminated if the conditions precedent have "not been fulfilled through no fault of Acquirer, or waived by Acquirer, at and as of the Closing Date."

43.     The above representations, as described in paragraph 27, were in fact false.

44.     The failure of the conditions precedent occurred through no fault of e4e, and e4e at no time waived the conditions precedent.

45.     e4e seeks rescission of the Agreement because Plaintiff has no other adequate remedy at law. If the Agreement is not rescinded, e4e will suffer irreparable harm and injury because Plaintiff will be deprived of its bargain. Meridian is impaired because it has undisclosed liabilities to repay millions of dollars of misappropriated customer funds, it will face unanticipated lawsuits from customers, loss of customer goodwill and further erosion of value as the facts of the misappropriation become known.

46.     By their failure to fulfill the condition precedent, Defendants were unjustly enriched at the expense of Plaintiff, and Plaintiff is entitled to restitution from Defendants and disgorgement of all profits, benefits, and other consideration obtained by Defendants through the Agreement.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

## THIRD CAUSE OF ACTION

### (Mistake; as against all Defendants)

47.    e4e realleges and incorporates herein Paragraphs 1 through 29.

48.    The consent of e4e to the Agreement was not real, mutual, or free in that it was obtained solely through mistake as alleged herein.

49.    e4e entered into the Agreement under a mistake of fact that was material and essential to the Agreement in that e4e believed the representations described in paragraphs 25 and 26 herein, and believed that the Meridian Financial Statements fully and accurately reflected the financial condition of Meridian, that it had no extraordinary liabilities to its customers, and that it had committed no violations of law or generally accepted accounting rules.

50.    Defendants were or should have been aware of the mistake, in that Defendants were regularly apprised of Meridian's financial condition, cash flow problems, and customer relationships since the beginning of the repeated misappropriation and theft of customer funds in 2003.

51.    As a result of the mistake of fact, e4e was injured in that if the Agreement is not rescinded, e4e will have paid over $5 million in value for Meridian, at the same time that Meridian had undisclosed liabilities to repay misappropriated funds to its customers in amounts that exceed $5 million. Meridian is also impaired because it will face unanticipated lawsuits from customers for misappropriated funds, loss of customer goodwill, and further erosion of value as the facts behind the misappropriation become known. Under these circumstances, enforcement of the Agreement would be unconscionable.

52.    e4e would not have given apparent consent to the Agreement if the mistake had not existed.

53.    e4e seeks rescission of the Agreement because Plaintiff has no other adequate remedy at law. If the Agreement is not rescinded, e4e will suffer irreparable harm and injury because e4e will be deprived of its bargain and incur damage and injury as alleged herein. By this mistake of fact on the part of e4e, Defendants were unjustly enriched at the expense of e4e,

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   and e4e is entitled to restitution from Defendants and disgorgement of all profits, benefits, and

2   other consideration obtained by Defendants through their wrongful conduct.

3                              **FOURTH CAUSE OF ACTION**

4                    **(Negligent Misrepresentation; as against all Defendants)**

5        54.    e4e realleges and incorporates herein Paragraphs 1 through 29.

6        55.    Defendants Meridian, Nautic, Hilinski, Alper, and the Majority Shareholders

7   through their agents and representatives, made certain representations to e4e, as previously

8   described in paragraphs 20, 25 and 26, with the intention of inducing e4e to act in reliance on

9   those representations, or with the expectation that e4e would so act.

10       56.    In truth and in fact, each of the representations previously described in paragraphs

11  20, 25 and 26 were false.

12       57.    Defendants failed to exercise due diligence or conduct reasonable inquiry about

13  the truth and accuracy of their representations or the representations contained in the Meridian

14  Financial Statements.

15       58.    As a result of Defendants' negligent misrepresentations, and in actual and

16  reasonable reliance thereon, e4e entered into the Agreement and has been damaged.

17       59.    e4e seeks rescission of the Agreement because e4e has no other adequate remedy

18  at law. If the Agreement is not rescinded, e4e will suffer irreparable harm and injury because e4e

19  will be deprived of its bargain and will face unanticipated legal claims from customers because of

20  Defendants misappropriation and theft of customer funds and false financial reporting and

21  because of Defendants' failure to apprise Plaintiff of the wrongdoing prior to the acquisition.

22       60.    By their negligent misrepresentations, Defendants were unjustly enriched at the

23  expense of Plaintiff, and Plaintiff is entitled to restitution from Defendants and disgorgement of

24  all profits, benefits, and other consideration obtained by Defendants through their wrongful

25  conduct.

26  ///

27  ///

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1

## FIFTH CAUSE OF ACTION

2

### (Innocent Misrepresentation; as against all Defendants)

3

61.    e4e realleges and incorporates herein Paragraphs 1 through 29.

4

62.    Defendants Meridian, Nautic, Hilinski, Alper, and the Majority Shareholders

5

through their agents and representatives, made certain representations to e4e, as previously

6

described in paragraphs 20, 25 and 26, with the intention of inducing e4e to act in reliance on

7

those representations, or with the expectation that e4e would so act.

8

63.    In truth and in fact, each of the representations previously described in paragraphs

9

20, 25 and 26 were false.

10

64.    In actual and reasonable reliance on each of those representations, e4e entered in

11

the Agreement and has been damaged.

12

65.    e4e seeks rescission of the Agreement because e4e has no other adequate remedy

13

at law. If the Agreement is not rescinded, e4ewill suffer irreparable harm and injury because e4e

14

will be deprived of its bargain and will face unanticipated legal claims from customers because of

15

Defendants misappropriation and theft of customer funds and false financial reporting and

16

because of Defendants' failure to apprise Plaintiff of the wrongdoing prior to the acquisition.

17

66.    By their conduct, Defendants were unjustly enriched at the expense of Plaintiff,

18

and Plaintiff is entitled to restitution from Defendants and disgorgement of all profits, benefits,

19

and other consideration obtained by Defendants through their wrongful conduct.

20

## SIXTH CAUSE OF ACTION

21

### (Securities Fraud: California Corporations Code §§ 25401, 25403, 25501, 25504;

22

### as against Nautic, Hilinski and the Majority Shareholders)

23

67.    e4e realleges and incorporates herein Paragraphs 1 through 29.

24

68.    In connection with the offer to sell and the actual sale of all of the issued and

25

outstanding shares of preferred stock in Meridian to e4e, defendants Nautic, Hilinski, and the

26

Majority Shareholders through their agents and representatives, directly and indirectly, made

27

certain oral and written communications and representations to e4e, as previously described in

28

paragraphs 25 and 26, which included untrue statements of material fact.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

69.     As a result of Defendants' misstatements of material fact in connection with the sale of Meridian's preferred stock to e4e, e4e has been damaged and seeks rescission of the Agreement and the sale of the aforementioned securities, and to recover the consideration paid for those securities, together with interest at the legal rate.

**SEVENTH CAUSE OF ACTION**

**(Fraud; as against all Defendants)**

70.     e4e realleges and incorporates herein Paragraphs 1 through 29.

71.     On or about the Closing Date, at Santa Clara, California, Defendants, knowing the representations to be false and with the intent to deceive Plaintiff, or acting with reckless indifference to the truth or falsity of the representations, falsely and fraudulently represented to e4e that:

    a.  Meridian's Financial Statements were in accordance with the books and records of Meridian and fairly presented Meridian's financial condition as of the closing dates indicated and the results of operations for the specified periods ending and, except as to the lack of footnotes and subject to normal year-end adjustments, were prepared in accordance with GAAP;

    b.  Meridian had no material debt, liability or obligation of any nature, that was not disclosed in the Schedule of Exceptions to the Agreement or disclosed in its Financial Statements;

    c.  Meridian had complied and was in full compliance with all applicable laws, ordinances, regulations, and rules, the violation of which could reasonably be expected to have a Material Adverse Effect upon it;

    d.  Meridian had withheld and paid to the appropriate government entity all amounts required to be withheld from employees of Meridian and was not liable for any arrears of taxes, penalties or other sums for failure to pay such sums;

    e.  Meridian's books, records and accounts were in all material respects true, complete and accurate, were maintained in accordance with good business

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

practices on a basis consistent with prior years, were stated in reasonable detail and accurately and fairly reflect the transactions and dispositions of the assets of Meridian, and accurately and fairly reflected the basis for the Financial Statement; and

    f.  Neither the Agreement, the exhibits and schedules, nor any of the certificates or documents to be delivered by Meridian, taken together, contained any untrue statement of a material fact or omitted to state any material fact.

72.    The above representations were false, as described in paragraph 27 herein.

73.    At the time Defendants made their representations, and at all times prior to December 1, 2005, e4e did not know the representations were false, but believed them to be true and actually and reasonably relied on them. Meridian created financial statements that appeared accurate and correct, and nothing said by Defendants during the merger discussions led e4e to believe otherwise. In addition, Defendants presented e4e with a Compliance Certificate that stated that all of the representations and warranties in the Agreement were true and complete, including but not limited to the representations described in paragraph 25 and 26 above, the truth and accuracy of which were a condition to holding the Closing.

74.    As a result of the misrepresentations, e4e was damaged in that e4e paid over $5 million in value for Meridian, at the same time that Meridian had undisclosed liabilities to repay misappropriated funds to its customers in an amount that exceeds $5 million. Meridian is also impaired because it will face unanticipated lawsuits from customers for misappropriated funds, loss of customer goodwill, and further erosion of value as the facts behind the misappropriation become known. e4e has also incurred other consequential damages caused by the fraud, in an amount proven at trial.

75.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of e4e, and Plaintiff is entitled to restitution from Defendants and disgorgement of all profits, benefits, and other consideration obtained by Defendants through their wrongful conduct.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

76.    In doing the things herein alleged, Defendants acted willfully and with the intent to cause injury to a prospective buyer such as e4e. Defendants are therefore guilty of malice, oppression, and fraud as defined under Civil Code section 3294(c), in conscious disregard of e4e's rights, thereby warranting an assessment of punitive damages in an amount appropriate to punish defendants and deter others from engaging in similar misconduct.

## EIGHTH CAUSE OF ACTION

### (Conspiracy to Commit Fraud; as against all Defendants)

77.    e4e realleges and incorporates herein Paragraphs 1 through 29.

78.    Beginning on or about December, 2003, Defendants knowingly and willfully conspired and agreed among themselves to solicit acquisition offers for Meridian from prospective buyers, including e4e, while fraudulently failing to disclose that Meridian had misappropriated and stolen money from customer accounts and failing to report such liabilities in the Meridian Informational Memorandum and the Meridian Financial Statements.

79.    Defendants did the acts and things herein alleged pursuant to, and in furtherance of, the conspiracy.

80.    e4e is informed and believes and alleges that the last overt act in pursuance of the above-described conspiracy occurred on or about August 4, 2005, when Defendants received Plaintiff's shares and consideration.

81.    e4e did not become aware of this fraud until on or about December 1, 2005.

82.    As a proximate result of Defendants' conspiring to defraud e4e and the facts herein alleged, e4e was induced to tender an offer for Meridian and entered the Agreement. e4e has been damaged and injured as previously alleged.

83.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of e4e, and e4e is entitled to restitution from Defendants and disgorgement of all profits, benefits, and other consideration obtained by Defendants through their wrongful conduct.

84.    In doing the things herein alleged, Defendants acted willfully and with the intent to cause injury to a prospective buyer such as e4e. Defendants are therefore guilty of malice,

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

oppression, and fraud as defined under Civil Code section 3294(c), in conscious disregard of e4e's rights, thereby warranting an assessment of punitive damages in an amount appropriate to punish defendants and deter others from engaging in similar misconduct.

<u>NINTH CAUSE OF ACTION</u>

(Breach of Contract; as against Defendants Meridian,<br>Nautic, Hilinski, Alper and the Majority Shareholders)

85.    e4e realleges and incorporates herein Paragraphs 1 through 29.

86.    e4e has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Agreement.

87.    On or about August 4, 2005, Defendant Meridian breached the Agreement by violating the provision that all representations, warranties and covenants be complete and accurate in all material respects as of the date of Closing. The Agreement further provides that all representations, warranties and covenants shall remain in full force and effect until December 31, 2006 (the "Indemnity Period"). Because of the unauthorized withdrawal of funds from customer accounts and subsequent attempts to hide the shortfalls from auditors, Meridian did not comply with, and at the time of Plaintiff's acquisition, was not in full compliance with all applicable laws, ordinances, regulations, and rules as required by the Agreement.

88.    As a proximate result of Defendants' breach and the facts herein alleged, Plaintiff has been damaged as alleged herein.

89.    Under Section 10 of the Agreement, Defendants Meridian, Nautic and the Majority Shareholders agreed to hold e4e harmless from any and all loss, claims, expenses, and liability that e4e might sustain at any time as a consequence of "any misrepresentation or breach of, or default in connection with, any of the representations, warranties and covenants given or made by Target [Meridian] in this Agreement or in any certificate, document or instrument delivered by or on behalf of Target pursuant hereto."

90.    Under Section 10 of the Agreement, Defendants Meridian, Nautic and the Majority Shareholders agreed that no limitation applies to indemnity and that e4e "shall be entitled to recover fully the amount of their Damages from the Defending Parties (defined to include

Plaintiff e4e, Inc.'s Complaint for Rescission        22

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

Meridian, Nautic and the Majority Shareholders) for the fraud of the Defending Parties or any act or omission of any Defending Party with intent to cause physical damage, loss of reputation or financial loss to" Plaintiff.

91.    Defendants breached the warranties and covenants given or made by Meridian in this Agreement and misrepresented Meridian's finances through certificates, documents or instruments delivered by or on behalf of Meridian pursuant to the Agreement, as previously alleged. Defendants committed acts of fraud and acts or omissions with intent to cause physical damage, loss of reputation or financial loss to the Plaintiff, so no contractual limitations apply to e4e's recovery of damages.

92.    In investigating and defending against claims by Meridian customers from whose accounts Defendants made unauthorized withdrawals, e4e has necessarily and reasonably incurred additional costs in operating Meridian, and paid attorney's fees and other legal costs.

93.    e4e has incurred and continues to incur necessary and reasonable attorney's fees and other legal costs in prosecuting this action against defendant. By the terms of the Agreement, e4e is entitled to recover these fees and costs from Defendant Meridian.

## TENTH CAUSE OF ACTION

**(Unjust Enrichment; as against Defendants Nautic, Hilinski and the Majority Shareholders)**

94.    e4e realleges and incorporates herein Paragraphs 1 through 29.

95.    As a result of the conduct alleged herein e4e was fraudulently induced to acquire Meridian for valuable consideration.  As a result, Defendants Nautic, Hilinski and the Majority Shareholders have been unjustly enriched at the expense of e4e.

96.    e4e seeks restitution from Defendants Nautic, Hilinski and the Majority Shareholders and seeks an order of this Court disgorging all profits, benefits, and other consideration obtained by those Defendants as a result of e4e's acquisition of Meridian.

///

///

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays judgment as follows:

On the **FIRST CAUSE OF ACTION**

1. For a preliminary and permanent injunction, enjoining Defendants, and their directors, officers, shareholders, agents, servants, employees and all other persons in active concert or privity or in participation with them, from dissipating the monies they wrongfully acquired from e4e and requiring Defendants to hold such funds in trust for the benefit of e4e until final judgment in this action;

2. For rescission of the Agreement dated August 2, 2005 and all corresponding obligations, including without limitation rescission of any promissory notes and stock certificates issued pursuant to the Agreement;

3. For restitution of all consideration paid by e4e pursuant to the Agreement, according to proof.

4. For an order declaring that Defendants hold in constructive trust for e4e all sums and other consideration paid to Defendants and any and all proceeds, in whatever form, Defendants have received in exchange therefore;

5. For compensatory and consequential damages in an amount to be proven at trial;

6. For exemplary and punitive damages in an amount to be proven at trial;

7. For an award of prejudgment interests, cost of suit, and reasonable attorneys' fees to the extent permitted by law; and

8. For such other and further relief as the Court deems just and proper.

On the **SECOND THROUGH SIXTH CAUSES OF ACTION**:

1. For a preliminary and permanent injunction, enjoining Defendants, and their directors, officers, shareholders, agents, servants, employees and all other persons in active concert or privity or in participation with them, from dissipating the monies they wrongfully acquired from e4e and requiring Defendants to hold such funds in trust for the benefit of e4e until final judgment in this action;

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

2.  For rescission of the Agreement dated August 2, 2005 and all corresponding obligations, including without limitation rescission of any promissory notes and stock certificates issued pursuant to the Agreement;

3.  For restitution of all consideration paid by e4e pursuant to the Agreement, according to proof.

4.  For an order declaring that Defendants hold in constructive trust for e4e all sums and other consideration paid to Defendants and any and all proceeds, in whatever form, Defendants have received in exchange therefore;

5.  For compensatory and consequential damages in an amount to be proven at trial;

6.  For an award of prejudgment interests, cost of suit, and reasonable attorneys' fees to the extent permitted by law; and

7.  For such other and further relief as the Court deems just and proper.

On the **SEVENTH THROUGH EIGHTH CAUSES OF ACTION**:

1.  For a preliminary and permanent injunction, enjoining Defendants, and their directors, officers, shareholders, agents, servants, employees and all other persons in active concert or privity or in participation with them, from dissipating the monies they wrongfully acquired from e4e and requiring Defendants to hold such funds in trust for the benefit of e4e until final judgment in this action;

2.  For general and special damages in an amount to be proven at trial;

3.  For restitution and an order declaring that Defendants hold in constructive trust for e4e all sums and other consideration paid to Defendants and any and all proceeds, in whatever form, Defendants have received in exchange therefore;

4.  For exemplary and punitive damages in an amount to be proven at trial;

5.  For an award of prejudgment interests, cost of suit, and reasonable attorneys' fees to the extent permitted by law; and

6.  For such other and further relief as the Court deems just and proper.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1    On the <u>NINTH CAUSE OF ACTION</u>:

2        1.    For compensatory and consequential damages in an amount to be proven at trial;

3        2.    For an award of prejudgment interests, cost of suit, and reasonable attorneys' fees

4    to the extent permitted by law; and

5        3.    For such other and further relief as the Court may deem proper.

6    On the <u>TENTH CAUSE OF ACTION</u>:

7        1.    For a preliminary and permanent injunction, enjoining Defendants, and their

8    directors, officers, shareholders, agents, servants, employees and all other persons in active

9    concert or privity or in participation with them, from dissipating the monies they wrongfully

10   acquired from e4e and requiring Defendants to hold such funds in trust for the benefit of e4e until

11   final judgment in this action;

12       2.    For an order declaring that Defendants hold in constructive trust for e4e's benefit

13   all sums and other consideration paid to Defendants and any and all proceeds, in whatever form,

14   Defendants have received in exchange therefore;

15       3.    For such other and further relief as the Court may deem proper.

16   Dated: January 9, 2006                FENWICK & WEST LLP

17

18                                         By: _Bradford C. L_____

19                                             Bradford C. Lewis

20                                         Attorneys for Plaintiff
                                           e4e, Incorporated

21

22

23   21844/00600/LIT/1242286.9

24

25

26

27

28

# Exhibit C

91367

1  UZZELL S. BRANSON III (State Bar No. 46561)
   A Professional Corporation
2  LAW OFFICES OF UZZELL S. BRANSON III
   70 South Lake Avenue, Suite 660
3  Pasadena, California 91101
   Telephone: (626) 683-8925
4  Telecopier: (626) 683-8512

5  Attorneys for Plaintiff, Northridge
   Medical Group, Inc.

6

7

**FILED**
LOS ANGELES SUPERIOR COURT

FEB 1 4 2006

JOHN A. CLARKE, EXECUTIVE OFFICER/CLERK
BY_____
        J. SUNGA, DEPUTY

Case assigned to.
Judge _____

8          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9              **FOR THE COUNTY OF LOS ANGELES**

10

11  NORTHRIDGE MEDICAL GROUP, INC., a )   Case No.  **BC347480**
    California medical professional corporation, )
12                                            )   **COMPLAINT FOR: FRAUD;**
              Plaintiff,                      )   **NEGLIGENT MISREPRESENTATION;**
13                                            )   **CONSPIRACY TO COMMIT FRAUD;**
         v.                                   )   **CONVERSION; VIOLATIONS OF**
14                                            )   **BUSINESS AND PROFESSIONS CODE**
    NAUTIC PARTNERS, LLC; CHISHOLM            )   **§ 17200; BREACH OF CONTRACT;**
15  PARTNERS IV, LP; FLEET VENTURE            )   **TORTIOUS INDUCEMENT OF**
    RESOURCES, INC.; FLEET EQUITY             )   **BREACH OF CONTRACT;**
16  PARTNERS VI, LP; KENNEDY PLAZA            )   **RESTITUTION AND CONSTRUCTIVE**
    PARTNERS II, LLC; MERIDIAN HEALTH         )   **TRUST; AND INJUNCTIVE AND**
17  CARE MANAGEMENT, INC.; SCOTT              )   **DECLARATORY RELIEF**
    HILINSKI; BRIAN SATO; MICHAEL             )
18  ALPER; and DOES 1 through 100, inclusive, )
                                              )
19            Defendants.                     )
    _____ )
20                                            )

CIT/CASE: BC347480 LEA/DEF#:
RECEIPT #: CCH280104075
DATE PAID: 02/14/06  04:05:07 PM
RECEIVED:
    CASH:
    CHANGE:
    CARD:

21        Plaintiff Northridge Medical Group, Inc., a California professional medical corporation

22  ("Plaintiff"), for cause of action against Defendants and each of them, alleges as follows:

23              **GENERAL ALLEGATIONS**

24        1.     Plaintiff was at times relevant hereto, and is, a California professional medical

25  corporation with its principal place of business in Northridge, County of Los Angeles,

26  California, operating as an independent practice association in the providing of medical services.

27  Plaintiff provides medical services to its managed care patients primarily in the central San

28

1

COMPLAINT OF NORTHRIDGE MEDICAL GROUP, INC.

ORIGINAL

1  Fernando Valley area of Los Angeles County and surrounding areas, ranging from children and

2  their families to seniors on Medicare, through a network of several hundred physicians and other

3  health care providers who contract with Plaintiff to provide such services.

4      2.    Defendant Nautic Partners LLC was at all times relevant hereto, and is, a

5  Delaware limited liability corporation with its principal place of business in Providence, Rhode

6  Island, specializing in the formation and structuring of, investment in, and participation in and

7  management of, among others, companies engaged in the providing of healthcare administration

8  and management services in California and other locations in the United States, and the

9  successor in interest of Fleet Equity Partners (collectively, "Nautic").

10      3.    Defendants Chisholm Partners, IV, L.P. ("Chisholm") and Fleet Equity Partners

11  VI, L.P. ("Fleet Equity") each was at all times relevant hereto, and is, a Delaware limited

12  partnership; Defendant Fleet Venture Resources, Inc. ("Fleet Venture") was at all times relevant

13  hereto, and is, a Delaware corporation; and Kennedy Plaza Partners II, LLC was at all times

14  relevant hereto, and is, a Delaware limited liability company ("Kennedy"). Chisholm, Fleet

15  Equity, Fleet Venture and Kennedy have had at all times relevant hereto, and have, offices and

16  principal places of business in Providence, Rhode Island.

17      4.    Defendant Meridian Health Care Management, Inc. ("Meridian") was at all times

18  relevant hereto, and is, a Delaware corporation with its offices and principal place of business in

19  Woodland Hills, County of Los Angeles, California, engaged in the business of providing

20  operations, management and administrative services for independent practice associations such

21  as Plaintiff.

22      5.    Defendant Scott Hilinski ("Hilinski" and with Nautic, Chisholm, Fleet Equity,

23  Fleet Venture and Kennedy, collectively the "Nautic Defendants") was at all times relevant

24  hereto, and is, a Managing Director of Nautic, concentrating in its healthcare operations.

25  Although the precise nature and extent of the relationships among the Nautic Defendants is not

26  yet fully known to Plaintiff, all of them participated in and in and benefitted from, the acts,

27  events and conduct alleged herein, and at all times relevant hereto, and Hilinski was at all times

28

2

1  relevant hereto, and is, a principal, manager and/or agent of each of the Nautic Defendants with

2  respect to the facts and events hereinbelow alleged. From and after mid-1999 Hilinski was a

3  member of the Board of Directors of Meridian, appointed to represent the interests of the Nautic

4  Defendants, and from and after September, 2002 Hilinski was the sole member the Board of

5  Directors of Meridian representing the interests of the Nautic Defendants. Hilinski in the act,

6  conduct and omissions alleged hereinbelow at all times relevant hereto was, and is, acting within

7  the course and scope of his actual, ostensible, apparent and/or implied authority as Managing

8  Director of Nautic and as director, officer, agent and/or employee of Meridian, and Plaintiff is

9  informed and believes and on that basis alleges that Hilinski at all relevant times acted within the

10 course and scope of his actual, ostensible, apparent and/or implied authority as a director, officer,

11 agent and/or employee of the other Nautic Defendants and each of them, and with their

12 permission, acquiescence and consent.

13      6.     Defendant Michael Alper ("Alper") was at all times relevant hereto the President

14 and Chief Executive Officer of Meridian, as well as a member of Meridian's Board of Directors,

15 and a resident of the County of Los Angeles, State of California. Alper in the acts, conduct and

16 events set forth in this Complaint at all relevant times acted within the course and scope of his

17 actual, ostensible, apparent and/or implied authority as a director, officer, agent and/or employee

18 of Meridian and with its permission, acquiescence and consent, and within the course and scope

19 of his actual and apparent authority and agency conferred on him by Hilinski and the Nautic

20 Defendants.

21      7.     Defendant Brian Sato ("Sato," and with Meridian and Alper, the "Meridian

22 Defendants") was at all times relevant hereto the Chief Financial Officer of Meridian, as well as

23 a member of Meridian's Board of Directors, and a resident of the County of Los Angeles, State

24 of California. Sato in the acts, conduct and events set forth in this Complaint at all relevant

25 times acted within the course and scope of his actual, ostensible, apparent and/or implied

26 authority as a director, officer, agent and/or employee of Meridian and with its permission,

27 acquiescence and consent, and within the course and scope of his actual and apparent authority

28

3

COMPLAINT OF NORTHRIDGE MEDICAL GROUP, INC.

1  and agency conferred on him by Hilinski and the Nautic Defendants.

2       8.     The true names and capacities of Defendants Does 1-100, inclusive (with the

3  Nautic Defendants and the Meridian Defendants sometimes collectively termed the

4  "Defendants"), are now unknown to Plaintiff, and said Defendants are thus sued by fictitious

5  names.  Plaintiff is informed and believes, and thereon alleges, that each Doe Defendant bears

6  some legal responsibility for some or all of the allegations hereinafter set forth, and was, at

7  various times herein mentioned, the agent, employee, officer, director and/or partner of some or

8  all of the other Defendants, acting within the course and scope of such relationship or

9  relationships.

10      9.     Prior to July, 1999 Meridian's predecessor in interest Meridian Health Care

11  Management, LP ("Meridian LP") was a Delaware limited partnership with its offices and

12  principal place of business in the County of Los Angeles, State of California, engaged in the

13  business of providing operations, management and administrative services for independent

14  practice associations such as Plaintiff.  In or about July, 1999, the Nautic Defendants and

15  Meridian LP, together with Alper and Sato, among others, entered into a plan for Meridian to be

16  formed to assume the business operations and assets of Meridian LP and for the Nautic

17  Defendants concurrently to become primary investors in, and to participate in the management,

18  control and operation of, Meridian.  Pursuant to this agreement and plan, on or about July 24,

19  1999 Meridian was incorporated and on or about July 26, 1999 Meridian and the Nautic

20  Defendants entered into certain agreements under which the Nautic Defendants acquired all of

21  the issued and outstanding preferred stock of Meridian as well as subordinated debt issued to

22  them by Meridian in the principal amount of $3,750,000.

23      10.    In or about August of 1999, in the County of Los Angeles, State of California,

24  Meridian agreed with Plaintiff for Meridian to provide management, administrative and related

25  services to Plaintiff, as set forth in the Management Services Agreement dated as of July 1, 1999

26  between Plaintiff and Meridian LP and Amendment 001 to Management Services Agreement

27  dated as of September 1, 1999 between Meridian and Plaintiff (collectively termed and attached

28

4

COMPLAINT OF NORTHRIDGE MEDICAL GROUP, INC.

with its subsequent amendments as Exhibit "1" hereto and incorporated by reference as, the "Northridge MSA"). Pursuant to the Northridge MSA Meridian. and through Meridian the Nautic Defendants, among other things obtained exercised operational control over certain bank accounts, revenues and funds of Northridge, and were and are obligated to account fairly and accurately for Meridian's stewardship and handling of Northridge funds.

11.    Plaintiff is informed and believes and on that basis alleges that beginning in mid-2003. Meridian began experiencing financial difficulty, and during the period June-September, 2003 lost significant customer accounts resulting in significant financial losses and negative cashflows, and that Hilinski (who was Chairman of the Audit and Compensation Committees of Meridian's Board of Directors). Alper and Sato were aware of and discussed these events. Plaintiff is further informed and believes, and on that basis alleges, that during this period Alper and Sato conferred with Helinski about Meridian's financial position and cashflow shortages, including among others a telephone discussion in October, 2003 in which, among other things, the following occurred:

    (a)    Alper requested that Nautic and/or the Nautic Defendants provide additional cash of several million dollars to Meridian, which Hilinski immediately refused; and

    (b)    Hilinski, Alper and Sato accordingly discussed alternative ways of meeting Meridian's cash needs, and agreed to take funds from customer accounts, including the accounts of Plaintiff, over which Meridian had control but which Meridian had not earned and to which Defendants were not entitled, to provide cash for the benefit of Meridian and the Nautic Defendants.

12.    Pursuant to this agreement, from approximately October of 2003 until discovery of their scheme in or about December, 2005, the Defendants, principally through Hilinski, Alper and Sato, entered into and pursued a scheme of employing funds of Meridian clients, including particularly and without limitation funds of Plaintiff, for the benefit and use of the Defendants to meet ongoing expenses and obligations of Meridian which the Nautic Defendants, through

5

COMPLAINT OF NORTHRIDGE MEDICAL GROUP, INC.

Hilinski, refused to fund. Pursuant to this scheme, among other things, Defendants, directly and through Sato, Alper and Hilinski as their representatives and agents, did the following:

(a)     Knowingly misappropriated approximately $6,000,000 in Plaintiff's funds entrusted to and under the control of Meridian, and sums which Plaintiff is informed and believes and on that basis alleges total additional millions of dollars in funds of other Meridian accounts and amounted to several hundred thousand dollars in client funds per month throughout 2004 and part of 2005;

(b)     Falsely presented the financial condition, business operations and liabilities of Meridian, among other means by causing improper and false adjusting entries to be made to the accounts and records of Meridian, concealing the actual balances in customer fund accounts to hide the misappropriations of customer funds; and

(c)     Interrupted and discontinued the annual audits of Meridian for the year ending December 31, 2003 and thereafter, and failed to put in place adequate or prudent financial controls for Meridian.

The acts and conduct of Defendants were intended to, and did, conceal their wrongful conduct and among other things induced Plaintiff and other clients of Meridian to continue to trust and rely upon the apparent financial and operational stability of Meridian, which had received clean or unqualified opinions on its financial statements from its outside auditors Deloitte & Touche LLP for the years ending December 31, 2001 and 2002. Defendant Hilinski and other members of Meridian's Board of Directors knew the Meridian financials statements were false, or acted with reckless indifference to their truth or falsity.

13.     During this same period, the Defendants made and caused and permitted to be made affirmative misrepresentations to Plaintiff to conceal the financial difficulties of Meridian and persuade Plaintiff that Meridian continued to be a stable and financially sound business operation in which Plaintiff could continue to repose trust and confidence. These misrepresentations included, in particular and without limitation, the use of Nautic's public statements and representations about its financial strength and expertise, when the Nautic

6

1   Defendants had already refused to provide additional funding to Meridian. These

2   representations were made, among other times, at or about the time that the Defendants

3   recognized and acknowledged among themselves, that the redemption by Meridian of the

4   preferred stock held by the Nautic Defendants and repayment to the Nautic Defendants of the

5   Notes, which were to have taken place respectively in March and July of 2004, could not be

6   implemented because of the financial condition of Meridian as above alleged.

7         14.    During this same period, in furtherance of the interests of the Nautic Defendants

8   as well as the Meridian Defendants, Defendants beginning in early 2004 undertook efforts to

9   arrange for a sale of the positions of the Nautic Defendants in Meridian to prospective third

10  parties, among other things so the Nautic Defendants could recoup their investments in

11  Meridian. These efforts, which culminated in a purchase and sale transaction with e4e,

12  Incorporated in or about August 2005, were furthered by, and made possible only by, the

13  continued misappropriations by and on behalf of the Defendants of customer funds, in particular

14  the millions of dollars of Plaintiff's funds, which enabled the Defendants to continue to present

15  Meridian as a viable business and attractive acquisition.

16        15.    Further, the acts and conducts of the Defendants as set forth above, by concealing

17  the true condition of the Meridian business as well as the wrongful misappropriations of

18  Plaintiff's funds, prevented Plaintiff from obtaining the benefits of the Northridge MSA and

19  from exercising its rights and remedies under the Northridge MSA. Plaintiff has performed all

20  duties and obligations on its part to be performed herein, except as performance thereof has been

21  excused by the acts, conduct and/or omissions of Defendants.

22        16.    Plaintiff as a proximate result of the acts and conduct of Defendants as alleged

23  above, has sustained losses of its property in sums not yet fully ascertained but which Plaintiff is

24  informed and believes and on that basis alleges, presently exceed $6,000,000. Further, by reason

25  of such losses Plaintiff has sustained the loss and loss of use of valuable health care resources

26  impacting Plaintiff and its patient community, and unless and until such sums and property are

27  returned to Plaintiff, Plaintiff's capacity to apply same toward health care services and quality of

28

7

COMPLAINT OF NORTHRIDGE MEDICAL GROUP, INC.

1  care improvement programs for the benefit of Plaintiff's patient community will continue to be

2  impaired thereby.

### FIRST CAUSE OF ACTION

[Fraud, Against All Defendants]

5      17.    Plaintiff realleges and incorporates by this reference all the allegations of

6  Paragraphs 1 though 16, inclusive, hereinabove, as though set forth here at length.

7      18.    The acts and conduct of the Defendants as hereinabove alleged were done falsely,

8  fraudulently and in order to induce Plaintiff to act in reliance upon the apparent performance,

9  stability and financial strength of Meridian and support and financial strength of the Nautic

10 Defendants, to enable Defendants wrongfully to misappropriate and use to their benefit

11 Plaintiff's funds.

12     19.    Plaintiff justifiably relied upon the acts and conduct of Defendants, and has been

13 proximately damaged thereby in sums not yet fully ascertained but which Plaintiff is informed

14 and believes and on that basis alleges, presently exceed $6,000,000.

15     20.    The acts and conduct of Defendants as set forth above were done with malice,

16 fraud and oppression, and Plaintiff is accordingly entitled to punitive damages in a sum or sums

17 in excess of $10,000,000.00.

### SECOND CAUSE OF ACTION

[Negligent Misrepresentation, Against All Defendants]

20     21.    Plaintiff realleges and incorporates by this reference all the allegations of

21 Paragraphs 1 though 16 and 18 through 20, inclusive, hereinabove, as though set forth here at

22 length.

23     22.    The representations and acts of the Defendants as set forth hereinabove were

24 made and done without reasonable basis for the truth or accuracy of such representations and

25 with knowledge that such Defendants lacked a reasonable basis therefor.

26 ///

27

28

8

COMPLAINT OF NORTHRIDGE MEDICAL GROUP, INC.

**THIRD CAUSE OF ACTION**

[Conspiracy to Commit Fraud, Against All Defendants]

23.    Plaintiff realleges and incorporates by this reference all the allegations of Paragraphs 1 though 16, 18 through 20 and 22, inclusive, hereinabove, as though set forth here at length.

24.    Beginning in or about October, 2003, the Defendants knowingly and willfully conspired and agreed among themselves to misappropriate funds of Meridian customers, including without limitation Plaintiff, and to conceal from Plaintiff, among others, that such Defendants had caused to be misappropriated and stolen money from customer accounts and falsely to present Meridian, with the support and financial strength of Nautic, as a financially stable business.

25.    Said Defendants did the acts and things herein alleged pursuant to, and in furtherance of, said conspiracy.

26.    Among other overt acts in furtherance of the above-described conspiracy, in or after August, 2005 the Nautic Defendants, among other things, obtained more than $3,750,000 in cash from the sale of their investments in Meridian.

27.    Plaintiff did not become aware of the fraud until in or about December, 2005, and did not become aware of the above-described conspiracy until in or about January, 2006.

**FOURTH CAUSE OF ACTION**

[Conversion, against All Defendants]

28.    Plaintiff realleges and incorporates by this reference all the allegations of Paragraphs 1 though 16, 18 through 20, 22 and 24 through 27, inclusive, hereinabove, as though set forth here at length.

29.    The Defendants, by reason of the acts and conduct as alleged hereinabove, have exercised wrongful dominion and control over property of Plaintiff and unlawfully taken, appropriated and converted property of Plaintiff to their own use and benefit.

///

9

## FIFTH CAUSE OF ACTION

[Unfair and Fraudulent Business Practices, Bus. & Prof. Code §17200 *et seq.*,

Against All Defendants]

30.     Plaintiff realleges and incorporates by this reference all the allegations of Paragraphs 1 though 16, 18 through 20, 22, 24 through 27 and 29, inclusive, hereinabove, as though set forth here at length.

31.     The acts and conduct of the Defendants as alleged above constitute unfair and fraudulent business acts, and the plan, pattern and practice of said Defendants as alleged above, and in which the Nautic Defendants aided and abetted the other Defendants, constitute an unfair and fraudulent business practices, all as prohibited by Cal. Bus. & Prof. Code §§17200 *et seq.* and for which Plaintiff is entitled to equitable relief, including restitution of all sums wrongfully obtained and used for their benefit by Defendants thereby.

## SIXTH CAUSE OF ACTION

[Breach of Contract, Against Meridian]

32.     Plaintiff realleges and incorporates by this reference all the allegations of Paragraphs 1 though 16, inclusive, hereinabove, as though set forth here at length.

33.     The acts and conduct of Meridian as set forth above were in breach of the Northridge MSA.

## SEVENTH CAUSE OF ACTION

[Tortious Inducement to Breach of Contract, Against the Nautic Defendants]

34.     Plaintiff realleges and incorporates by this reference all the allegations of Paragraphs 1 though 16, 18 through 20, 22, 24 through 27, 29 and 31, inclusive, hereinabove, as though set forth here at length.

35.     The acts and conduct of the Nautic Defendants as set forth above were intended to, and were, done with the intent and result of inducing Meridian to breach its obligations to Plaintiff under the Northridge MSA.

///

COMPLAINT OF NORTHRIDGE MEDICAL GROUP, INC.

**EIGHTH CAUSE OF ACTION**

[Restitution and Imposition of Constructive Trust, Against All Defendants]

36.    Plaintiff realleges and incorporates by this reference all the allegations of Paragraphs 1 though 16, 18 through 20, 22, 24 through 27, 29, 31 and 35, inclusive, hereinabove, as though set forth here at length.

37.    Plaintiff is entitled to restitution from all Defendants of, and /or imposition of a constructive trust upon, any and all property and assets of Plaintiff acquired or used by Defendants thereby, and all proceeds thereof.

**NINTH CAUSE OF ACTION**

[Injunctive and Declaratory Relief, Against All Defendants]

38.    Plaintiff realleges and incorporates by this reference all the allegations of Paragraphs 1 though 16, 18 through 20, 22, 24 through 27, 29, 31, 35 and 37, inclusive, hereinabove, as though set forth here at length.

39.    By reason of the matters alleged above in this Complaint, Defendants, and each of them, and their respective agents, employees and representatives and all persons acting in concert with them, should be enjoined and restrained from interfering with the use and possession by Plaintiff of its property and assets, and from any further efforts to appropriate such property and assets and/or deny Plaintiff the use and benefit of them.  Such injunction is necessary in that Defendants are and if not enjoined will continue to act in violation of the rights of Plaintiff, and unless such an injunction is issued the acts and conduct of Defendants will continue to injure Plaintiff irreparably, as set forth above, for which Plaintiff has no adequate remedy at law.

40.    By reason of the foregoing, there is an actual controversy by and between Plaintiff  on the one hand and Defendants on the other hand, in that, among other things Plaintiff maintains that it is entitled to the possession, use, recovery and benefit of its funds and assets, whereas Defendants have misappropriated and converted same and denied Plaintiff the use thereof; and Plaintiff is informed and believes and on that basis alleges that Defendants continue

11

1   to claim that they are entitled to do so and are not liable to Plaintiff thereby.

2       41.    A decree and judgment of this Court is necessary and appropriate to adjudicate

3   the respective rights and obligations as between Plaintiff and Defendants in the premises.

4       WHEREFORE, plaintiff prays for judgment against Defendants, and each of them, as

5   follows:

6       ON THE FIRST THROUGH FOURTH AND SEVENTH CAUSES OF ACTION:  For

7   compensatory damages according to proof but not less than $6,000,000, and for punitive and

8   exemplary damages as determined upon trial of this action but not less than $10,000,000;

9       ON THE FIFTH CAUSE OF ACTION:  For injunctive relief as provided by law, and for

10  full restitution of all sums wrongfully obtained by Defendants and each of them.

11      ON THE SIXTH CAUSE OF ACTION:  For compensatory damages according to proof

12  but not less than $6,000,000;

13      ON THE EIGHTH CAUSE OF ACTION:  For a decree and order of this Court for

14  restitution from all Defendants of, and /or imposition of a constructive trust upon, any and all

15  property and assets of Plaintiff acquired or used by Defendants thereby, and all proceeds thereof;

16      ON THE NINTH CAUSE OF ACTION:  For injunctive relief as provided by law, and

17  for the decree and judgment of this Court adjudicating the rights and obligations of Plaintiff and

18  Defendants in the premises;

19      ON ALL CAUSES OF ACTION:  For prejudgment and postjudgment interest as

20  provided by law, for Plaintiff's attorneys' fees and expenses to the extent provided by law, for

21  costs of suit incurred herein, and for such other and further relief as the Court may deem just and

22  proper.

23

24  Dated: February 14, 2006          UZZELL S. BRANSON III
                                      a Professional Corporation
25                                    LAW OFFICES OF UZZELL. S. BRANSON III

26

27                                    Uzzell S. Branson III
                                      Attorney for Plaintiff Northridge Medical
28                                          Group, Inc.

                                      12

COMPLAINT OF NORTHRIDGE MEDICAL GROUP, INC.



**EXHIBIT "1"**

13

# MANAGEMENT SERVICES AGREEMENT

between

MERIDIAN HEALTH CARE MANAGEMENT

and

Northridge Medical Group, Inc.

a California professional medical corporation

Dated as of July 1, 1999

©1997, All Rights Reserved
MID3172.MSA

1

14

# TABLE OF CONTENTS

Page

RECITALS ................................................................................................... 1

AGREEMENT .............................................................................................. 1

ARTICLE I

        RELATIONSHIP OF THE PARTIES ........................................ 2
1.1    Independent Contractors ................................................................. 2
1.2    Control Over Practice of Medicine ................................................. 2
1.3    Representations and Warranties of the Parties ............................... 2

ARTICLE II

        RESPONSIBILITIES OF MHCM .............................................. 3
2.1    Engagement ..................................................................................... 3
2.2    Authority of MHCM ....................................................................... 3
2.3    Managed Care Contract Negotiations ............................................ 3
2.4    Provider Agreements ...................................................................... 3
2.5    Utilization and Quality Management .............................................. 4
2.6    Claims Administration .................................................................... 4
2.7    Billing and Collections ................................................................... 5
2.8    General Financial Management ...................................................... 5
2.9    Marketing Assistance ..................................................................... 5
2.10  Custody of Records ........................................................................ 5
2.11  Support Services ............................................................................. 5
2.12  Support Personnel .......................................................................... 6
2.13  IPA Expenses ................................................................................. 6
2.14  Performance Guarantees ................................................................ 6
2.15  Non-Exclusivity ............................................................................. 6

ARTICLE III

        OBLIGATIONS OF IPA ............................................................ 7
3.1    Organization and Licensure. .......................................................... 7
3.2    Medical Services ............................................................................ 7
3.3    Practice of Medicine ...................................................................... 7
3.4    Standards of Practice and Conduct ................................................ 7
3.5    Terms of Provider Agreements ...................................................... 8
3.6    Documentation of Services Performed ........................................... 8
3.7    Insurance ........................................................................................ 8
3.8    IPA Expenses ................................................................................. 8

© 1999. All Rights Reserved

2

3.9     Assistance ............................................................ 8
3.10    Corporate Status .................................................... 9
3.11    Board of Directors Meetings .................................... 9
3.12    Cooperation and Authority ...................................... 9

ARTICLE IV

                    FINANCIAL ARRANGEMENTS ............................... 9
4.1     Gross Revenue Defined .......................................... 9
4.2     Deposit of Gross Revenue ...................................... 9
4.3     Management Fee .................................................... 10
4.4     Credentialing Fee .................................................. 10
4.5     Fee Payment ......................................................... 10
4.6     Fair Value Warranty .............................................. 10

ARTICLE V

                    TERM AND TERMINATION ................................... 10
5.1     Term and Termination Without Cause ....................... 10
5.2     Termination With Cause or Cancellation ................... 11
5.3     Actions After Termination ...................................... 11

ARTICLE VI

                    INDEMNIFICATION ............................................ 12
6.1     Indemnification by IPA. ........................................ 12
6.2     Indemnification by MHCM ..................................... 12
6.3     Survival of Obligations .......................................... 12

ARTICLE VII

                    RESTRICTIVE COVENANTS ................................. 13
7.1     Exclusivity .......................................................... 13
7.2     Non-Solicitation .................................................. 13
7.3     Non-Disclosure .................................................... 13
7.4     Confidentiality of Agreement .................................. 13
7.5     Reasonableness of Restrictions ............................... 13
7.6     Severability ......................................................... 14
7.7     Remedies ............................................................ 14

©1999: All Rights Reserved
MHCM/MGA

3

*16*

**ARTICLE VIII**

MISCELLANEOUS

| 8.1 | Taxes and Tax Returns | 15 |
| 8.2 | Books and Records | 15 |
| 8.3 | Assignment | 15 |
| 8.4 | Successor in Interest | 15 |
| 8.5 | Modification of Agreement | 15 |
| 8.6 | Modification Compelled by Law | 15 |
| 8.7 | Waiver; Consents | 16 |
| 8.8 | Force Majeure | 16 |
| 8.9 | Remedies | 16 |
| 8.10 | No Requirement to Refer | 16 |
| 8.11 | Headings | 17 |
| 8.12 | Notices | 17 |
| 8.13 | Non-discrimination | 17 |
| 8.14 | Counterparts | 18 |
| 8.15 | No Third Party Beneficiary | 18 |
| 8.16 | Governing Law | 18 |
| 8.17 | Language Construction | 18 |
| 8.18 | Dispute Resolution | 18 |
| 8.19 | Attorneys' Fees | 18 |
| 8.20 | Time is of the Essence | 19 |

**EXHIBIT LIST**

EXHIBIT "A"     Compensation
EXHIBIT "B"     Operational Management Services
EXHIBIT "C"     Performance

©1999; All Rights Reserved

4

17

# MANAGEMENT SERVICES AGREEMENT

This Management Services Agreement ("*Agreement*") is made and entered into as of the ___ day of _____, 1999 (the "*Effective Date*"), by and between Meridian Health Care Management, LP, a Delaware Limited Partnership, ("*MHCM*"), and Northridge Medical Group, a wholly owned subsidiary of Southern California Regional Medical Group, Inc. a California professional medical corporation ("*IPA*"), for the provision of management services by MHCM to IPA. IPA and MHCM are sometimes referred to herein individually as a "*Party*" or collectively as the "*Parties.*"

## RECITALS

A.    IPA is a duly formed and validly existing California professional medical corporation, which has been organized in Los Angeles, California, to operate as an independent practice association, and to enter into agreements with organizations such as health care service plans and other purchasers of pre-paid medical services (hereinafter collectively referred to as "*Plans*") for the arrangement of the provision of health care services to subscribers or enrollees of said Plans (the "*Business*");

B.    IPA has entered or is entering into written agreements with physicians and other health care professionals ("*Providers*") to provide or arrange for the provision of health care services to subscribers or enrollees of Plans ("*Enrollees*") that have or will contract with IPA for health care services;

C.    In addition to providing or arranging for the provision of health care services to subscribers or enrollees of Plans, IPA is expecting to perform a variety of administrative and management services in connection with the provision of health care services to Enrollees of Plans;

D.    MHCM is in the business of providing management and administrative services and has developed operations, management and marketing systems for independent practice associations engaged in providing health care services to Plans;

E.    IPA desires to engage MHCM, and MHCM is willing to provide IPA with the necessary support to manage the Business, all upon the covenants, conditions and restrictions set forth in this Agreement.

©1999; All Rights Reserved
MHCM MSA 7.99

1

18

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants, conditions and restrictions set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## RELATIONSHIP OF THE PARTIES

**I.1      Independent Contractors.** In performing their obligations hereunder, the Parties shall be and shall act as independent contractors. MHCM is not a partner, joint venturer, or employee of IPA. Except as otherwise expressly set forth in this Agreement, neither Party will have the authority to bind the other Party, contractually or otherwise. In addition, IPA will not have any claim under this Agreement, or otherwise, against MHCM for vacation pay, sick leave, unemployment insurance, worker's compensation, disability benefits or employee benefits of any kind.

**I.2      Control Over Practice of Medicine.** The Parties acknowledge and agree that the physicians who are engaged by IPA (each, a *"Physician"*, and, collectively, the *"Physicians"*), shall have exclusive control over the practice of medicine and the delivery of professional medical services to Enrollees, and that all diagnoses, tests, and other professional medical and clinical services shall be undertaken or directly supervised by Physicians and other duly licensed non-physician health care professionals who are engaged by IPA.

**I.3      Representations and Warranties of the Parties.** Each Party represents and warrants as follows: (i) this Agreement when executed and delivered will constitute the Party's legal, valid and binding obligation enforceable in accordance with its terms, subject to general equitable principles and the laws governing creditors' rights; (ii) the Party has full legal power and authority to enter into and deliver this Agreement and perform the transactions contemplated herein; (iii) all consents, approvals, resolutions, authorizations, actions or orders required of the Party for the authorization, execution and delivery of, and for the consummation of the transactions contemplated by, this Agreement have been obtained; (iv) the execution and delivery of this Agreement, and the performance of its obligations hereunder, do not conflict with or violate any judicial or administrative order, award, judgment or decree applicable to the Party, or violate or conflict with any of the terms, conditions or provisions of the Party's organizational documents or any contract between the Party and any third person or entity.

©1999; All Rights Reserved
MHCM MSA 7 99

## ARTICLE II
## RESPONSIBILITIES OF MHCM

**II.1    Engagement.** IPA hereby engages MHCM and MHCM hereby agrees to serve as the sole and exclusive administrator of the Business for those items identified in Exhibit B, commencing as of the Effective Date and subject to the terms and conditions of this Agreement.

**II.2    Authority of MHCM.** Consistent with the provisions of this Agreement, MHCM shall be responsible for providing such management services as are reasonably necessary, advisable, or proper to conduct the business affairs of the Business.    In carrying out its obligations under this Agreement with respect to the management of the Business, MHCM agrees to provide the services set forth in Exhibit B.    (Exhibit B is attached hereto and hereby incorporated by this reference herein.)    MHCM agrees that it will not, without the prior written consent of IPA, which consent IPA may give or withhold in its sole and complete discretion, do any of the following:    (i) sell, mortgage, pledge, convey, assign, hypothecate, or otherwise transfer any interest in any property of IPA; or (ii) incur debts or enter into contracts, leases, or other agreements in IPA's name except as such obligations are expressly approved in the IPA's annual operating or capital budget or this Agreement.    In the performance of its services hereunder, MHCM shall act at all times in good faith and within reasonable diligence, MHCM shall perform all duties and obligations under this Agreement in a timely manner.    MHCM shall devote the required employees' time as is necessary for MHCM to perform its duties and obligations under this Agreement.

**II.3    Managed Care Contract Negotiation and Implementation.**    IPA shall be responsible for negotiating managed care payor contracts ("Managed Care Contracts"). MHCM shall have the opportunity, prior to execution of any such contract, to review and comment with respect to administrative issues and implementation issues.    IPA shall provide MHCM with copies of each Managed Care Contract.

       (a)    IPA and MHCM shall comply with all terms of each Managed Care Contract including, without limitation, the terms of all documents or instruments incorporated therein by reference and all documents or instruments related thereto.

       (b)    MHCM agrees to provide all management services within its scope of responsibility necessary to implement such Managed Care Contracts or amendments to such Managed Care Contract.

**II.4    Provider Agreements.** MHCM agrees to assist IPA in the administration of its agreements with Physicians and other providers of health care services ("*Providers*"), including, without limitation, (i) soliciting and negotiation with Providers identified by the IPA as necessary for IPA operations; (ii) assisting in the credentialing of such Providers by providing the Provider's credentialing application and related information to the IPA designated contracted credentialing company or the Plan, as appropriate; (iii) making recommendations regarding the

©1999; All Rights Reserved
MHCM MSA 7.99

3

20

business terms of agreements between IPA and such Providers; (iv) instructing Providers and their office staff regarding established IPA policies and procedures. IPA shall provide MHCM with provider contracting guidelines which shall specify reimbursement rate ranges, reimbursement methodologies and scope of services for each specialty. Any and all Provider agreements are subject to the approval of the Board of Directors of IPA.

Both Parties recognize that the services to be provided by MHCM will be feasible only if IPA operates an active business. Therefore, IPA agrees to obtain and enforce a written Participating Provider Agreement with each current and future Physician who provides professional medical services for IPA (a *Provider Agreement*). Each Provider Agreement shall comply with all applicable laws, and shall comply with all provisions of this Agreement, including in particular and without limitation, all provisions of Section III.5   Except with MHCM's prior written consent, IPA agrees not to amend any Provider Agreement if such amendment would cause the Provider Agreement not to be consistent with any provision of this Agreement.   If MHCM believes that any particular Provider Agreement should be terminated or that a particular Provider should not be engaged by IPA, and IPA disagrees, then IPA will promptly meet with MHCM in a conscientious and good faith effort to reach an agreement on such question.   IPA shall be responsible for funding the payment of compensation for all Providers.   MHCM shall have no obligation whatsoever to provide funds for compensating any Provider.   MHCM shall reasonably cooperate with and assist IPA to meet its obligations in relations to its Provider Agreements, provided however, that IPA acknowledges and agrees that it shall retain ultimate responsibility for meeting such obligations.

**II.5   Utilization and Quality Management.**   MHCM shall provide such utilization and quality management services as are reasonably necessary for the operations of the Business. These services shall include eligibility verification, case management, specialty referral review, claims review, and hospital and utilization tracking and coordination with hospital utilization management and case management staff.   All services shall be performed in accordance with written utilization management and quality management policies and procedures developed by IPA in consultation with MHCM.

**II.6   Claims Administration.**   MHCM shall have sole and exclusive right and responsibility to administer and pay claims for services rendered to IPA by Physicians and other Providers, including, without limitation, the following:   (i) reviewing claims and supporting documentation submitted by Physicians and other Providers; (ii) calculating payable claims based on the IPA and Plan policies and procedures; (iii) billing other payors for coordination of benefits and other third party liability payments according to IPA and Plan policies and procedures; and (iv) preparing and disbursing checks to pay amounts due and owning, subject to prior approval of IPA and the defined disbursement procedures. MHCM shall perform its duties within the time frames established by the Plans, the State of California Department of Corporations and/or HCFA. *Failure to perform at this level will constitute a breach of this Agreement.*

©1999, All Rights Reserved
MHCM MSA 7.99

4

21

**II.7    Billing and Collections.**  MHCM shall have sole and exclusive right and responsibility to bill, collect, and receive payments, for medical services rendered by IPA for which IPA does not receive capitation or for services where additional reimbursement is owed to IPA.  This may include, but not be limited to stop loss cases, third party liability cases, and services for which the Plans reimburse IPA on a fee for service basis.  MHCM shall use diligent, good faith efforts to bill and collect such accounts receivable in a timely manner, subject to the receipt by MHCM from IPA, Physicians and other providers, of the billing information as required.

**II.8    General Financial Management.**  MHCM shall provide such financial accounting and record keeping services as are reasonably necessary for the operations of the Business.  These services shall include financial record keeping, accounts receivable and accounts payable processing, bank reconciliation, and preparation of a monthly unaudited financial statements with respect to the operation of the Business (balance sheets and income statements generated in a format agreed upon by IPA and MHCM).  IPA shall be solely responsible for the preparation of all audited financial statements of IPA.  MHCM agrees to assist and coordinate with IPA's certified public accountants, at its sole cost and obligation, the annual review of IPA's books and records and the preparation of compiled or reviewed financial statements, provided, however, that MHCM shall have no responsibility for the preparation of IPA's federal or state income tax returns or the payment of such income taxes.

**II.9    Marketing Assistance.**  MHCM agrees to assist IPA in the development of a marketing plan and related materials for the advertising and marketing of IPA's Business and the services offered by IPA.  In furtherance of the foregoing, MHCM agrees, on behalf of IPA and at IPA's sole expense, to engage appropriate personnel to accomplish this task if such engagement is deemed necessary by IPA.  IPA hereby authorizes MHCM to use IPA's name, address and office location and the respective names, images, qualifications and biographical data of the Physicians in advertising and marketing materials developed by MHCM, or its agents, employees or subcontractors.

**II.10    Custody of Records.**  MHCM shall maintain on behalf of IPA, custody of all records and files relating to the day-to-day operation of the Business, including but not limited to, books of account and financial records, and patient medical records.  Patient medical records shall at all times be and remain the property of IPA and shall be located at the Medical Offices so that they are readily accessible for patient care.  The management of all files and records shall comply with applicable state and federal laws.  MHCM shall use its best efforts to preserve the confidentiality of patient medical records and use information contained in such records only for the limited purposes necessary to perform the services set forth herein.

**II.11    Support Services.**  MHCM agrees, at its cost and expense, to provide or arrange

©1999; All Rights Reserved
MHCM MSA 7 99

5

for the provision of all support services as are reasonably necessary for the provision of the services required of MHCM under this Article II (the "*Support Services*"), including but not limited to, computer services, printing, postage and duplication services.

**II.12  Support Personnel.**  MHCM agrees, at its cost and expense, to provide or arrange for the provision of all non-physician personnel as are reasonably necessary for the provision of the services required of MHCM under this Article II (the "*Support Personnel*"). Support Personnel does not include any Providers.  All Support Personnel shall be subject to the supervision, direction and control of MHCM, including, without limitation, (i) hiring any Support Personnel; (ii) determining the salaries, fringe benefits, bonuses, health and disability insurance, workers' compensation insurance and any other benefits that the Support Personnel receive; and (iii) determining any *appropriate disciplinary action required to be taken* against Support Personnel, up to and including termination.  IPA shall have the right to periodically evaluate any on-site MHCM personnel and report such evaluations to MHCM.  However, the hiring, compensation and all other terms of employment for all on-site and off-site MHCM personnel shall be at the sole discretion of MHCM.  MHCM agrees to assign an administrator who will be responsible for the day-to-day operations of the IPA and who will be responsive to the Board of Directors of IPA.

**II.13  IPA Expenses.**  Except as otherwise provided in this Agreement, MHCM agrees, at its sole cost and expense, to provide the services set forth in this Article II.  Notwithstanding the foregoing, MHCM shall have no obligation to pay the following expenses incurred by or on behalf of IPA, which shall be the sole and complete responsibility of IPA:  (i) Physician or provider compensation; (ii) expenses for medical offices, facilities, and equipment; (iii) life, malpractice and other insurance expenses; (iv) expenses of attorneys and accountants; (v) IPA Board of Director, committee or medical directorship fees; (vi) costs incurred, with IPA's prior written consent, for IPA's membership, Board, or committee meetings, excluding costs for routine preparation of information packets, presentation materials and other routine materials; (vii) entertainment and travel expenses; (viii) fees relating to professional licensing and Drug Enforcement Administration ("DEA") certification, and other professional licensing, registration and certification requirements; (ix) dues, subscriptions and continuing education expenses; (x) contributions to charitable or other organizations; and (xi) income taxes and preparation of tax returns, (xii) credentialing and provider office site visits.

**II.14  Performance Guarantees.**  MHCM agrees to meet the specific performance standards as described in Exhibit C.

**II.15  Non-Exclusivity.**  IPA acknowledges and agrees that MHCM's obligation to provide management services to IPA as required hereunder is non-exclusive, and that MHCM has the right, without obtaining IPA's prior consent, to make similar arrangements with other physicians, medical groups or independent practice associations ("Physician Groups") to provide

©1999; All Rights Reserved
MHCM MSA 7.99

23

management and administrative services to such other physicians or medical groups.

### ARTICLE III
### OBLIGATIONS OF IPA

**III.1   Organization and Licensure.**  As a continuing condition of MHCM's obligations under this Agreement, IPA and each of its Physicians shall at all times during the term hereof be and remain legally organized and licensed to provide professional medical services in accordance with all requirements of applicable state and federal laws and regulations.

**III.2   Medical Services.**  IPA agrees to provide professional medical services to patients of the Business at all times in accordance with requirements of professional services agreements between IPA and each Plan, and in accordance with this Agreement ("*Medical Services*").  IPA further agrees as an essential term of this Agreement to undertake to provide Medical Services in a cost-effective manner consistent with accepted utilization review and quality assurance practices prevailing in the IPA's service area.

**III.3   Practice of Medicine.**  IPA shall be solely and exclusively responsible for supervising, directing and controlling all aspects of the practice of medicine and the provision of medical care and services to Enrollees, including, without limitation, diagnosis, treatment, prescription and administration of medicine and drugs, the preparation of medical records and reports, and the training of Physicians and other Providers, and the compliance of Physicians and other Providers with the utilization management and quality management policies and procedures of IPA.  MHCM shall neither have nor exercise any control or direction over the methods by which IPA or any Physicians practice medicine.

**III.4   Standards of Practice and Conduct.**  IPA agrees that all medical services provided by IPA, and each Physician and Provider, shall be consistent with the applicable professional standards of the American Medical Association, the applicable law of the State of California, and the prevailing community standards of care in the Los Angeles area, and federal laws and regulations (including specifically those related to the Medicare and Medi-Cal programs).  IPA shall take all steps necessary to ensure that it and each of its Physicians remain in good standing as a provider under the Medicare and Medi-Cal programs, as appropriate.  IPA shall take all steps necessary to ensure that Physicians remain duly licensed to practice medicine in the State of California and maintain unrestricted prescription authority from the DEA.  IPA shall take all steps necessary to ensure that all Providers are qualified and licensed to perform the services for which they are contracted pursuant to applicable law and/or professional standards. IPA shall maintain utilization management and quality management programs as established from time to time by IPA in consultation with MHCM, or as mandated by accreditation and/or licensing standards applicable to the Business, and shall ensure that each of its contracting Physicians participates in such continuing medical education as is necessary for such person to

©1999, All Rights Reserved
MHCM MSA 7.99

7

24

maintain adequate professional skills and expertise. IPA acknowledges and agrees that it is solely responsible for making all reports, if any, required to be made to the Medical Board of California under Section 805 of the California Business and Professions Code, or to the National Practitioner Data Bank.

**III.5   Terms of Provider Agreements.** Each Provider Agreement shall require the Provider: (i) to maintain a current unrestricted licenses to practice their respective professions in the State of California; (ii) to maintain a current unrestricted certification by the Federal Drug Enforcement Administration ("DEA"); (iii) to maintain professional liability insurance covering all activities by such Provider consistent with the terms of Section 3.8 below; (iv) for Physician Providers, to maintain appropriate medical staff membership and clinical privileges at hospitals to the extent necessary for the provision of professional medical services to Enrollees of Plans; and (v) to maintain the confidentiality of IPA's information and the Confidential Information of MHCM, pursuant to terms consistent with Section VII.3 of this Agreement. IPA agrees to establish procedures to ensure that Providers and Provider Agreements meet these requirements on an ongoing basis. IPA further agrees to use commercially reasonable efforts to enforce the covenants made by Providers in any Provider Agreement.

**III.6   Documentation of Services Performed.** IPA and Physicians shall be solely responsible for recording and collecting proper encounter data, including, without limitation, coding and recordation of all medical services and all other health care services provided by any of the Physicians or other IPA providers to Enrollees. IPA agrees to furnish or cause to be furnished to MHCM, all encounter data and information required by MHCM to properly report such information to Plans or to bill and collect for medical services provided in accordance to Section II.7. Such information shall be submitted in a format agreed upon by the Parties.

**III.7   Insurance.** Each party covenants and agrees that it shall obtain and maintain in effect throughout the initial term of this Agreement and each renewal term thereof, as appropriate, such policies of comprehensive general liability insurance and professional liability insurance including, but not limited to Directors & Officers and Errors & Omissions policies as well as comprehensive general liability insurance, as appropropriate.

**III.8   IPA Expenses.** IPA shall be responsible for any and all expenses incurred by or on behalf of IPA other than those expenses for which responsibility has been expressly assumed by MHCM hereunder, including, without limitation, all expense items identified in Section II.13. Nothing in this Agreement shall preclude IPA from purchasing from MHCM any items or services which otherwise are not provided by MHCM pursuant to this Agreement.

**III.9   Assistance.** IPA agrees to cooperate with and assist MHCM, and to execute such other documents and take such other actions as may be reasonably necessary or desirable, in

©1999; All Rights Reserved
MHCM MSA 7 99

8

25

connection with the efficient management of the Business.

    **III.10  Corporate Status.**    IPA covenants and agrees that it is presently and shall remain through the term of this Agreement, a professional corporation in good standing with the California Secretary of State.

    **III.11  Board of Directors Meetings.**        IPA shall hold regular Board of Directors meetings.

    **III.12  Cooperation and Authority.**  IPA covenants and agrees that it shall provide MHCM with all information and the use of such facilities as is reasonably required by MHCM to perform its services hereunder.  IPA further covenants that it shall grant MHCM such authority as may be necessary or desirable to ensure MHCM's ability to perform its duties hereunder. Such authority shall include access to individual provider offices, as approved by IPA.


**ARTICLE IV**
**FINANCIAL ARRANGEMENTS**

    **IV.1  Gross Revenue Defined.**   For purposes of this Agreement, IPA's *"Gross Revenue"* shall mean and include all payments owing to IPA for the provision of medical services to Enrollees, in accordance with generally accepted accounting principles, adjusted to reflect contractual allowances and other normal deductions from revenue, including such deductions mutually agreed upon by the Parties for charity care, bad debts and other amounts deemed uncollectible.  Without limiting the generality of the foregoing, IPA's Gross Revenue shall include, or exclude as appropriate, all revenue described in each of the following categories:

    (a)     Gross Revenue shall include capitation revenue ( defined as revenue where payment for services provided by IPA is made to IPA periodically on a per member per month basis, percentage of premium basis or any other basis  as defined by the Plan agreement) net of contractual deductions (such as withholds or POS deductions but excluding claims, except in those instances where the claim has not previously processed by MHCM), reinsurance, third party liability recoveries, stop loss recoveries, coordination of benefits,  and risk pool disbursements.  In the event that the Plan takes over claims processing and payment activities that were the responsibility of MHCM through this Agreement, Gross Revenue will be adjusted to reflect the deductions taken by the Plan to perform these functions.  Such deductions shall include deductions in capitation that the IPA receives from the Plan as well as penalty amounts  that the Plan may levy against the IPA for failure to perform functions that are the responsibility of MHCM under this Agreement.

    (b)      Gross revenue shall not include:  (i) expert witness fees or speaking honoraria received by individual Physicians; (ii) medical directorship fees received by individual

©1999; All Rights Reserved
MHCM MSA 7.99

26

physicians.

**IV.2   Deposit of Gross Revenue.**  IPA shall establish a bank account (the "*General Account*"), to be maintained by MHCM at such bank or similar financial institution as IPA and MHCM may from time to time agree (the "*Bank*"), and all Gross Revenue collected by MHCM pursuant to this Agreement shall be deposited therein.  IPA agrees to account for and deliver to MHCM for deposit into the General Account, any and all Gross Revenue collected or received by IPA during the term of this Agreement.  The General Account shall be used solely for depositing funds collected by MHCM or IPA and disbursing such funds in accordance with this Agreement.

**IV.3   Management Fee.**  As compensation for the performance by MHCM of its obligations hereunder, IPA agrees to pay MHCM in accordance to those amounts identified in Exhibit A.

**IV.4   Credentialing Fee.**  Credentialing is not MHCM's responsibility under this Agreement.

**IV.5   Fee Payment.**  Within thirty (30) days of IPA's receipt of MHCM's invoice for services, IPA shall pay to MHCM the Management Fee for such month.  MHCM agrees that the payment of such amounts by IPA shall constitute full and complete compensation to MHCM for all of MHCM's obligations and services rendered to IPA pursuant to this Agreement.

**IV.6   Fair Value Warranty.**  Each Party represents and warrants on behalf of itself, that the aggregate benefit given or received under this Agreement has been determined in advance through a process of arms-length negotiations that were intended to achieve an exchange of goods and/or services consistent with fair market value under the circumstances, and that any benefit given or received under this Agreement is not intended to induce, does not require, and is not contingent upon, the admission, recommendation or referral of any patient, directly or indirectly, to the MHCM, or to IPA, and further, is not determined in any manner that takes into account the value of business generated between the parties.

## ARTICLE V
## TERM AND TERMINATION

**V.1   Term and Termination Without Cause.**  Unless earlier terminated pursuant to the terms of either Section V.2 or V.3 below, or pursuant to any other provision of this Agreement, the term of this Agreement shall commence on July 1, 1999, and shall extend for a period of three (3) years thereafter. At the expiration of the initial term, this Agreement shall automatically extend for successive terms of two (2) years each, unless either Party gives to the

©1999; All Rights Reserved
MHCM MSA 7 99

10

other Party written notice of termination without cause at least four (4) months prior to the expiration of the then current term.

**V.2    Termination With Cause Or Cancellation.** Notwithstanding the foregoing, this Agreement may be terminated or canceled by either Party (non-defaulting Party) giving thirty (30) days prior written notice to the other Party if the other Party is in default of this Agreement. The following shall constitute events of default:

(a)    Failure by either Party to perform, keep or fulfill any material covenant, undertaking, obligation, condition or service set forth in this Agreement, including those Services and Performance Guidelines specifically set forth in Exhibits B and C, provided such failure is not cured within a period of thirty (30) days after receipt of written notice of such failure by the defaulting party.

(b)    Failure of a Party to pay any amount which may become due hereunder for a period of thirty (30) days after written notice of such failure.

(c)    Cancellation of insurance required by either Party herein.

(d)    IPA's practice of medicine is deemed illegal by any state or federal agency.

(e)    Any representations or warranties made herein by either Party are intentionally falsified or incorrect as of the effective date of this Agreement.

(f)    Either Party filing involuntary bankruptcy or an assigning of a majority of its assets for the benefit of creditors, or upon other action taken or suffered, voluntarily or involuntarily, under any federal or state law for the benefit of debtors of such Party, except for the filing of a petition of involuntary bankruptcy which is dismissed within sixty (60) days thereafter.

**V.3    Actions After Termination.** Upon the expiration or earlier termination of this Agreement, the following shall apply:

(a)    MHCM shall be paid in accordance with Article IV hereof for all agreed services rendered by MHCM to IPA prior to the expiration or earlier termination of this Agreement;

(b)    upon request of IPA, MHCM shall continue to provide claims administration for IBNR claims against a reserve account established by IPA, without additional cost or charge to the IPA, for a period of sixty (60) days following the date of termination (it being understood that all funds in the reserve account are the property of IPA and will be disbursed in accordance with this Agreement), and at the expiration of such sixty (60) day period, MHCM shall deliver to IPA a final statement of reserve account funds and IBNR claims for IPA;

(c)    MHCM further agrees that upon request by IPA, MHCM shall continue to provide claims administration for IBNR claims against a reserve account established by the IPA. on a monthly basis for a period not to exceed six (6) months following the expiration or termination of this Agreement, in exchange for the payment by IPA to MHCM of five dollars ($5.00) per adjudicated and paid claim, beginning with the sixty-first (61st) day following the date

©1999; All Rights Reserved
MHCM MSA 7.99

11

28

of termination of this Agreement, and MHCM shall deliver to IPA a monthly statement of reserve account funds and IBNR claims for IPA, as well as a final statement of reserve account funds and IBNR claims for IPA as of the date of termination;

        (d)    upon termination of the period set forth in subparagraph (b) or (c) above, whichever is applicable, MHCM shall remit to IPA all reserve account funds that remain following administration by MHCM of IBNR claims; and

        (e)    in effectuating the foregoing provisions, IPA agrees that for the applicable period following the expiration or earlier termination of this Agreement, the IPA Account and General Account (and related Depository Agreements) shall be maintained, it being understood that funds in the reserve account will be disbursed in accordance with this section.

## ARTICLE VI
## INDEMNIFICATION

**VI.1    Indemnification by IPA.**  IPA hereby agrees to indemnify, defend, and hold harmless MHCM, and each of MHCM's officers, directors, shareholders, agents and employees, from and against any and all claims, demands, losses, liabilities, actions, lawsuits and other proceedings, judgments and awards, and costs and expenses (including reasonable attorneys' fees), arising directly or indirectly, in whole or in part, out of any matter related to (i) the professional negligence of IPA or any professional acts or omissions of IPA to the extent that such is not paid or covered by the proceeds of insurance; and (ii) any breach by IPA in the performance of its obligations under this Agreement.  IPA shall immediately notify MHCM of any lawsuits or actions, or any threat thereof, that may become known to IPA that might adversely affect any interest of IPA or MHCM whatsoever.

**VI.2    Indemnification by MHCM.**  MHCM hereby agrees to indemnify, defend, and hold harmless IPA, and each of IPA's officers, MHCM's, members, agents and employees, from and against any and all claims, demands, losses, liabilities, actions, lawsuits and other proceedings, judgments and awards, and costs and expenses (including reasonable attorneys' fees), arising directly or indirectly, in whole or in part, out of any matter related to any breach by MHCM of this Agreement or any acts or omissions by MHCM in its performance of this Agreement, including but not limited to the negligence of MHCM, to the extent that such is not paid or covered by the proceeds of insurance.  Notwithstanding the foregoing, MHCM shall not indemnify IPA for the acts, or failure to act, by Clinicians or Support Personnel who perform services under the direct supervision or control of any Physician at the Business.  MHCM shall immediately notify IPA of any lawsuits or actions, or any threat thereof, that may become known to MHCM that might adversely affect any interest of MHCM or IPA whatsoever.

**VI.3    Survival of Obligations.**  The obligations set forth in this Article VI shall survive the expiration or termination of this Agreement.

©1999; All Rights Reserved
MHCM HSA 7.99

12

29

## ARTICLE VII
## RESTRICTIVE COVENANTS

**VII.1  Exclusivity.**  During the term of this Agreement and except as otherwise provided herein, IPA will use MHCM exclusively for all administrative services as required for the day-to-day operations of IPA as defined in Exhibit "B" of this Agreement.

It is furthered agreed and understood that prior to entering into an agreement with any other qualified agency, for the purpose of obtaining additional administrative services, other than the specific functions that are set forth in this Agreement, IPA will notify MHCM of such intent, in writing, and MHCM will have the right of refusal to provide these additional services, at additional compensation no less than the compensation proposed to IPA in any bona fide offer from a qualified third Party.  Such right of first refusal shall expire thirty (30) days after IPA presents to MHCM a bona fide offer from a third Party qualified to provide such additional services.

**VII.2  Non-Solicitation.**  The parties agree that during the term of this Agreement and for a period of one year following termination of this Agreement, neither Party will directly or indirectly solicit any employee of the other to accept employment with that Party.

**VII.3  Non-Disclosure.**  At no time during or after the termination of this Agreement shall IPA, its partners, shareholders of partners, employees, or independent contractors, disclose, communicate or divulge to, or use for the direct or indirect benefit of any person, firm, association or company any material referred to in this Section VII.3, or any information regarding the business methods, business policies, procedures, techniques, or trade secrets, or other knowledge or processes of or developed by MHCM, or any other confidential information relating to or dealing with the business operations or activities of MHCM, made known to IPA, its shareholders, employees or agents or learned or acquired by IPA, its shareholders, employees or agents during the term of this Agreement, (collectively, "*Company Information*") except as may be expressly authorized by MHCM or any successor to it.   Immediately upon the termination of this Agreement, IPA and/or the applicable shareholder, physician employee or independent contractor, or other key employee or independent contractor shall deliver to MHCM all documents, computer discs or other forms of recorded information, including all copies thereof, containing Company Information.

**VII.4  Confidentiality of Agreement.**  IPA and MHCM acknowledge and agree that this Agreement, and the terms and conditions set forth herein, are confidential.  Each Party on behalf of itself, its agents and employees, covenants and agrees not to disclose directly or indirectly the terms of this Agreement, whether in whole or in part, to any third person or entity, except when necessary for the performance of this Agreement (*e.g.*, to MHCM's assignees), or required by

©1999; All Rights Reserved
Source at least 7.99

13

*30*

law, or for the sole purpose of securing legal counsel with respect hereto.  In addition, each Party further agrees not to disclose to any third party any financial or other information regarding the other Party obtained by the disclosing Party under this Agreement, regardless of when obtained, without the prior written consent of the other Party, except when necessary for the performance of this Agreement (e.g., to MHCM's assignees), or when required by law, or for the sole purpose of securing legal counsel with respect hereto.

**VII.5  Reasonableness of Restrictions.**  The parties hereto acknowledge that the restrictions contained in this Article VII are reasonable and necessary to protect the legitimate interests of MHCM and IPA and that any violation of these restrictions would result in irreparable injury to MHCM and IPA.  If the period of time, geographical area or scope of restricted activities or items specified in this Article VII should be adjudged unreasonable in any judicial, or any state or professional regulatory, proceeding, then the period of time or geographical area or scope shall be reduced to whatever extent the applicable authority deems to be reasonable.  In the event of a violation of these restrictions, the duration of the restrictions referred to in this Article VII shall be extended by a period of time equal to that period beginning with the commencement of any such violation and ending when such violation shall have been finally terminated in good faith.

**VII.6  Severability.**  If any provisions of this Article VII shall be determined to be invalid or unenforceable, either in whole or in part, this Article VII shall be deemed amended to delete or modify, as necessary, the offending provisions and to alter the balance of this Article VII in order to render the same valid and enforceable to the fullest extent permissible, as aforesaid.  Additionally, the provisions of this Article VII shall be deemed to be valid to the extent of any lesser area or for any lesser duration permitted by law if the area and duration set forth herein is deemed to be too broad by a court of competent jurisdiction.  The provisions of this Article VII shall be construed as an agreement independent of the other provisions of this Agreement. The existence of any claim or cause of action by either Party against the other Party shall not constitute a defense to the enforcement by either Party of the provisions of this Article VII.

**VII.7  Remedies.**  The Parties acknowledge that the forgoing restrictions are reasonable and necessary to protect the legitimate interests of the respective Parties and that the Parties would not have entered into this Agreement without the restrictive covenants contained herein, that the violation of these covenants will result in irreparable injury to the affected Party, that the remedy at law for any such violation or threatened violation would be inadequate and that in the event of any such breach or violation, the injured Party, in addition to any other remedies or damages available to it, shall be entitled to injunctive or other equitable relief without the necessity of proving actual damages but such rights to relief shall not preclude the injured Party from other remedies which may be available to it hereunder.

©1999; All Rights Reserved
MHCM MSA 7.98

14

*31*

**ARTICLE VIII**
**MISCELLANEOUS**

**VIII.1 Taxes and Tax Returns.**  MHCM shall be responsible for all federal, state and local taxes and contributions with respect to MHCM and persons employed by it, and MHCM shall make all returns and/or reports required in connection with any and all such laws, regulations, taxes, contributions, and benefits.  IPA shall be responsible for all federal, state and local taxes and contributions with respect to IPA and persons employed by it, and IPA shall make all returns and/or reports required in connection with any and all such laws, regulations, taxes, contributions, and benefits.  MHCM agrees to provide IPA with such financial and accounting information in the possession of MHCM *in order to assist IPA in the preparation of its income tax returns*, provided, however, that MHCM shall have no obligation or responsibility whatsoever to provide IPA with either tax returns or tax advice.

**VIII.2 Books and Records.**  All documents and materials including all patient charts and files, records, contracts, and other papers or documents which pertain to the Business, shall be the sole and exclusive property of IPA, provided that MHCM, at its expense, shall be entitled to retain copies of any and all such materials.  During the term of this Agreement IPA, or its respective designees, shall have reasonable access during normal business hours upon reasonable request, for inspection and copying of records maintained by MHCM in conjunction with MHCM's performance hereunder.  Notwithstanding the foregoing, IPA shall have no right to inspect or copy business or financial records of MHCM that relate solely to MHCM, or that are not generated in the ordinary course of performance by MHCM of its obligations hereunder.

**VIII.3 Assignment.**  This Agreement, being intended to secure the services of MHCM, its agents, employees and representatives, shall not be assigned, sublet or transferred by MHCM without prior written consent of IPA.  Such consent shall not be unreasonably withheld.  This Agreement shall inure to the benefit of and be binding on IPA and MHCM, their executors and administrators, including any person or entity which affiliates, merges or acquires substantially all of the assets of IPA or MHCM, or into which IPA may be consolidated or otherwise combined.

**VIII.4 Successor in Interest.**  Subject to Section VIII.3, all of the rights, benefits, duties, liabilities, and obligations of the parties hereto shall inure to the benefit of and be binding upon the parties and their permitted successors and assigns.

**VIII.5 Modification of Agreement.**  This Agreement supersedes any and all agreements, either written or oral, between the Parties, and contains all of the covenants and agreements between the Parties with respect to the subject matter hereof.  All Exhibits referred to in this Agreement are intended to and shall be incorporated into this Agreement by reference and shall be deemed to be a part of this Agreement.  Each Party to this Agreement acknowledges that no

©1999; All Rights Reserved
[illegible] MSA 7.99

15

32

representations, inducements, promises, or agreements, oral or otherwise, have been made by either Party, or anyone acting on behalf of either Party, which are not embodied herein, and that no other agreement, statement, or promise not contained in this Agreement shall be valid or binding. This Agreement may not be modified or amended except by a written document executed by both Parties.

**VIII.6 Modification Compelled by Law.** In the event any existing state or federal law or regulation is interpreted by a judicial decision or by a regulatory agency, or any new state or federal law or regulation is enacted, so as to indicate that any provision of this Agreement may be in violation of any such law or regulation or interpretation thereof, IPA and MHCM promptly shall make diligent and good faith efforts to amend this Agreement as necessary to accommodate the law or regulation or interpretation thereof. To the maximum extent possible, any such amendment shall preserve the underlying economic and financial arrangements between IPA and MHCM. In the event that the necessary modifications cannot be agreed upon by the Parties within thirty (30) days of one Party's written request of the other to negotiate such modification, this Agreement may be terminated by either Party, upon thirty (30) days prior written notice to the other Party.

**VIII.7 Waiver; Consents.** No consent or waiver, express or implied, by either Party hereto shall be valid unless set forth in a written document executed by both Parties, and no such consent or waiver shall be deemed or construed to be a consent to or waiver of any other obligation of a Party hereunder. Failure on the part of either Party to complain of any act or failure to act of the other Party or to declare the other Party in default, irrespective of how long such failure continues, shall not constitute a waiver by such Party of its rights hereunder. The granting of any consent or approval in any other instance by or on behalf of IPA and/or MHCM shall not be construed to waive or limit the need for such consent in any other or subsequent instance.

**VIII.8 Force Majeure.** Either Party shall be excused for failures and delays in performance of its respective obligations under this Agreement due to any cause beyond the control and without the fault of such Party, including without limitation, any act of God, war, riot or insurrection, law or regulation, strike, flood, fire, explosion or inability due to any of the aforementioned causes to obtain necessary labor, materials or facilities, for so long as such event continues, and for a reasonable period of time thereafter. This provision shall not, however, release such Party from using its best efforts to avoid or remove such cause and such Party shall continue performance hereunder with the utmost dispatch whenever such causes are removed. Upon claiming any such excuse or delay for non-performance, such Party shall give prompt written notice thereof to the other Party, provided that failure to give such notice shall not in any way limit the operation of this provision.

**VIII.9 Remedies.** All rights, powers and remedies granted to either Party by any

© 1999: All Rights Reserved
MHCM MSA 7.99

16

*33*

particular term of this Agreement are in addition to, and not in limitation of, any rights, powers or remedies which it has under any other term of this Agreement, at common law, in equity, by statute, or otherwise. All such rights powers and remedies may be exercised separately or concurrently, in such order and as often as may be deemed expedient by either Party. No delay or omission by either Party to exercise any right, power or remedy shall impair such right, power or remedy or be construed to be a waiver of or an acquiescence to any breach or default. A waiver by either Party of any breach or default hereunder shall not constitute a waiver of any subsequent breach or default.

**VIII.10    No Requirement to Refer.** No provision of this Agreement, or the relationship between the parties created by this Agreement, is intended by the parties hereto to include an agreement or requirement that IPA or its Physicians utilize the services or otherwise direct the patients to facilities owned or operated by MHCM or its affiliates or as an inducement to IPA or its Physicians to make any such referral. The parties hereto agree that the benefits under this Agreement do not require, are not payment for, and are not in any way contingent upon the admission, referral or other arrangement for the provision of any item or service reimbursed under Medicare or Medi-Cal.

**VIII.11    Headings.** The headings of the Sections and Articles of this Agreement are inserted for convenience of reference only and shall not in any manner affect the construction or meaning of anything herein contained or govern the rights or liabilities of the parties hereto.

**VIII.12    Notices.** All notices, requests, and communications required or permitted hereunder shall be in writing and shall be sufficiently given and deemed to have been received upon personal delivery or delivery by overnight courier or, if mailed, upon the first to occur of actual receipt or seventy-two (72) hours after being placed in the United States mail, postage prepaid, registered or certified mail, receipt requested, addressed to the parties as follows:

If to IPA:    Northridge Medical Group, Inc.
18350 Roscoe Blvd., Suite 700
Northridge, CA  91325
Attention:  President

If to MHCM:    Meridian Health Care Management, LP
21045 Califa St.
Woodland Hills, CA 91367
Attention:  President

Notice of a change in address of one of the parties shall be given in writing to the other Party as provided above, but shall be effective only upon actual receipt.

©1999; All Rights Reserved
MHCM MSA 7.99

17

34

**VIII.13    Non-discrimination.** IPA and MHCM will not discriminate on the basis of race, sex, age, religion, national origin, or handicap in providing services under this Agreement or in the selection of employees or independent contractors.

**VIII.14    Counterparts.** This Agreement may be executed in exact counterparts and when so executed by the parties hereto shall be effective in accordance with the terms hereof.

**VIII.15    No Third Party Beneficiary.** None of the provisions herein contained are intended by the parties, nor shall they be deemed, to confer any benefit on any person not a Party to this Agreement.

**VIII.16    Governing Law.** This Agreement shall be governed by the laws of the State of California.

**VIII.17    Language Construction.** The language in all parts of this Agreement shall be construed, in all cases, according to its fair meaning, and not for or against either Party. Any rule of law, or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the Party that drafted it has no application and is expressly waived.

**VIII.18    Dispute Resolution.** In the event of a dispute between the Parties to this Agreement, the Parties agree that the following procedure will be used in an attempt to resolve the dispute prior to the pursuit by any Party of other available remedies:

    (a)    A meeting (the "Initial Meeting") shall promptly be held at which all Parties are present or represented by individuals with full decision making authority regarding the matters in dispute.

    (b)    If within thirty (30) days following the Initial Meeting the Parties have not succeeded in negotiating a resolution of the dispute, the dispute shall be submitted to mediation facilitated by a mediator ("Mediator"). Such Mediator shall be a retired judge or mature practicing attorney with experience relevant to this Agreement. Each Party shall bear its proportionate share of the costs of the mediation, including the Mediator's fee.

    (c)    The Parties agree to participate in good faith in the mediation and negotiations related thereto in the Initial Meeting and in all mediation conferences.

    (d)    If within a period of sixty (60) days following the mediation conference or any adjournment thereof, the parties are unable to resolve the dispute, the Parties agree to submit such dispute to Arbitration. Such arbitration shall be settled in accordance with the rules of commercial arbitration of the American Arbitration Association and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Such arbitration shall occur within the County in which MHCM offices are located, unless the parties mutually agree to have such proceeding in some other locale. The arbitrator(s) may in any such proceeding award attorneys' fee and costs to the prevailing Party.

©1999, All Rights Reserved
MHCM MSA 7.99

18

35

**VIII.19**     **Attorneys' Fees.**  If legal action is commenced by either Party to enforce or defend its rights under this Agreement, or to interpret or enforce this Agreement, the prevailing Party in such action shall be entitled to recover its costs and reasonable attorneys' fees from the other Party, in addition to any other relief granted.

**VIII.20**     **Time is of the Essence.**  Time is hereby expressly declared to be of the essence in this Agreement.

IN WITNESS WHEREOF, the parties have hereunto set their hand as of the day and year first above written.

"MHCM"                                              "IPA"

Meridian Health Care Management, A                  Northridge Medical Group, Inc.
Delaware Limited Partnership.                        a California professional
By Meridian Health Care Consulting Inc,. A          medical corporation
California Corporation, its General Partner.

By: _____              By: _____

Its:   President                          Its:   President

Date:   8/3/99                            Date:   7/30/99

©1999; All Rights Reserved
MHCM-MSA - 99

19

36

EXHIBIT "A"

COMPENSATION

MHCM shall be compensated as follows:

A.    For development, and initial set-up: to include implementation services, initial information system set-up, loading into MHCM information system of all IPA provider files, member eligibility files, contract benefit tables and fee schedules via electronic or magnetic media, and recruitment and training of all MHCM staff necessary to support MHCM's responsibilities hereunder, team meetings with IPA, development activities, as requested, IPA shall pay MHCM the following:

IPA shall pay MHCM a payment of Forty Thousand dollars ($40,000.00) in accordance to the following schedule:

- 33.3 % ($13,500) upon signature of this Agreement.
- 33.3 % ($13,500) on the date the first Plan agreement between IPA and Plan becomes effective (expected to be August 1, 1999).
- 33.3 % ($13,000) upon successful completion of the implementation of this Agreement (see Exhibit C for definition).

B.    In addition to any fees paid to MHCM under Section A of this Exhibit, commencing immediately on the date that MHCM begins to perform any of the services described in Exhibit "B" of this Agreement, which date is expected to be August 1, 1999, IPA shall remit to MHCM, within thirty (30) days of IPA's receipt of MHCM's invoice for services, a monthly payment equal to **11.5%** of Gross Revenue, as defined in Article IV.1(a) of this Management Services Agreement

C.    Notwithstanding Section B of this Exhibit, the monthly fee paid to MHCM for providing management services as described in Exhibit "B" hereof shall be a minimum of $10,000 Thousand dollars per month, effective October 1, 1999.

©1999. All Rights Reserved
MHCM MSA 7.99

37

D.     All expenses directly related to the performance of services under Article II and Exhibit "B" of this Management Services Agreement shall be borne by MHCM, excluding the following:

- IPA legal expenses.
- Accounting expenses for year end taxes, audits and special accounting services other than the day-to-day operation of IPA.
- IPA Board, committee and Medical Director fees
- Design, printing and duplication expenses for medical encounter and referral forms, IPA stationery, newsletters and other marketing materials.
- IPA insurance premiums, including but not limited to: reinsurance, directors and officers, professional or general liability, and as approved by IPA.
- Costs incurred, with prior approval of IPA, for IPA's membership, Board or committee meetings, excluding costs for routine preparation of information packets, presentation materials and other routine items.
- Space rent, furnishings and equipment for office space located within IPA's primary service area (as defined in Article III, Section B of this Agreement) and used by MHCM, with IPA's approval, to perform the services required under this Agreement.

E.     For additional services not included in Exhibit "B", but requested and approved by IPA, MHCM shall be paid as follows:

|  |  |
|---|---|
| $235.00 per hour | Executive level staff |
| $160.00 per hour | Director or management staff |
| $ 50.00 per hour | *Support Staff* |

In additional to these hourly rates: IPA agrees to reimburse MHCM, with IPA's prior approval, and upon receipt of appropriate invoice and documentation, for all reasonable travel (excepting travel between the offices of MHCM and IPA), hotel, postage, copying and other out-of-pocket expenses. All such expenses shall be billed at MHCM's cost.

©1999: All Rights Reserved
MHCM MSA 2.00

2

## EXHIBIT "B"
## OPERATIONAL MANAGEMENT SERVICES TO BE PROVIDED BY MHCM

A. General Management and Administration.

1. Supervising and coordinating day-to-day non-medical business aspects of IPA.
2. Providing administrative support for interface with physicians, including voice mail access to MHCM staff at any time. Making best efforts to return as quickly as possible IPA voice mail messages, including voce mail messages received outside of normal business hours.
3. Providing the services of a consulting Medical Director who shall assist IPA in the provision of medical, administrative, peer review and utilization management services to IPA, including, but not limited to:
4. Consulting on Payor/IPA communications pertinent to medical matters.
5. Assisting in resolving any grievances between IPA and Payors pertinent to all medical matters.
6. Consulting on resolving IPA/Payor Member grievances pertinent to medical matters.
7. Consulting on IPA's medical and hospital referral authorization procedures.
8. Interfacing with IPA provider's office staff to monitor IPA's medical and hospital referral authorization procedures.
9. Coordinating medical administrative support prior to and at all Utilization Management and Quality Management Committee Meetings.
10. Providing clerical and secretarial support adequate to meet functions of IPA, its employees and its Board of Directors.
11. Coordinating printing of all forms and correspondence.
12. Processing all incoming and outgoing mail.
13. Maintaining a liaison with Payors where necessary to obtain/submit data, etc.
14. Preparing ad-hoc reports as requested by IPA.
15. On-going provision of computerized management information system.
16. Display capability of the software and up to five days of system training.
17. Encounter receipt and processing in accordance with Health Plan requirements
18. Purchased service claim receipt and processing

B. Financial Management.

1 Establishing bookkeeping and accounting systems including the maintenance, custody and supervision of all of IPA's business records and the preparation, distribution and recordation of all bills and statements for professional services rendered by IPA, including billing and completion of reports and forms required by prepaid health plans, employers, insurance companies, governmental agencies and other third party payors.

©1999; All Rights Reserved
MHCM MSA 7 99

3

2   Establishing an annual budget that reflects major operating objectives and anticipated
    revenues, expenses and cash flow.
3   Maintain bank accounts and supervise short term investments and money management.
4   Preparing financial statements on a monthly basis to include a balance sheet, statement of
    revenue and expenses, and cash flow for IPA's operations for such month and a statement of
    accounts receivable.  Such statements to be produced on both a cash and accrual basis of
    accounting.
5   Establishing and maintaining an accounts payable system.
6   Administering a claims processing system, including, but not limited to:
    a   Receiving completed claim forms from IPA providers.
    b   Entering data in computerized database.
    c   Generating reports required by Payors.
    d   Adjudicating and paying claims pursuant to IPA's instructions and policies.
    e   Reviewing available cash versus payable claims.
    f   Generating reports required by IPA for utilization management and financial review.
7   Administering capitation distribution from prepaid Payors, including but not limited to:
    a   Receiving and depositing capitation payments.
    b   Reconciling capitation payments with eligibility lists and other pertinent reports.
    c   Preparing budgets for internal IPA management.
    d   Distributing primary care physician ("PCP") capitation payments and explanation of
        benefits.
8.  Distributing specialty physician payment based upon authorized referrals and explanation of
    benefits or other such reimbursement methodologies as determined by the IPA.
    a   Producing reports and collecting reimbursement for insured and reinsured services.
    b   Providing third party payor information for coordination of benefits and billing other
        payors for COB and other third party liability payments in accordance to the terms of the
        Plan agreement.
    c   Distributing payments to all ancillary and administrative providers.

    d   Preparing monthly, quarterly, and yearly financial statements and accounting protocols.

9.  Assistance in developing bonus distribution methodologies and distributing any such bonuses
    and or other risk sharing in accordance with bonus distribution methodologies.

10. Preparation of 1009s for all providers and vendors.

11. Establishment of internal control procedures designed to minimize opportunities for

12. misappropriation of IPA fund.

©1999; All Rights Reserved
AGHCM MSA 7.99

C. Risk Pool Administration. (If data is provided by Payors or Providers).

1. Entering charges against risk pool(s) in computerized database.
2. Generating reports of charges against risk pool(s).
3. Verifying accuracy and validity of reports produced by Payors.
4. Reconciling risk pool(s) accounts with Payors and any internal arrangement between hospital and IPA.

D. Management Information System. Provide a management information system to include the handling of accounts receivable, accounts payable, patient tracking, claims processing, utilization analysis, and eligibility determination. MIS system to be available and accessible to IPA at all times (minimal downtime).

E. Insurance and Risk Management.

1. Providing recommendations regarding professional liability insurance, comprehensive liability insurance, workers' compensation insurance and disability insurance.
2. Coordinating IPA's risk management program.

F. Patient Eligibility.

1. Obtaining eligibility lists from Payors.
2. Assisting with determination of eligibility of patients for health care coverage prior to provision of medical services.
3. Maintaining computerized eligibility database.
4. Reconciling retroactive denial of eligibility against provision of medical services and authorization process by IPA against appropriate health care benefit agreement.
5. Administering system for retroactive eligibility determination.
6. Distributing eligibility reports to appropriate IPA providers, hospital staff and IPA.

G. Provider Recruiting. Assist in recruiting and negotiating contracts with new providers.

H. IPA Provider Data.

1. Obtaining approved IPA provider applications from IPA.
2. Negotiating agreements with IPA providers.
3. Presenting complete provider applications and contracts for IPA approval.
4. Maintaining data in computerized eligibility database.
5. Tracking client provider contract renewal dates.
6. Distribution of updated IPA provider lists, as appropriate.

©.... All Rights Reserved
MHCM MSA 7.98

5

*41*

I.  Provider Relations.

1. Providing resources to train IPA providers and office staff in IPA's policies and procedures.
2. Distributing IPA's forms to IPA providers.
3. Assisting IPA in development and updating of a IPA manual.

J.  Education.

1. Educating physicians regarding IPA's polices and procedures.
2. Educating of Patients of IPA regarding third party payors.
3. Coordinating health education and wellness programs to Patients of IPA.

K.  Managed Care Contracting.

1. Implementation of managed care contracts and assistance in negotiation, if requested.
2. Negotiating agreements with hospital and ancillary providers within IPA service area.
3. Tracking contract renewal dates for agreements with third party payors.

L.  Liaison with Third Party Payors Contracting with IPA.

1. Coordinating communications with third party payors.
2. Providing third party payors with rosters of physicians in IPA, obtain provider health plan numbers, audit directories for accuracy.
3. Informing third party payors of roster changes.
4. Coordinating IPA network and office expansion to meet requirements of third party payors.
5. Assisting in resolving any grievances between IPA and third party payors.
6. Assisting in resolving patient grievances.

M.  Utilization Management, Quality Management and Medical Policy Committee Functions.

1. Administering managed care medical and hospital referral authorization procedure (include recommendations and policies and procedures for prior authorization of elective, urgent and emergent ambulatory and hospital services).
2. Designing, developing and implementing a physician education program and claims analysis program.

©1999; All Rights Reserved

6

42

3. Providing administrative assistance prior to and at all managed care Utilization Management, Quality Management and Medical Policy Committee Meetings (e.g. meeting schedules, set-up, agenda, minutes) and provide administrative assistance to IPA's Medical Director.

4. Providing administrative support when applicable at each managed care Utilization Management Committee meeting pertinent to health benefits, billing information, referral authorization process, referral and practice patterns, compliance with referral authorization process, referral limitations, monitoring of coding procedures and utilization guidelines.

5. Providing administrative support for all managed care Quality Management activities as they relate to non-medical policy and procedure development, data collection, meeting administration, documentation of finds, monitoring of IPA developed requirements for medical record documentation and responses to member grievances.

6. Providing administrative support for the managed care Medical Policy Committee as it relates to non-medical policy and procedure development, meeting administration, documentation of finds, and consistent application of non-medical adopted polices.

7. Developing a Provider Profiling system which includes a database of information relating to provider practice patterns, referral behavior and utilization of hospital, specialty and ancillary resources.

REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK

©1999; All Rights Reserved
MHCM MSA 7 99

7

43

# EXHIBIT C

## PERFORMANCE

IPA and MHCM agree that certain specific performance standards, measurement criteria, measurement period, penalties and bonuses as detailed in this Exhibit are required. IPA and MHCM shall measure results quarterly and jointly evaluate them. MHCM will provide IPA with monthly contract compliance reports within fifteen (15) days of the completion of each month.

### Performance Guidelines

**A.    *Claims Compliance***

All claims counted for purposes of evaluating performance shall exclude those claims where IPA has not provided eligibility, contract information, or authorization information to permit adjudication of the claim.

1.    Regulatory Compliance for Claims

The following standards will be adhered to:

***Medicare Claims***
- 95% of clean claims from noncontracted providers will be processed within 30 calendar days or within standards required by health plans.
- 95% of unclean and contracted claims will be processed within 60 calendar days or within standards required by health plans.

***Commercial/Medi-Cal claims***
- 95% of clean claims will be processed within 60 calendar days or within standards required by health plans.

©1999. All Rights Reserved
MHCM MSA 7-99

R

44

2.     Payment Accuracy

The following standards will be adhered to:

- 98% of all claims in sample paid correctly in accordance with contract terms and conditions.

3.     Encounter Reporting

95% of encounters will be reported to the HMOs within the required time period. MHCM will identify to IPA those PCPs and capitated specialists who are not compliant with encounter reporting and jointly develop a plan to improve encounter reporting

*B.     Authorizations*

1.     Authorization Turn Around

Processing of authorizations will meet the following standards:
Note: time measurement begins when the authorization is received in MHCM office and ends when the authorization is approved and provided to the requesting physician.

Emergent authorizations:      Immediate
Urgent authorizations         2 hours
Non-urgent authorizations     2 business days

2.     On-line Authorizations using MHCM Web based system.

Standard:      All PCPs will have access to the MHCM system within ninety (90) days of the effective date of this Agreement.

Standard:      MHCM will maintain a fax-based back-up system for authorizations processing

©,999: All Rights Reserved
MHCM MSA 7.99

43

C.     *Implementation and administration of Specialty and Ancillary Provider Reimbursement Methodologies*

1.     <u>Specialty zero based budgeting methodology and/or contact cap reimbursement</u>

Standard:     MHCM will work with IPA to administer and monitor specialty zero based budgeting reimbursement system.

Standard:     MHCM will work with IPA to administer and monitor a contact cap reimbursement methodology for identified specialties.

Standard:     MHCM will work with IPA to identify the most appropriate reimbursement methodology for various specialties.

D.     *Successful Implementation Definition.*

In accordance with the set-up fee payment schedule identified in Exhibit A, MHCM and IPA agree that "Successful Implementation" will be defined as follows:

> 90% of items identified in the attached "Implementation Checklist" (attached) completed by Day 1 (Day 1 defined as the first day that the first Plan Agreement becomes effective).

NOTE:  Attach MHCM Implementation Checklist

©1997, All Rights Reserved
MHCM MSA 7.99

Amendment 001
to
Management Services Agreement


This Amendment is entered into by and between Meridian Health Care Management, Inc. (MHCM) and Northridge Medical Group, Inc (Client) as of the FIRST (1ˢᵗ) day of September, 1999 amending the Management Agreement effective August 1, 1999.

The parties hereby agree that:

1. Exhibit "A", Section B. is deleted in its entirety and replaced as follows:

   B. In addition to any fees paid to MHCM under Section A of this Exhibit, commencing September 1, 1999, IPA shall remit to MHCM, within thirty (30) days of IPA's receipt of MHCM's invoice for services, a monthly payment equal to **11.6%** of Gross Revenue, as defined in Article IV.1 (a) of this Management Services Agreement.

2. Exhibit "B" is revised to include Section N. as follows:

   N. <u>Coordination of Credentialing Activities.</u>
   1. Preparing provider credentialing packets for distribution
   2. Coordinating with CheckPoint, as appropriate
       a. Sending completed provider credentialing packets to CheckPoint for PSV.
       b. Receiving completed CheckPoint verification information and place in provider files.
   3. Sending complete provider applications to Payors requiring copies.
   4. Coordinating Payor required provider site visit reports conducted by Marlborough Medical Management.
   5. Coordinating information received with Client's Medical Director; reviewing provider files with Client's Medical Director.
   6. Maintaining credentialing data in MHCM database and appropriate provider files.
   7. Staffing Client credentialing committee meetings as frequently as necessary to conduct business.
       a. Taking and maintaining minutes.
   8. Maintaining and updating Credentialing Policies and Procedures to ensure compliance with NCQA and Payor requirements.
   9. Coordinating recredentialing activities with Checkpoint and Marlborough Medical Management.
       a. Sending out notices and collect information required for recredentialing.
   10. Coordinating Payor audit site visits for those Payors that delegate credentialing activities to Client.
   11. Coordinating Payor quality assurance activities that relate to credentialing issues.

45

12. Reporting administrative issues to state agencies, as appropriate and directed by Client.

3. All other provisions not inconsistent shall remain in full force and effect.

By:                                          By:

Meridian Health Care Management, Inc.       Northridge Medical Group, Inc.

*Gertrude S Carter, m.v.*

*DBRoss*
_____              _____
Dolores B. Ross                             Signature

                                            *President*
Executive Vice President                    _____
_____              Title
Title
                                            Date: 2/17/0 0
Date: 2/15/00

NIPA Amendment 001                          2
02/15/00

46

**Amendment 002**
**to**
**Management Services Agreement**

This Amendment is entered into by and between Meridian Health Care Management, Inc. (MHCM) and Northridge Medical Group, Inc. (Client) as of the twenty-eighth (28th) day of September, 2000 amending the Management Agreement effective August 1, 2000.

The parties hereby agree that:

1.  Article II.5 is deleted in its entirety and replaced as follows:

    II.5  **Utilization and Quality Management.**  MHCM shall provide such utilization and quality management services as are reasonable necessary for the operations of the Business. These services shall include eligibility verification, concurrent review for out of network and out of area admissions, case management, specialty referral review, claims review, and hospital and utilization tracking and information management and coordination with hospital utilization management and case management staff in accordance with Exhibit "B". All services shall be performed in accordance with written utilization and quality management policies and procedures developed in consultation with MHCM.

2.  Exhibit "A", Section B. is deleted in its entirety and replaced as follows:

    B.  In addition to any fees paid to MHCM under Section A of this Exhibit, commencing August 1, 2000, IPA shall remit to MHCM, within thirty (30) days of Client's receipt of MHCM's invoice for services, a monthly payment equal to eleven and ninety-five hundredths percent (11.95%) of Gross Revenue, as defined in Article IV.1 (a) of this Management Services Agreement.

3.  Exhibit "A" is revised to include Section F. as follows:

    F.  For any medical management service Client or designee (including but limited to Northridge Hospital Medical Center (NHMC) or consultants) has requested or approved outside the scope of this Agreement as set forth in Exhibit "B", Client agrees to compensate MHCM at a rate of $34.00 per hour per FTE required to perform needed services within thirty days of Client's receipt of MHCM's invoice for services.

4.  Exhibit "B", Sections O., P. and Q. are created as follows:

    O.  Concurrent Review/Discharge Planning Services.

NIPA Amendment 002                           1
09/28/00

47

1.  In-patient Concurrent Review
    a.  Out of Area – Notifying health plans and hospitalist of out of area (as defined in Client's health plan contracts) admissions, coordinating initial reviews and continued reviews, as appropriate per health plan contract. Such reviews include applicable systems documentation and patient/provider notifications.
    b.  Admissions outside of NHMC Roscoe and Sherman Way campuses and affiliated skilled nursing facilities – Coordination with Client's contracted hospitalist vendor for transfer of patients back into the NHMC system. MHCM shall provide concurrent review services for those patients admitted to hospitals (acute and skilled nursing facilities) outside the NHMC system until such patients are stable for transfer back into the NHMC system. Such services include applicable systems documentation and patient/provider notifications. NHMC shall be responsible for concurrent review/discharge planning services, inclusive of applicable systems documentation and patient/provider notifications, for admissions to NHMC acute facilities and for concurrent review/discharge planning services for admissions to NHMC skilled nursing facilities. MHCM shall be responsible for the applicable systems documentation (as provided by NHMC) and patient notifications to NHMC for delivery to patient/representative for skilled nursing concurrent review/discharge planning services.

P.  <u>Case Management Services</u>
1.  Catastrophic Case Management
    a.  Management of complex, catastrophic care as referred to MHCM from NHMC, Client or designee (including but not limited to NHMC, hospitalist or consultants) inclusive of applicable systems documentation and patient/provider/health plan notifications.

2.  Community Case Management
    a.  Management of chronic patients through continuums of care outside the facility setting (e.g. home health, DME services) inclusive of applicable systems documentation and patient/provider/health plan notifications. Community case management does not include any Disease State Management services.

Q.  All other medical management services provided by MHCM shall be subject to the compensation as set forth in Exhibit "A", Section F.

5.  MHCM and Client agree that should Client wish to modify the responsibilities of either party relative to this Amendment 002, Client shall provide MHCM with ninety (90) days notice. During that ninety (90) day period Client and MHCM agree to meet and negotiate a modification which is mutually agreeable.

48

5. All other provisions not inconsistent shall remain in full force and effect.

By:

Meridian Health Care Management, Inc.

_____
Dolores B. Ross

Executive Vice President
Title

Date: _____

By:

Northridge Medical Group, Inc.

_Gertrude J Center, MD_
Signature

_President_
Title

Date: _10/30/2000_

NIPA Amendment 002
09/28/00

3

49



Amendment 003
to
Management Services Agreement

This Amendment is entered into by and between Meridian Health Care Management, Inc. ("MHCM") and Northridge Medical Group, Inc. ("IPA") as of this 1st day of Aug 2002 amending the Management Services Agreement ("MSA") entered into by the parties effective July 1, 1999, and its Amendment 001 entered into effective September 1, 1999 and its Amendment 002 entered into effective August 1, 2000

The parties hereby agree that:

1. This Amendment shall be effective as of the first day of August, 2002.

2. The term of the MSA shall be extended for two (2) years effective August 1, 2002.

3. Exhibit "A" Section B. of the MSA is deleted in its entirety and is replaced with the following:

   Effective on August 1, 2002, IPA shall remit to MHCM, within thirty (30) days of IPA's receipt of MHCM's invoice for services, a monthly payment equal to:

   i. Ten and one-half percent (10.50%) of Gross Revenue, as defined in Article IV.1(a) of the Management Services Agreement, not to exceed $4.35 Per Member Per Month ("PMPM") for commercial and POS members and $26.75 PMPM for senior members less

   ii. Ten Thousand Dollars ($10,000.00) to reflect the reduction in staff and services provided by MHCM related to this Amendment, plus

   iii. One hundred twenty-five percent (125.00%) of the direct cost of salaries/wages for MHCM employees specifically dedicated to IPA support and under the direct supervision of IPA Executive or Medical Director ("IPA Support Staff") as described in Exhibit B.H.14-16 attached hereto, plus

   iv. Three hundred forty dollars ($340.00) per month per IPA Support Staff and IPA Executive and Medical Director to offset MHCM direct costs for office space, furniture, telephone, computer equipment, printer access, fax access and mail support ") as described in Exhibit B.H.14-16 attached hereto.

   v. For primary source provider credentialing, if provided by MHCM, a fee of one hundred twenty-five dollars ($125.00) per initial credentialing and seventy-five dollars ($75.00) per re-credentialing.

NMG Amendment 003 020801.doc

50



4. Exhibit "A" Section C. of the MSA is deleted in its entirety and is replaced with the following:

   Notwithstanding Section B of this Exhibit, the monthly fee paid to MHCM for providing management services as described in Exhibit "B" hereof shall be a minimum of fifty thousand dollars ($50,000.00) per month, effective July 1, 2002.

5. Exhibit "B" of the MSA is deleted in its entirety and replaced with Exhibit "B" attached hereto.

6. Exhibit "C" of the MSA is deleted in its entirety and replaced with Exhibit "C" attached hereto.

7. Amendment 001 to the MSA is deleted in its entirety.

8. Amendment 002 to the MSA is deleted in its entirety.

9. All terms and conditions of the MSA and Amendments 001 and 002 not inconsistent herewith shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have hereunto set their hand as of the day and year first above written.

Meridian Health Care Management, Inc. ("MHCM")

_____              _____8|1|02_____
Michael S. Alper, President & CEO                Date

Northridge Medical Group, Inc. ("IPA")

_____ MD            _____11-20-0 2_____
Gertrude Carter, MD, President                   Date

_____Sikander Cyn_____                    _____7|29|02_____
Sikander Kajani, M.D                             Date
        Vice President

NMG Amendment 003 020801.doc          Page 2 of 2

51

## EXHIBIT "B"
## SERVICE MATRIX

| | | IPA | MHCM |
|---|---|---|---|
| **A.** | **MANAGEMENT INFORMATION SYSTEM** | | |
| | 1. Provide a computerized management information system to process and store the following: | | |
| | a. Member eligibility files | | X |
| | b. Provider demographic files | | X |
| | c. Provider vendor files | | X |
| | d. Provider fee schedules | | X |
| | e. Benefit packages | | X |
| | f. Referral/authorization requests | | X |
| | g. Claims record | | X |
| | h. Capitation payments | | X |
| | i. Accounts receivable | | X |
| | j. Accounts payable | | X |
| | 2. Provide appropriate PRIMEridian™ data security | | X |
| | a. Restrict access to data to all non-MHCM personnel | | X |
| | b. Restrict access to data to specific Client-specified individuals | | X |
| | c. Restrict access to data by user and security classification | | X |
| | 3. Provide PRIMEridian™ emulation software for use by Client at Client location(s) | | X |
| | 4. Provide technical support | | X |
| | a. Connectivity to MHCM systems at Client location(s) | | X |
| | b. Availability of PRIMEridian DIRECT™ | | X |
| | 5. Provide client training on MHCM systems | | X |
| | a. At Client site | | X |
| | b. At Client Provider sites | | X |
| | c. At MHCM training facility | | X |
| | | | X |
| **B.** | **CLAIMS MANAGEMENT** | | X |
| | 1. PROCESSING | | |
| | a. Receive electronic UB92 claim data from Client and/or Client providers via a claims clearinghouse | | X |
| | b. Receive electronic HCFA 1500 format claims data from Client and/or Client providers via PRIMEridian DIRECT™ or via a claims clearinghouse | | X |
| | c. Receive via mail completed HCFA 1500 and UB92 claim forms from Client providers | | |
| | d. Digitally image claims and upload nightly to PRIMEridian™ | | X |
| | e. Enter claims data into PRIMEridian™ | | X |
| | 2. ADJUDICATION | | |
| | a. Adjudicate claims in accordance with Client's instructions, policies, provider and payor contracts. | | X |
| | b. Match completed claim to authorization record when required by Client policies | | |
| | c. Prohibit adjudication of claims without authorization in accordance with Client policies | | X |
| | d. Allow re-adjudication of previously unauthorized claims when authorization is properly acquired | | X |
| | e. Validate claim coding for appropriate diagnosis(es), procedure(s), etc. | | X |
| | f. Adjudicate co-payment, co-insurance and/or deductible for each claim | | X |
| | g. Adjudicate benefit limits and coverage | | X |
| | h. Calculate allowed payment according to Client specified fee schedule(s) | | X |
| | i. Support multiple fee schedules for Client providers (within acceptable parameters) | | X |
| | j. Support periodic adjustments to fee schedules | | X |
| | k. Track other primary health insurance coverage for COB include an item to treat commercial members over 65 as Medicare prime. | | X |
| | l. Adjudicate COB to be paid by other primary Payor(s) | | |
| | m. Adjudicate TPL to be paid by other primary Payor(s) | | X |
| | n. Track payments made by primary Payor | | X |
| | 3. PAYMENT | | X |
| | a. Release payable claims to Providers in compliance with Payor, state, HCFA mandated timeframes and other requirements (as cash allows) | | X |
| | b. Work with client to resolve issues preventing compliance with Payor, state, and HCFA-mandated timeframes or other requirements for paying claims | | X |
| | c. Aggregate multiple claims by individual vendor (potentially multiple providers) within a check | | X |

Confidential and Proprietary Meridian Health Care Management, Inc.
NMG Amendment 003 Exhibit B 020801.doc

52

| | | | IPA | MHCM |
|---|---|---|---|---|
| | | run into single payment and explanation of payment | | |
| | d. | Generate claim denial letters | | X |
| **4.** | **REPORTING** | | | |
| | a. | Generate claims history reports as required by Payors or HCFA | | X |
| | b. | Generate standard claims history reports by date of service and date paid. | | X |
| | c. | Generate standard data warehouse files when requested by Client | | X |
| | d. | Generate EDI submission of HCFA 1500 and UB92 encounter data to Payors | | X |
| | e. | Generate EDI submission of insured services to Payors | | X |
| | f. | Generate IBNR calculation | | X |
| | g. | Generate detailed encounter reports | | X |
| | h. | Generate referral, utilization, and cost reports based on claim data per Client request | | X |
| | i. | Track claims cost by service by member by provider by medical group by specialty, by place of service | | X |
| | j. | Generate report on stop loss submissions and recoveries by claim by member | | X |
| | k. | Generate quarterly/annual report(s) on aggregate stop loss receivables and recoveries | | X |
| | l. | Generate TPL reporting | | X |
| | m. | Generate COB reporting | | X |
| | | | | |
| **C.** | **MEDICAL MANAGEMENT** | | | |
| **1.** | **REFERRAL DATA ENTRY AND PROCESSING** | | | |
| | a. | Provide capability for Client or Client providers to enter referral requests into PRIMEridian DIRECT™ or PRIMEridian™. | | X |
| | b. | Receive routine prospective and retrospective referral requests via fax and PRIMEridian DIRECT™ from Client providers | | X |
| | c. | Receive urgent or emergent referral requests via telephone from Client providers | | X |
| | d. | Enter referral requests into PRIMEridian™ | | X |
| | e. | Assign computer generated tracking number to each referral request | | X |
| | f. | Perform eligibility verification of member | | X |
| | g. | Issue approval by non-clinical staff to referral requests in strict accordance with Client's instructions and policies | | X |
| | h. | Issue approval by clinical staff to referral requests in strict accordance with Client's instructions and policies | | X |
| | i. | Send via fax and/or PRIMEridian DIRECT™ computer generated notice of approval to providers involved in the referral request in strict accordance with Client's Payor contracts, instructions and policies | | X |
| | j. | Send via U.S. mail computer generated notice of approval to member | | X |
| | k. | Send to requesting provider notice describing Client's need for additional data prior to authorization of referral request in strict accordance with Client's instructions and policies | | X |
| | l. | Send to providers involved in the referral request notice of denial via fax in strict accordance with Client's instructions and policies | | X |
| | m. | Send via U.S. mail to member notice of denial in strict accordance with Client's Payor contracts instructions and policies | | X |
| | n. | Prepare agenda and minutes for Utilization Management Committee (UMC) meetings with assistance from MHCM as necessary | X | |
| | o. | Provide pertinent reports for UMC meetings | X | X |
| | p. | Attend UMC meetings with assistance from MHCM as necessary | X | |
| | q. | Facilitate UMC meetings with assistance from MHCM as necessary | X | |
| **2.** | **UTILIZATION REVIEW** | | | |
| | a. | Prospective and Retrospective Review | | |
| | i. | Generate daily log of referral requests requiring action by Client | | X |
| | ii. | Send to Client via fax or PRIMEridian DIRECT™ daily log of referral requests requiring action by Client | | X |
| | iii. | Client will review daily log of referral requests and denote action to be taken for each referral request contained in log. Such direction from Client shall include the following: authorize, deny, or request for additional data. | X | |
| | iv. | Enter action into PRIMEridian™ and issue authorization, denial, or request for additional data for each referral request contained in daily log in strict accordance with Client's instructions and policies | | X |
| | v. | Enter into PRIMEridian™ the requested new data to each referral request as applicable. | | X |
| | vi. | Allow a single tracking number for multiple services by place of service or provider requested | | X |

Confidential and Proprietary Meridian Health Care Management, Inc.
NMG Amendment 003 Exhibit B 020801.doc

53

| | | | IPA | MHCM |
|---|---|---|---|---|
| | vii. | Track pre-certified admissions by provider and by facility | | X |
| | viii. | Check authorizations for conformity with Client's adopted critical pathways or clinical protocols | | X |
| | ix. | Check appropriateness of location and delivery modality of requested services | | X |
| b. | | Concurrent Review and Case Management (in area, out of area, skilled nursing, and durable medical equipment, which does not meet automatic approval criteria) | | |
| | i. | Identify inpatient admissions for which Client and/or Payor(s) require concurrent review | X | |
| | ii. | Create a tracking number via PRIMEridian™ for each admission | X | |
| | iii. | Document appropriate concurrent review and discharge planning data for each admission in PRIMEridian™ | X | |
| | iv. | Provide on-site UR Nurse to perform daily chart reviews | X | |
| | v. | Provide UR nurse to perform daily chart reviews telephonically | X | |
| | vi. | Perform concurrent length-of-stay reviews | X | |
| | vii. | Perform case management and discharge planning, including durable medical equipment which does not meet automatic approval criteria. | X | |
| | viii. | Provide patient data for hospital admissions | X | |
| c. | | Reporting | | |
| | i. | Track consolidated or by provider referral request turn around time per NCQA standards | | X |
| | ii. | Track bed day activity by length of stay, facility, Payor, commercial/senior status, admit/discharge diagnosis and level of care per NCQA standards | | X |
| | iii. | Report on aberrant inpatient as identified by Case Manager | | X |
| | iv. | Compile demographic information on patients treated by Client | | X |
| | v. | Track referrals by member, provider, group, specialty, place of service, referral submission date, admit/discharge date, Payor and/or diagnosis | | X |
| | vi. | Track location of services by member by provider by medical group by specialty by place of service | | X |
| 3. | | QUALITY MANAGEMENT | | |
| a. | | Assist with development of Client's Quality Management Program | | X |
| b. | | Prepare agenda and minutes for Quality Management Committee (QMC) meetings | | X |
| c. | | Provide pertinent reports for QMC meetings | | X |
| d. | | Attend QMC meetings | | X |
| e. | | Facilitate QMC meetings | X | |
| f. | | Track member grievance and appeals issues | | X |
| g. | | Resolve member grievance and appeals issues as delegated by Client in strict accordance with client's instructions and policies. | | X |
| h. | | Provide for HEDIS tracking and reporting | | X |
| i. | | Integrate HEDIS and other outcomes data | | X |
| j. | | Report performance statistics to Client Medical Director or UM/QM Committee | | X |
| k. | | Communicate Client's performance standards to providers | | X |
| l. | | Administer member satisfaction surveys per NCQA guidelines | | X |
| m. | | Report results of member satisfaction surveys | | X |
| n. | | Administer provider satisfaction surveys per NCQA guidelines | | X |
| o. | | Report results of provider satisfaction surveys | | X |
| 4. | | POLICIES AND PROCEDURES | | |
| a. | | Provide limited consulting services as requested of MHCM Medical Director to assist Client with: | | X |
| | i. | Grievances with Payors relating to medical matters | | X |
| | ii. | Grievances with members relating to medical matters | | X |
| | iii. | Client's physician and hospital referral authorization policies and procedures | | X |
| | iv. | Agenda and discussion at UMC and QMC meetings | | X |
| | v. | Development or updates of clinical protocols, critical pathways and other treatment standards and guidelines | | X |
| | vi. | Other medical matters as requested by Client | | X |
| b. | | Assist with development or updates of medical management policies | X | X |
| c. | | Assist with development or updates of prospective review guidelines (including hospital pre-certification) | X | X |
| d. | | Assist with development or updates of concurrent review standards and guidelines | X | X |
| e. | | Assist with development or updates of case management program | X | X |

Confidential and Proprietary Meridian Health Care Management, Inc.
NMG Amendment 003 Exhibit B 020801.doc

54

| | | IPA | MHCM |
|---|---|---|---|
| **D.** | **PROVIDER PANEL MANAGEMENT** | | |
| | **1.  PROVIDER CONTRACTING** | | |
| a. | Identify Client need(s) for new or additional provider(s) | | |
| b. | Assist Client with recruitment of new or additional providers | | X |
| c. | Review and recommend changes/updates to Client provider applications, contracts and memorandums of understanding | | X |
| d. | Obtain completed provider applications from new providers | | X |
| e. | Present to Client Board of Directors completed provider applications | | X |
| f. | Negotiate provider contracts or memorandums of understanding with new providers at direction of Client | | X |
| g. | Amend current provider contracts or memorandums of understanding at direction of Client | | X |
| h. | Maintain files containing current and historical provider contracts and memorandums of understanding | | X |
| i. | Track renewal dates of provider contracts and memorandums of understanding | | |
| j. | Negotiate member-specific letters of agreement with non-contracted providers at agreed upon criteria | | X |
| | **2.  PROVIDER RELATIONS** | | |
| a. | Maintain database of providers and provider demographics | | X |
| b. | Maintain network participation and/or affiliation | | X |
| c. | Maintain vendor database | | X |
| d. | Maintain Board of Director and shareholder status | | X |
| e. | Maintain providers ability to speak additional languages | | X |
| f. | Audit database of providers and provider demographics | | X |
| g. | Maintain database of open/closed status of providers | | X |
| h. | Generate provider roster as necessary | | X |
| i. | Distribute updated provider roster to Client on monthly or other periodic basis | | X |
| j. | Assist with development and updates of Provider Manuals | | X |
| k. | Produce an distribute Provider Manuals | | X |
| l. | Provide ongoing communication, education, and training to provider and provider office staffs regarding changes to Client policies and procedures | | X |
| m. | Provide ongoing communication, education, and training to provider and provider office staffs regarding changes to Payor contracts | | X |
| n. | Assist with development and updates of provider grievance process | | |
| o. | Administer provider grievance process | | X |
| p. | Provide telephone line for provider inquiries | | X |
| q. | Answer provider eligibility inquiries | | X |
| r. | Answer provider referral inquiries | | X |
| s. | Answer provider claims inquiries | | X |
| t. | Track key performance standards (e.g. extended office hours, encounters per member, referrals per member, etc.) | | X |
| u. | Develop administrative forms (e.g. referral request) | | X |
| v. | Print administrative forms (e.g. referral request) | | X |
| w. | Distribute administrative forms (e.g. referral request) | | X |
| x | Develop provider newsletter | | X |
| y. | Print provider newsletter | | X |
| z. | Distribute provider newsletter | | X |
| | **3.  PROVIDER CREDENTIALING** | | |
| a. | Maintain compliance with NCQA standards | | X |
| b. | Process applications for new providers | | X |
| c. | Perform primary source verification | X | |
| d. | Perform site visits | X | |
| e. | Maintain provider application and credential files | | X |
| f. | Maintain computerized database of provider credentialing information | | X |
| g. | Track key identifiers (e.g. license #, DEA #, Medicare #, Tax ID, etc.) | | X |
| h. | Track key statistics (e.g. hospital staff status, board certification status, malpractice insurance data) | | X |
| i. | Perform re-credentialing of current providers | X | |
| **E.** | **MEMBERSHIP MANAGEMENT** | | |
| | **1.  ELIGIBILITY VERIFICATION** | | |
| a. | Obtain benefits and eligibility files from Client or Payor, reconcile against existing eligibility data, and load into MHCM system electronically or manually | | X |

Page 4 of 6

|   |   | IPA | MHCM |
|---|---|---|---|
| | b. Maintain member eligibility database | | X |
| | c. Identify each member by unique identification number | | X |
| | d. Assist with determination of member eligibility for health care services prior to provision of services | | X |
| | e. Maintain benefit database to track co-payments, co-insurance, deductibles, other primary health insurance, coverage limitations, lifetime maximum benefits and other benefits by member if supplied by Client or Payor | | X |
| | f. Maintain and track eligibility of services for each member | | X |
| | g. Allow on-line retrieval through PRIMEridian DIRECT™ by provider offices of updated eligibility information | | X |
| | h. Generate monthly eligibility reports and distribute monthly to Client and Client providers | | X |
| | i. Match benefit coverage to authorization and claim at all points of service | | X |
| | j. Maintain eligibility history of each member for retroactive verification | | X |
| | k. Administer system for retroactive eligibility verification | | X |
| | l. Reconcile retroactive denial of eligibility against Client claims payment process | | X |
| 2. | MEMBER SERVICES | | |
| | a. Provide telephone line for member inquiries | | X |
| | b. Answer member eligibility inquiries | | X |
| | c. Answer member referral inquiries | | X |
| | d. Answer member claims inquiries | | X |
| | e. Generate telephone tracking report | | X |
| | f. Utilize standard letter to inform members of grievance process | | X |
| | g. Issue correspondence acknowledgement letters | | X |
| | h. Issue new member welcome letter | | X |
| F. | PAYOR CONTRACTING | | |
| | 1. Identify opportunities for risk contracts with Payors, including pre-paid health plans (HMOs), preferred provider organizations, exclusive provider organizations, self-insured employers, employee unions, and indemnity carriers | X | |
| | 2. Negotiate risk contracts with Payors | X | |
| | 3. Negotiate risk sharing agreements with Payors, hospitals and other applicable entities | X | |
| | 4. Coordinate Client communication with Payors | | X |
| | 5. Inform Payors of changes to Client provider roster | | X |
| | 6. Provide Payors with current Client provider roster | | X |
| | 7. Coordinate expansion of Client provider network to accommodate Payor needs | | X |
| | 8. Assist in resolution of grievances between Client and Payor(s) | | X |
| | 9. Track renewal dates of Payor contracts | X | |
| G. | FINANCIAL MANAGEMENT | | |
| | 1. CAPITATION MANAGEMENT | | |
| | a. Accept and deposit all capitation payments to Client | | X |
| | b. Reconcile capitation payments with available eligibility lists and other pertinent documents | | X |
| | c. Produce and distribute capitation payments to capitated primary care physicians | | X |
| | d. Produce and distribute capitation payments to capitated specialty physicians, hospitals, and ancillary providers based upon capitation distribution methodology approved by Client | | X |
| | e. Provide information to third party Payors for coordination of benefits | | X |
| | f. Bill & collect additional reimbursement for insured and reinsured services | | X |
| | g. Distribute payments to all fee-for-service providers (in accordance with Article B of this Exhibit) | | X |
| | h. Assist Client with development of bonus distribution methodologies | | X |
| | 2. RISK POOL ADMINISTRATION | | |
| | a. Track charges against risk pool(s) | | X |
| | b. Generate report of charges against risk pool(s) | | X |
| | c. Verify accuracy and validity of risk pool reports generated by Payors or hospital(s) | | X |
| | d. Reconcile risk pool surplus(es) or deficit(s) with Payors and hospital(s) | | X |
| | e. Pursue timely recovery of all risk pool surpluses | | X |
| | f. Negotiate favorable payments terms for Client share of validated deficits | | X |
| | 3. BOOKKEEPING AND ACCOUNTING | | |
| | a. Establish and maintain bookkeeping system for all Client business handled by MHCM | | X |
| | b. Establish and maintain accounting system for all Client business handled by MHCM | | X |
| | c. Establish and maintain an accounts payable system | | X |
| | d. Maintain custody and supervision of business records for all Client business handled by MHCM | | X |
| | e. Prepare bills and statements for professional services rendered by Client under contracts | | X |

Confidential and Proprietary Meridian Health Care Management, Inc.
NMG Amendment 003 Exhibit B 020801.doc

56

| | | IPA | MHCM |
|---|---|---|---|
| | managed by MHCM | | |
| f. | Assist with compilation of reports and forms required by government agencies and Payors | | |
| g. | Establish and manage Client bank accounts | | X |
| **4.** | **FINANCIAL ANALYSIS** | | X |
| a. | On an as needed bases provide flexible pro forma financial modeling, including major operating objectives, anticipated revenues, expenses, and cash flow with assistance of Client. | | X |
| b. | Assist Client with determining need for credit lines and/or short-term investments | | |
| c. | Assist Client with establishing needed credit lines | | X |
| d. | Assist Client with placing short-term investments | | X |
| e. | Manage short-term investments at the direction of the Client | | X |
| f. | Monitor cash flow and balance sheet for adequate risk reserves | | X |
| **5.** | **REPORTING** | | X |
| a. | Generate monthly and YTD balance sheet, income statement, and cash flow statement | | |
| b. | Generate financial statements on both a cash and an accrual basis | | X |
| c. | Generate monthly and YTD accounts receivable aging report | | X |
| d. | Generate monthly and YTD accounts payable aging report | | X |
| e. | Generate periodic claims lag study (however, not prior to six months of fully paid claims data) | | X |
| f. | Generate monthly report regarding claims status (i.e. open, payable, IBNR) | | X |
| g. | Provide pertinent reports for finance committee meetings | | X |
| h. | Attend finance committee meetings | | X |
| i. | Facilitate finance committee meetings | | X |
| j. | Assist with preparation of audited or unaudited financial statements as prepared by third party when requested by Client | | X |
| k. | Generate data and supporting documents required for tax preparation | | X |
| l. | Generate Form 1099 for each provider paid by Client during the calendar year | | X |
| m. | Mail Form 1099 to each provider paid by Client during the calendar year | | X |
| **H.** | **GENERAL ADMINISTRATION** | | |
| 1. | Supervise and coordinate business aspects of Client's risk contracts | | |
| 2. | Serve as primary point of contact on behalf of Client | | X |
| 3. | Report directly to Client Board of Directors | | X |
| 4. | Provide 24 hour per day, 7days per week toll-free automated telephone access to MHCM | | X |
| 5. | Provide on-line assistance | | X |
| 6. | Provide ongoing systems support and training | | X |
| 7. | Provide access to Client data an average of 20 hour per day, 7 days per week | | X |
| 8. | Provide recommendations for insurance coverage, including reinsurance, D&O, E&O, professional liability, general liability, workers compensation, and disability | | X |
| 9. | Coordinate printing of all forms and letterhead (to be used regarding managed care) on Client stationery (actual cost is passed through to Client) | | X |
| 10. | Process managed care related mail, both incoming and outgoing | | |
| 11 | Generate ad hoc reports as requested by Client | | X |
| 12. | Coordinate regulatory and payor audits (e.g. NCQA, HCFA) at MHCM and at provider sites and provide NMG with copies of audits and corrective action plans. | | X |
| 13. | Provide adequate office space and furnishings for MHCM staff | | X |
| 14. | Recruit and hire and employ with MHCM standard benefits up to 5 employees to be directly supervised by IPA to perform concurrent review/case management/DME/Home Health management services. If IPA should require additional employees, IPA will provide MHCM with sixty (60) days notice. | | X |
| 15. | Provide and furnish work space for 5 employees plus IPA Executive and Medical Director in accordance with MHCM standards. If IPA should require additional space, IPA will provide MHCM with sixty (60) days notice. | | X |
| 16. | Provide telephone and telephone service, computer and network access, printer access, fax access, e-mail accounts for 5 employees and IPA Executive and Medical Director (required to provide their own PC acceptable to MHCM). If IPA to require access for additional employees, IPA will provide MHCM with sixty (60) days notice. | | X |

Confidential and Proprietary Meridian Health Care Management, Inc.
NMG Amendment 003 Exhibit B 020801.doc

57

**Exhibit C**

**Performance Standards**

MHCM agrees to meet the Performance Standards identified below.

| Component | Standard | Performance Measurement | Frequency |
|---|---|---|---|
| Reports | Provide CEO with the following reports on a regular basis | • Physician report Card to be provided quarterly<br>• Specialty Expenses Analysis to be provided monthly<br>• PMPM cost analysis by health plan to be provided monthly<br>• Monthly Claims Data Extract Report to be provided within 5 business days of close of preceding month<br>• Bed Day report to be provided monthly<br>• Bed day log report to be provided daily | Quarterly or monthly as indicated |
| Claims and Encounters | Processing Accuracy | • 98% payment dollar accuracy<br>• 96.5% payment incidence accuracy<br>• 98% administrative accuracy | Annually |
| | Turn around | • 95% of non-contracted clean claims paid/denied within 30 days.<br>• 95% of clean contracted claims paid within 60 calendar days. | |
| | Encounters | • Encounters from capitated providers and PCPs to be input within 15 days of receipt. | Monthly |

Confidential and Proprietary Meridian Health Care Management, Inc.
NMG Amendment 003 020801 Exhibit C and D.doc

58

| Component | Standard | Performance Measurement | Frequency |
|---|---|---|---|
| | Reporting | • MHCM to provide weekly reporting of claims inventory<br>• MHCM to provide monthly reporting of audit results and claims audit results<br>• MHCM to provide reporting of compliance with performance standards | Weekly or monthly as indicated |
| | Post Payment Review | MHCM to provide CEO with all post payment check runs so that CEO can perform a review | Weekly |
| Utilization Review | Meet the following standards for 95% of authorizations | Emergency: Immediate<br>Urgent:  4 hours<br>Non-urgent: 2 business days | |
| Finance | Reconciliation | Bank reconciliation completed 1 month in arrears with no unresolved amounts | |
| Administration | Contracts | Send contracts out to providers within five days of request and track process. | NA |
| | | Load contracts into MHCM system within 5 days of receipt | NA |
| | | Corrections of contract entry errors to be made within 24 hours of notification | |
| | Eligibility | Updated within 3 business days of receipt | |

Confidential and Proprietary Meridian Health Care Management, Inc.
NMG Amendment 003 020801 Exhibit C and D.doc

59

**Exhibit D**

**Corrective Action Plan**

1. Any deficiencies in MHCM's performance pursuant to Exhibit B or C shall be identified by IPA and provided to MHCM in writing.
2. MHCM shall review such deficiencies and within 15 calendar days, submit to IPA a corrective action plan ("CAP") which will identify how each deficiency will be corrected and by which date.
3. IPA shall review the CAP and shall have the right to require MHCM to revise the steps MHCM will take to correct the deficiencies or the dates by which the deficiencies will be corrected.
4. All changes that the IPA requires will be provided to MHCM in writing. MHCM shall incorporate such changes into its CAP and shall submit its revised CAP to IPA within five (5) business days.
5. Both parties shall monitor the progress of the corrective action plan. As specified in the CAP, MHCM shall provide periodic written reports regarding its progress.
6. If MHCM does not successfully complete the corrective action plan, IPA shall have the rights set forth in this agreement.

Failure to meet such Performance Standards in accordance with the CAP will result in a monthly payment deduction equal to the amounts listed below. Such payment deduction will be made from the IPA's monthly payment to MHCM for the provision of management services until the deficiency is corrected. At no time shall the cumulative monthly payment deduction exceed 5.00% of the IPA's monthly payment to MHCM.

| | |
|---|---|
| Reports: | 1.00% |
| Claims | 2.00% |
| Administration | 0.50% |
| Utilization Review | 1.00% |
| Finance | 0.50% |

Confidential and Proprietary Meridian Health Care Management, Inc.
NMG Amendment 003 020801 Exhibit C and D.doc

60

| Component | Standard | Performance Measurement | Frequency |
|---|---|---|---|
| | Reporting | • MHCM to provide weekly reporting of claims inventory<br>• MHCM to provide monthly reporting of audit results and claims audit results<br>• MHCM to provide reporting of compliance with performance standards | Weekly or monthly as indicated |
| | Post Payment Review | MHCM to provide CEO with all post payment check runs so that CEO can perform a review | Weekly |
| Utilization Review | Meet the following standards for 95% of authorizations | Emergency: Immediate<br>Urgent: 4 hours<br>Non-urgent: 2 business days | |
| Finance | Reconciliation | Bank reconciliation completed 1 month in arrears with no unresolved amounts | |
| Administration | Contracts | Send contracts out to providers within five days of request and track process. | NA |
| | | Load contracts into MHCM system within 5 days of receipt | NA |
| | | Corrections of contract entry errors to be made within 24 hours of notification | |
| | Eligibility | Updated within 3 business days of receipt | |

Confidential and Proprietary Meridian Health Care Management, Inc.
NMG Amendment 003 020801 Exhibit C and D.doc

59

**Exhibit D**

**Corrective Action Plan**

1. Any deficiencies in MHCM's performance pursuant to Exhibit B or C shall be identified by IPA and provided to MHCM in writing.
2. MHCM shall review such deficiencies and within 15 calendar days, submit to IPA a corrective action plan ("CAP") which will identify how each deficiency will be corrected and by which date.
3. IPA shall review the CAP and shall have the right to require MHCM to revise the steps MHCM will take to correct the deficiencies or the dates by which the deficiencies will be corrected.
4. All changes that the IPA requires will be provided to MHCM in writing. MHCM shall incorporate such changes into its CAP and shall submit its revised CAP to IPA within five (5) business days.
5. Both parties shall monitor the progress of the corrective action plan. As specified in the CAP, MHCM shall provide periodic written reports regarding its progress.
6. If MHCM does not successfully complete the corrective action plan, IPA shall have the rights set forth in this agreement.

Failure to meet such Performance Standards in accordance with the CAP will result in a monthly payment deduction equal to the amounts listed below. Such payment deduction will be made from the IPA's monthly payment to MHCM for the provision of management services until the deficiency is corrected. At no time shall the cumulative monthly payment deduction exceed 5.00% of the IPA's monthly payment to MHCM.

| | |
|---|---|
| Reports: | 1.00% |
| Claims | 2.00% |
| Administration | 0.50% |
| Utilization Review | 1.00% |
| Finance | 0.50% |

Confidential and Proprietary Meridian Health Care Management, Inc.
NMG Amendment 003 020801 Exhibit C and D.doc

60

Exhibit D

1   **CHRISTENSEN & AUER**

2   Jay D. Christensen, Esq. – State Bar No. 65446
    Stephen G. Auer, Esq. – State Bar No. 74101

3   225 S. Lake Avenue, 8th Floor
    Pasadena, CA 91101

4   Telephone (626) 568-2900
    Facsimile (626) 568-1566

5   Attorneys for Family/Seniors Medical Group, Inc.

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

APR 03 2006

John A. Clarke, Executive Officer/Clerk
By _____ Deputy
D.M. Swain

6

7

8                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                           FOR THE COUNTY OF LOS ANGELES

10

11  FAMILY/SENIORS MEDICAL GROUP,
    INC., a California professional medical       CASE NO. **BC 349952**
12  corporation,
                                                  **COMPLAINT FOR DAMAGES**
13                          Plaintiff            **AND/OR RESTITUTION FOR:**

14                  vs.
                                                 (1) Intentional Misrepresentation;
15  MERIDIAN HEALTH CARE                         (2) Concealment;
    MANAGEMENT, INC.; NAUTIC                     (3) Conspiracy to Commit Fraud;
16  PARTNERS, LLC; CHISHOLM PARTNERS             (4) Conversion;
    IV, LP; FLEET VENTURE RESOURCES,             (5) Unfair Competition;
17  INC.; FLEET EQUITY PARTNERS VI, LP;          (6) Breach of Contract;
    KENNEDY PLAZA PARTNERS II, LLC;              (7) Interference with Contract;
18  SCOTT HILINSKI; BRIAN SATO;                  (8) Money Had and Received; and
    MICHAEL ALPER; and DOES 1 through            (9) Breach of Fiduciary Duty
19  100, inclusive,

20                          Defendants.

21

22  Plaintiff FAMILY/SENIORS MEDICAL GROUP, INC., a California professional medical

23  corporation ("Plaintiff"), alleges as follows:

24

25                            **GENERAL ALLEGATIONS**

26          1.  Plaintiff at all relevant times herein was a California professional medical

27  corporation with its corporate headquarters in Woodland Hills, County of Los Angeles,

28  California, operating as an independent practice association providing medical services.

                                          1

CHRISTENSEN &
AUER
ATTORNEYS AT LAW
PASADENA, CA

                    **COMPLAINT OF FAMILY/SENIORS MEDICAL GROUP**

1   Plaintiff provides medical services to its managed care patients primarily in the Inland Empire

2   area of Riverside County and surrounding areas, through a network of physicians and other

3   health care providers who contract with Plaintiff to provide such services.

4        2. Defendant MERIDIAN HEALTH CARE MANAGEMENT, INC. ("'Meridian") at

5   all relevant times herein was a Delaware corporation with its offices and principal place of

6   business in Woodland Hills, County of Los Angeles, California, engaged in the business of

7   providing operations, management and administrative services for independent practice

8   associations such as Plaintiff.

9        3. Defendant NAUTIC PARTNERS, LLC at all relevant times herein was a

10  Delaware limited liability corporation with its principal place of business in Providence, Rhode

11  Island, specializing in the formation and structuring of, investment in, participation in, and

12  management of, among others, companies engaged in providing health care administration and

13  management services in California and other locations in the United States, and the successor in

14  interest of Fleet Equity Partners (collectively, "Nautic").

15       4. Defendants CHISHOLM PARTNERS IV, LP ("Chisholm") and FLEET EQUITY

16  PARTNERS VI, LP ("Fleet Equity"), at all relevant times herein was a Delaware limited

17  partnership; Defendant FLEET VENTURE RESOURCES, INC. ("Fleet Venture") at all

18  relevant time herein was a Delaware corporation; and Defendant KENNEDY PLAZA

19  PARTNERS II, LLC at all relevant times herein was a Delaware limited liability company

20  ("Kennedy"). Chisholm, Fleet Equity, Fleet Venture and Kennedy (collectively, with Nautic

21  and Defendant Scott Hilinski, referred to herein as the "Nautic Defendants") each at all relevant

22  time herein had offices and principal places of business in Providence, Rhode Island.

23       5. Defendant SCOTT HILSINKI ("Hilinski," and collectively with Nautic,

24  Chisholm, Fleet Equity, Fleet Venture and Kennedy, the "Nautic Defendants") was at all

25  relevant times herein was a Managing Director of Nautic, concentrating in its healthcare

26  operations. Although the precise nature and extent of the relationships among the Nautic

27  Defendants is not yet fully known to Plaintiff, all of them participated in, and benefited from,

28  the acts, events and conduct alleged herein, and at all relevant times herein Hilinski was a

2

1    principal manager and/or agent of each of the Nautic Defendants with respect to the facts and

2    events herein alleged.  From and after mid-1999, Hilinski was a member of the Board of

3    Directors of Meridian, appointed to represent the interests of the Nautic Defendants, and from

4    and after September 2002, Hilinski was the sole member of the Board of Directors of Meridian

5    representing the interests of the Nautic Defendants.  In the act, conduct and omissions alleged

6    herein at all relevant times Hilinski was acting within the course and scope of his actual,

7    ostensible, apparent and/or implied authority as Managing Director of Nautic and as director,

8    officer, agent and/or employee of Meridian, and Plaintiff is informed and believes and on that

9    basis alleges that Hilinski at all relevant times acted within the course and scope of his actual,

10    ostensible, apparent and/or implied authority as a director, officer, agent and/or employee of the

11    other Nautic Defendants and each of them, and with their permission, acquiescence and consent.

12       6.  Defendant MICHAEL ALPER ("Alper") at all relevant times herein was the

13    President and Chief Executive Officer of Meridian, as well as a member of Meridian's Board of

14    Directors, and a resident of the County of Los Angeles, State of California.  Alper, in the acts,

15    conduct and events set forth in this Complaint, at all relevant times acted within the course and

16    scope of his actual, ostensible, apparent and/or implied authority as a director, officer, agent

17    and/or employee of Meridian and with its permission, acquiescence and consent, and within the

18    course and scope of his actual and apparent authority and agency conferred on him by Hilinski

19    and the Nautic Defendants.

20       7.  Defendant BRIAN SATO ("Sato," and with Meridian and Alper, the "Meridian

21    Defendants") at all relevant times herein was the Chief Financial Officer of Meridian, as well as

22    a member of Meridian's Board of Directors, and a resident of the County of Los Angeles, State

23    of California.  Sato, in the acts, conduct and events set forth in this Complaint, at all relevant

24    times acted within the course and scope of his actual, ostensible, apparent and/or implied

25    authority as a director, officer, agent and/or employee of Meridian and with its permission,

26    acquiescence and consent, and within the course and scope of his actual and apparent authority

27    and agency conferred on him by Hilinski and the Nautic Defendants.  (The Meridian Defendant:

28    and Nautic Defendants are referred to collectively hereinafter as the "Defendants.")

3

CHRISTENSEN &
AUER
ATTORNEYS AT LAW
PASADENA, CA

---

**COMPLAINT OF FAMILY/SENIORS MEDICAL GROUP**

8. The true names and capacities of Defendants Does 1-100, inclusive, are presently unknown to Plaintiff, and said Defendants are thus sued by such fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes, and thereon alleges, that each Doe Defendant bears some legal responsibility for some or all of the allegations hereinafter set forth, and was, at various times herein mentioned, the agent, employee, officer, director and/or partner of some or all of the other Defendants, acting within the course and scope of such relationship or relationships.

9. Prior to July 1999, Meridian's predecessor in interest, Meridian Health Care Management, LP ("Meridian LP"), was a Delaware limited partnership with its offices and principal place of business in the County of Los Angeles, State of California, engaged in the business of providing operations, management and administrative services for independent practice associations such as Plaintiff. In or about July 1999, the Nautic Defendants and Meridian LP, together with Alper and Sato, among others, entered into a plan for Meridian to be formed to assume the business operations and assets of Meridian LP and for the Nautic Defendants concurrently to become primary investors in, and to participate in the management, control and operation of Meridian. Pursuant to this agreement and plan, on or about July 24, 1999, Meridian was incorporated, and on or about July 26, 1999, Meridian and the Nautic Defendants entered into certain agreements under which the Nautic Defendants acquired all of the issued and outstanding preferred stock of Meridian as well as subordinated debt issued to them by Meridian in the principal amount of $3,750,000.

10. In or about November 2000, in the County of Los Angeles, State of California, Meridian entered into an agreement with Plaintiff whereby Meridian agreed to provide management, administrative and related services to Plaintiff, as set forth in the Development and Management Agreement dated as of November 1, 2000 between Plaintiff and Meridian (the "Management Agreement"). A true and correct copy of the Management Agreement is attached hereto as Exhibit "1." Pursuant to the Management Agreement, Meridian, and through Meridian, the Nautic Defendants, among other things obtained and exercised operational control over certain bank accounts, revenues and funds of Plaintiff, and were obligated to account fairly

4

CHRISTENSEN &
AUER
ATTORNEYS AT LAW
PASADENA, CA

**COMPLAINT OF FAMILY/SENIORS MEDICAL GROUP**

1   and accurately for Meridian's stewardship and handling of Plaintiff's funds.

2        11.  Plaintiff is informed and believes and on that basis alleges that, beginning in mid-

3   2003, Meridian began experiencing financial difficulty, and during the period June-September

4   2003 lost significant customer accounts resulting in significant financial losses and negative

5   cash flows, and that Hilinski (who was Chairman of the Audit and Compensation Committees of

6   Meridian's Board of Directors), Alper and Sato were aware of and discussed these events.

7   Plaintiff is further informed and believes and on that basis alleges that during this period Alper

8   and Sato conferred with Hilinski about Meridian's financial position and cash flow shortages,

9   including, among other such communications, a telephone discussion in October, 2003 in which,

10  among other things, the following occurred:

11       (a)   Alper requested that Nautic and/or the Nautic Defendants provide additional

12             cash of several million dollars to Meridian, which Hilinski immediately

13             refused; and

14       (b)   Hilinski, Alper and Sato accordingly discussed alternative ways of meeting

15             Meridian's cash needs, and agreed to take funds from customer accounts,

16             including the accounts of Plaintiff, over which Meridian had control, but

17             which funds Meridian had not earned and to which Defendants were not

18             entitled, in order to provide cash for the benefit of Meridian and the Nautic

19             Defendants.

20       12.  Pursuant to such agreement, from approximately October of 2003 until discovery

21  of their scheme in or about December 2005, the Defendants, principally through Hilinski, Alper

22  and Sato, entered into and pursued a scheme of employing funds of Meridian clients, including

23  particularly and without limitation funds of Plaintiff, for the benefit and use of said Defendants

24  to meet ongoing expenses and obligations of Meridian which the Nautic Defendants, through

25  Hilinski, refused to fund. Pursuant to this scheme, among other things, said Defendants directly

26  and through Sato, Alper and Hilinski as their representatives and agents, did the following:

27       (a)   Knowingly misappropriated more than $880,000 in Plaintiff's funds

28             entrusted to and under the control of Meridian;

CHRISTENSEN &
AUER
ATTORNEYS AT LAW
PASADENA, CA

5

**COMPLAINT OF FAMILY/SENIORS MEDICAL GROUP**

(b)  Falsely represented the financial condition, business operations and liabilities of Meridian, among other means, by causing improper and false adjusting entries to be made to the accounts and records of Meridian and concealing the actual balances in Plaintiff's fund accounts to hide the misappropriations of Plaintiff's funds; and

(c)  Interrupted and discontinued the annual audits of Meridian for the year ending December 31, 2003 and each year thereafter, and failed to put in place adequate or prudent financial controls for Meridian.

13.  The acts and conduct of Defendants were intended to, and did, conceal their wrongful conduct and among other things, induced Plaintiff and other clients of Meridian to continue to trust and rely upon the apparent financial and operational stability of Meridian, which had received clean or unqualified opinions on its financial statements from its outside auditors Deloitte & Touche, LLP for the years ending December 31, 2001 and 2002.  From and after the end of 2003 to and including the present, Defendants Hilinski, Alper, Sato and other members of Meridian's Board of Directors either knew the Meridian financial statements were false or acted with reckless indifference to their truth or falsity.

14.  During this same period, Defendants made, caused, and permitted to be made affirmative misrepresentations to Plaintiff to conceal the financial difficulties of Meridian and persuade Plaintiff that Meridian continued to be a stable and financially sound business operation in which Plaintiff could continue to repose trust and confidence.  These misrepresentations included, in particular and without limitation, the use of Nautic's public statements and representations about its financial strength and expertise, when the Nautic Defendants had already refused to provide additional funding to Meridian. These representations were made, among other times, at or about the time that the Defendants recognized and acknowledged among themselves that the redemption by Meridian of the preferred stock held by the Nautic Defendants and repayment to the Nautic Defendants of the subordinated debt, which were to have taken place respectively in March and July of 2004, could not be implemented because of the financial condition of Meridian as above alleged.

COMPLAINT OF FAMILY/SENIORS MEDICAL GROUP

1    15. During this same period, beginning in early 2004, in furtherance of the interests of

2    the Nautic Defendants as well as the Meridian Defendants, Defendants undertook efforts to

3    arrange for a sale of the positions of the Nautic Defendants in Meridian to prospective third

4    parties, among other things so the Nautic Defendants could recoup their investments in

5    Meridian. These efforts, which culminated in a purchase and sale transaction with e4e,

6    Incorporated, in or about August 2005, were furthered by, and made possible only by, the

7    continued misappropriations by and on behalf of the Defendants of customer funds, in particular

8    the hundreds of thousands of dollars of Plaintiff's funds, which enabled the Defendants to

9    continue to present Meridian as a viable business and attractive acquisition.

10    16. Further, the acts and conduct of the Defendants as set forth above, by concealing

11    the true condition of the Meridian business as well as the wrongful misappropriations of

12    Plaintiff's funds, prevented Plaintiff from obtaining the benefits of the Management Agreement

13    and from exercising its rights and remedies under the Management Agreement.  Plaintiff has

14    performed all duties and obligations on its part to be performed herein, except as performance

15    thereof has been excused by the acts, conduct and/or omissions of Defendants.

16    17. Plaintiff, as a proximate result of the acts and conduct of Defendants as alleged

17    above, has sustained losses of its property in sums not yet fully ascertained but which Plaintiff is

18    informed and believes and on that basis alleges, presently exceed $880,000.  Further, by reason

19    of such losses Plaintiff has sustained the loss of use of valuable health care resources impacting

20    Plaintiff and its patient community, and unless and until such sums and property are returned to

21    Plaintiff, Plaintiff's capacity to apply same toward health care services and quality of care

22    improvement programs for the benefit of Plaintiff's patient community will continue to be

23    impaired thereby.

24                                 **FIRST CAUSE OF ACTION**

25                [Intentional Misrepresentation, Against All Defendants]

26    18. Plaintiff realleges and incorporates by this reference all the allegations of

27    Paragraphs 1 through 17, inclusive, hereinabove, as though set forth here at length.

28    19. The representations, acts and conduct of the Defendants as hereinabove alleged

CHRISTENSEN &
AUER
ATTORNEYS AT LAW
PASADENA, CA

7

**COMPLAINT OF FAMILY/SENIORS MEDICAL GROUP**

1  were intended to induce Plaintiff to act in reliance upon the apparent performance, stability and

2  financial strength of Meridian, and the support and financial strength of the Nautic Defendants

3  and thereby enable Defendants wrongfully to misappropriate and use to their benefit Plaintiff's

4  funds. Defendants at all times knew the true facts to be, as alleged above, that Meridian did not

5  have sufficient income to meet its obligations and that the Nautic Defendants refused to provide

6  Meridian with support or financial assistance.

7       20. Plaintiff was ignorant of the falsity of Defendants' representations and believed

8  them to be true. In reliance on these representations, Plaintiff was induced to and did refrain

9  from terminating the Management Agreement, taking any action to prevent Defendants from

10  accessing Plaintiff's funds, or otherwise protecting its rights under the Management Agreement.

11  Plaintiff's reliance upon the representations, acts and conduct of Defendants was reasonable in

12  that Meridian at all relevant times appeared to be stable and properly performing its obligations,

13  and Plaintiff had no means by which to ascertain the truth of the matter.

14       21. Beginning in or about the end of 2003 and continuing to the present time

15  Defendants have wrongfully taken funds from Plaintiff's accounts, over which Defendants had

16  control, but which funds Meridian had not earned, in order to provide cash to meet Meridian's

17  financial obligations.

18       22. As a proximate result of the fraudulent conduct of Defendants, Plaintiff has been

19  damaged in a sum not yet fully ascertained but which Plaintiff is informed and believes, and on

20  that basis alleges, presently exceed $880,000.

21       23. The full amount of damages that Plaintiff has sustained is unknown to Plaintiff and

22  cannot be ascertained without recourse to voluminous and complicated financial records in the

23  possession of Defendants. Plaintiff therefore is entitled to an order requiring an accounting

24  between Plaintiff and Defendants.

25       24. The fraudulent representations, acts and conduct of Defendants as set forth above

26  were made and performed with respect to material facts and with the intention on the part of

27  Defendants of thereby depriving Plaintiff of legal rights and otherwise causing injury, and thus

28  constituted despicable conduct that subjected Plaintiff to unjust hardship in conscious disregard

8

1   of Plaintiff's rights, so as to justify an award of exemplary and punitive damages.

2                              SECOND CAUSE OF ACTION

3                    [Fraud-Suppression of Fact, Against All Defendants]

4           25. Plaintiff realleges and incorporates by this reference all the allegations of

5   Paragraphs 1 through 24, inclusive, hereinabove, as though set forth here at length.

6           26. In representing the apparent performance, stability and financial strength of

7   Meridian, and the support and financial strength of the Nautic Defendants as herein alleged,

8   Defendants failed to reveal and suppressed material facts concerning Meridian's loss of

9   business and inability to meet its financial obligations, which facts were know to Defendants at

10  all times herein mentioned. The suppression of these facts was likely to mislead Plaintiff and in

11  fact did mislead Plaintiff.

12          27. The representations and failures to disclose information and suppressions of

13  information herein alleged to have been made by Defendants were made with the intent to

14  induce Plaintiff to act in the manner herein alleged in reliance thereon.

15          28. Plaintiff, at the time these failures to disclose and suppressions of facts occurred,

16  and at the time Plaintiff took and refrained from taking the actions herein alleged, was ignorant

17  of the existence of the facts that Defendants suppressed and failed to disclose. If Plaintiff had

18  been aware of the existence of the facts not disclosed by Defendants, Plaintiff would have,

19  among other actions, terminated the Management Agreement, taken action to prevent

20  Defendants from accessing Plaintiff's funds, or otherwise protected its rights under the

21  Management Agreement. Plaintiff's reliance upon the representations, acts and conduct of

22  Defendants was reasonable in that Meridian at all relevant times appeared to be stable and

23  properly performing its obligations, and Plaintiff had no means by which to ascertain the truth

24  of the matter.

25          29. Beginning in or about the end of 2003 and continuing to the present time

26  Defendants have wrongfully taken funds from Plaintiff's accounts, over which Defendants had

27  control, but which funds Meridian had not earned, in order to provide cash to meet Meridian's

28  financial obligations.

                                              9

CHRISTENSEN &
AUER
ATTORNEYS AT LAW
PASADENA, CA

30. As a proximate result of the fraudulent conduct of Defendants, Plaintiff has been damaged in a sum not yet fully ascertained but which Plaintiff is informed and believes, and on that basis alleges, presently exceed $880,000.

31. The full amount of damages that Plaintiff has sustained is unknown to Plaintiff and cannot be ascertained without recourse to voluminous and complicated financial records in the possession of Defendants. Plaintiff therefore is entitled to an order requiring an accounting between Plaintiff and Defendants.

32. The fraudulent representations, acts and conduct of Defendants as set forth above were made and performed with respect to material facts and with the intention on the part of Defendants of thereby depriving Plaintiff of legal rights and otherwise causing injury, and was despicable conduct that subjected Plaintiff to unjust hardship in conscious disregard of Plaintiff's rights, so as to justify an award of exemplary and punitive damages.

### THIRD CAUSE OF ACTION

[Conspiracy to Commit Fraud, Against All Defendants]

33. Plaintiff realleges and incorporates by this reference all the allegations of Paragraphs 1 through 32, inclusive, hereinabove, as though set forth here at length.

34. Beginning in or about October 2003 the Defendants knowingly and willfully conspired and agreed among themselves to misappropriate funds of Meridian customers, including without limitation Plaintiff, and to conceal from Plaintiff, among others, that such Defendants had caused to be misappropriated and stolen money from customer accounts, and falsely to present Meridian, with the support and financial strength of Nautic, as a financially stable business.

35. Said Defendants did the acts and things herein alleged pursuant to, and in furtherance of, said conspiracy.

36. Among other overt acts in furtherance of the above-described conspiracy, in or after August 2005 the Nautic Defendants, among other things, obtained more than $3,750,000 in cash from the sale of their investments in Meridian; Defendants falsely presented the financial condition, business operations and liabilities of Meridian by, among other means, causing

10

1  improper and false adjusting entries to be made to the accounts and records of Meridian;
2  Defendants repeatedly removed funds from Plaintiff's accounts to which they were not entitled;
3  and Defendants interrupted and discontinued the annual audits of Meridian for the year ending
4  December 31, 2003 and thereafter.

5     37. In addition, the Nautic Defendants, through Hilinski, ratified and adopted each act
6  performed in furtherance of the above-described conspiracy.

7     38. Plaintiff is informed and believes and thereon alleges that the last overt act in
8  pursuance of the above-described conspiracy occurred in or about January 2006, when
9  Defendants wrongfully removed funds from Plaintiff's accounts.

10     39. Plaintiff did not become aware of the fraud until in or about December 2005, and
11  did not become aware of the above-described conspiracy until in or about January 2006.

12     40. As a proximate result of the wrongful acts herein alleged, Plaintiff has been
13  damaged in a sum not yet fully ascertained but which Plaintiff is informed and believes and on
14  that basis alleges, presently exceeds $880,000.

15     41. The full amount of damages that Plaintiff has sustained is unknown to Plaintiff and
16  cannot be ascertained without recourse to complicated records in the possession of Defendants.
17  Plaintiff therefore is entitled to an order requiring an accounting between Plaintiff and
18  Defendants.

19     42. In doing the acts herein alleged, Defendants acted wilfully and with a conscious
20  disregard of Plaintiff's rights and are guilty of malice, oppression and fraud, thereby warranting
21  an assessment of punitive damages in an amount appropriate to punish Defendants and deter
22  others from engaging in similar misconduct.

23                        **FOURTH CAUSE OF ACTION**
24                    [Conversion, Against All Defendants]

25     43. Plaintiff realleges and incorporates by this reference all the allegations of
26  Paragraphs 1 through 42, inclusive, hereinabove, as though set forth here at length.

27     44. From and after late 2003, Defendants, by reason of the acts and conduct as alleged
28  hereinabove, have exercised wrongful dominion and control over property of Plaintiff, namely,

11

1   funds from Plaintiff's accounts in a sum not fully ascertained, but exceeding $880,000, and have

2   unlawfully taken, appropriated and converted property of Plaintiff to their own use and benefit.

3       45. Plaintiff is entitled to recover the value of the property converted in a sum not yet

4   fully ascertained, but exceeding $880,000, with interest thereon according to proof.

5       46. By virtue of Defendants' wrongful acts, Plaintiff is entitled to an order declaring

6   that said Defendants hold the converted funds described above as constructive trustees for the

7   benefit of Plaintiff.

8       47. The full amount of damages that Plaintiff has sustained is unknown to Plaintiff and

9   cannot be ascertained without recourse to complicated records in the possession of Defendants.

10  Plaintiff therefore is entitled to an order requiring an accounting between Plaintiff and

11  Defendants.

12      48. Defendants' acts as herein alleged were willful, wanton, malicious and oppressive

13  and undertaken with the intent to defraud Plaintiff, thereby justifying the award of exemplary

14  and punitive damages.

### FIFTH CAUSE OF ACTION

[Unfair Business Practices. Bus. & Prof. Code § 17200, Against All Defendants]

17      49. Plaintiff realleges and incorporates by this reference all the allegations of

18  Paragraphs 1 through 48, inclusive, hereinabove, as though set forth here at length.

19      50. The acts and conduct of the Defendants as herein alleged, including but not limited

20  to taking funds from customer accounts, including Plaintiff's accounts, over which Defendants

21  had control, but which funds Meridian had not earned, in order to provide cash to meet

22  Meridian's financial obligations constitute unfair and fraudulent business acts, and the plan,

23  pattern and practice of said Defendants as alleged above, and in which the Nautic Defendants

24  aided and abetted the other Defendants, constitute unfair and fraudulent business practices, all as

25  prohibited by Cal. Bus. & Prof. Code §§ 17200 et seq.

26      51. As a direct, proximate and foreseeable result of Defendants' wrongful conduct as

27  herein alleged, Plaintiff suffered losses from its accounts in a sum not yet ascertained, but

28  exceeding $880,000.

CHRISTENSEN &
AUER
ATTORNEYS AT LAW
PASADENA, CA

**COMPLAINT OF FAMILY/SENIORS MEDICAL GROUP**

52. Plaintiff is entitled to relief, including full restitution of sums wrongfully obtained by Defendants as a consequence of the unfair business acts or practices herein alleged, plus interest as provided by law.

53. By virtue of Defendants' wrongful acts, Plaintiff is entitled to an order declaring that said Defendants hold the funds described above as constructive trustees for the benefit of Plaintiff.

54. The full amount of restitution to which Plaintiff is entitled is unknown to Plaintiff and cannot be ascertained without recourse to voluminous and complicated financial records in the possession of Defendants. Plaintiff therefore is entitled to an order requiring an accounting between Plaintiff and Defendants.

## SISTH CAUSE OF ACTION

### [Breach of Contract, Against Meridian]

55. Plaintiff realleges and incorporates by this reference all the allegations of Paragraphs 1 through 54 inclusive, hereinabove, as though set forth here at length.

56. As set forth herein, Plaintiff and Meridian entered into the Management Agreement on or about November 1, 2000.

57. Plaintiff has performed all conditions, covenants and promises required on its part to be performed in accordance with the terms and conditions of the Management Agreement, except as performance thereof has been excused by the acts, conduct and/or omissions of Defendants.

58. Commencing in or about late 2003, and continuing until the present, Defendants breached the Management Agreement by, among other acts, wrongfully taking funds from Plaintiff's accounts, over which Defendants had control, but which funds Meridian had not earned, in order to provide cash to meet Meridian's financial obligations.

59. As a result of Meridian's breach of the Management Agreement herein alleged, Plaintiff has been damaged in a sum not yet fully ascertained but which Plaintiff is informed and believes, and on that basis alleges, presently exceeds $880,000, together with attorney's fees and interest as provided by law.

13

60. The full amount of damages that Plaintiff has sustained is unknown to Plaintiff and cannot be ascertained without recourse to voluminous and complicated financial records in the possession of Defendant. Plaintiff therefore is entitled to an order requiring an accounting between Plaintiff and Defendant.

## SEVENTH CAUSE OF ACTION

[Intentional Interference with Contractual Relationship, Against the Nautic Defendants]

61. Plaintiff realleges and incorporates by this reference all the allegations of Paragraphs 1 through 60, inclusive, hereinabove, as though set forth here at length.

62. As herein alleged Plaintiff and Meridian entered into the Management Agreement on or about November 1, 2000. The Nautic Defendants knew of this Management Agreement existing between Plaintiff and Meridian because, among other reasons, Hilinski was a member of Meridian's Board of Directors.

63. The Nautic Defendants, among other acts herein alleged, through Hilinski, refused to provide sufficient funds to allow Meridian to meet its operational expenses and agreed to a plan whereby Meridian would take funds from customer accounts, including Plaintiff's accounts, to which funds Defendants were not entitled, in order to provide cash to meet Meridian's operating expenses.

64. As a consequence of the acts and conduct of the Nautic Defendants, Meridian breached its Management Agreement with Plaintiff by wrongfully taking funds that Meridian had not earned from Plaintiff's accounts for the purpose of meeting Meridian's financial obligations.

65. As a proximate result of Defendants' wrongful acts herein alleged and the breach of the Management Agreement, Plaintiff has been damaged in a sum not yet fully ascertained, but which Plaintiff is informed and believes and on that basis alleges, presently exceeds $880,000 plus additional damages for attorney's fees incurred in investigating and bringing a breach of contract action against Meridian.

66. In doing the acts herein alleged, the Nautic Defendants acted wilfully and with a conscious disregard of Plaintiff's rights and are guilty of malice, oppression and fraud, thereby

14

1   warranting an assessment of punitive damages in an amount appropriate to punish Defendants

2   and deter others from engaging in similar misconduct.

3   ### EIGHTH CAUSE OF ACTION

4   [Money Had and Received, Against All Defendants]

5   67. Plaintiff realleges and incorporates by this reference all the allegations of

6   Paragraphs 1 though 66, inclusive, hereinabove, as though set forth here at length.

7   68. Within the last four years at Woodland Hills, California, Defendants became

8   indebted to Plaintiff in a sum as yet not ascertained, but exceeding $880,000.

9   69. The full amount of indebtedness presently is unknown to Plaintiff and cannot be

10  ascertained without recourse to voluminous and complicated financial records in the possession

11  of Defendants. Plaintiff therefore is entitled to an order requiring an accounting between

12  Plaintiff and Defendants.

13  70. No payment has been made by Defendants to Plaintiff and there is now owing a

14  sum exceeding $880,000, according to proof, together with attorney's fees and interest as

15  provided by law.

16  ### NINTH CAUSE OF ACTION

17  [For Breach of Fiduciary Duty, Against Meridian]

18  71. Plaintiff realleges and incorporates by this reference all the allegations of

19  Paragraphs 1 through 70, inclusive, hereinabove, as though set forth here at length.

20  72. The Management Agreement entered into between Plaintiff and Meridian on

21  November 1, 2000 created the relationship of principal and agent between the parties in that,

22  among other reasons, pursuant to the Management Agreement Meridian received signature

23  authority on Plaintiff's bank accounts, made payments on behalf of Plaintiff and negotiated

24  agreements on behalf of Plaintiff.

25  73. Commencing in or about late 2003 and continuing until the present, Defendants

26  breached the Management Agreement by, among other acts, wrongfully taking funds from

27  Plaintiff's accounts, over which Defendants had control, but which funds Meridian had not

28  earned, in order to provide cash to meet Meridian's financial obligations and by falsifying

15

1  accounting records to prevent Plaintiff from learning of such wrongful taking.

2  74. As a result of Meridian's breach of fiduciary duty herein alleged, Plaintiff has been

3  damaged in a sum not yet fully ascertained, but which Plaintiff is informed and believes and on

4  that basis alleges, presently exceed $880,000.

5  75. The full amount of damages that Plaintiff has sustained is unknown to Plaintiff

6  and cannot be ascertained without recourse to complicated records in the possession of

7  Defendant Meridian.  Plaintiff therefore is entitled to an order requiring an accounting between

8  Plaintiff and Defendant Meridian.

9  76. The wrongful acts of Meridian alleged herein constitute despicable conduct that

10  was carried on in willful and conscious disregard of Plaintiff's rights, justifying an award of

11  exemplary and punitive damages.

12  ## TENTH CAUSE OF ACTION

13  [For Breach of Fiduciary Duty Against Hilinski, Alper and Sato]

14  77. Plaintiff realleges and incorporates by this reference all the allegations of

15  Paragraphs 1 through 76, inclusive, hereinabove, as though set forth here at length.

16  78. Plaintiff is informed and believes and thereon alleges that, commencing in or about

17  September 2003, Meridian began experiencing significant financial losses, negative cash flows

18  and was unable to meet its financial obligations as they became due.

19  79. Plaintiff is further informed and believes and thereon alleges that, commencing in

20  or about October 2003, Defendants Hilinski, Alper and Sato agreed to take funds from

21  Plaintiff's accounts, which funds Meridian had not earned and to which Defendants were not

22  entitled, in order to obtain cash to meet Meridian's financial obligations.  Between October 2003

23  and December 2005, Defendants Hilinski, Alper and Sato, directly or indirectly, caused amounts

24  in excess of $880,000 to be misappropriated from Plaintiff's accounts in this manner.

25  80. Plaintiff is further informed and believes and thereon alleges that, commencing

26  sometime after October 2003, Defendants Hilinski, Alper and Sato falsely represented the

27  financial condition, business operations and liabilities of Meridian, among other means, by

28  causing improper and false adjusting entries to be made to the accounts and records of Meridian

16



CHRISTENSEN &
AUER
ATTORNEYS AT LAW
PASADENA, CA

**COMPLAINT OF FAMILY/SENIORS MEDICAL GROUP**

1  and concealing the actual balances in Plaintiff's fund accounts to hide the misappropriations of

2  Plaintiff's funds.

3      81. Commencing in or about October 2003, Meridian was insolvent in fact and,

4  consequently, Defendants Hilinski, Alper and Sato, as directors of Meridian, were charged with

5  fiduciary duties for the benefit of Meridian's creditors.

6      82. Commencing in or about October 2003 and continuing to the present, Plaintiff

7  was a creditor of Meridian by virtue of, among other things, the above-alleged misappropriations

8  of Plaintiff's funds.

9      83. The above-described acts and conduct of Defendants Hilinski, Alper and Sato

10  constitute  breach of their fiduciary duty to Plaintiff in that, among other things, (a) said

11  Defendants continued to misappropriate Plaintiff's funds after they knew or should have known

12  that Meridian would be unable to repay the amounts owed to Plaintiff; and (b) said Defendants'

13  cover-up of the misappropriation prevented Plaintiff from being able to protect its interests and

14  minimize its damages.

15      84. As a result of said Defendants' breach of fiduciary duty herein alleged, Plaintiff

16  has been damaged in a sum not yet fully ascertained, but which Plaintiff is informed and

17  believes and on that basis alleges, presently exceed $880,000.

18      85. The wrongful acts of Defendants Hilinski, Alper and Sato alleged herein constitute

19  despicable conduct that was carried on in willful and conscious disregard of Plaintiff's rights,

20  justifying an award of exemplary and punitive damages.

21  **ELEVENTH CAUSE OF ACTION**

22  [For Breach of Fiduciary Duty Against Nautic, Chisholm,

23  Fleet Equity, Fleet Venture and Kennedy]

24      86. Plaintiff realleges and incorporates by this reference all the allegations of

25  Paragraphs 1 through 85, inclusive, hereinabove, as though set forth here at length.

26      87. Plaintiff is informed and believes and thereon alleges that from and after July 26,

27  1999, until Meridian was sold to e4e, Incorporated, Defendants Nautic, Chisholm, Fleet Equity,

28  Fleet Venture and Kennedy were the principal shareholders in Meridian.  Plaintiff is further

17

1   informed and believes and thereon alleges that at all relevant times herein Defendant Hilinski

2   was a managing director of Defendants Nautic and a manager and/or agent with respect to

3   Defendants Chisholm, Fleet Equity, Fleet Venture and Kennedy.

4        88. Plaintiff is informed and believes and thereon alleges that, commencing in or about

5   September 2003, Meridian began experiencing significant financial losses, negative cash flows

6   and was unable to meet its financial obligations as they became due.

7        89. Plaintiff is further informed and believes and thereon alleges that, commencing in

8   or about October 2003, Defendants Nautic, Chisholm, Fleet Equity, Fleet Venture and Kennedy,

9   through their managing director and/or agent, Defendant Hilinski, and along with Defendants

10  Alper and Sato, agreed to take funds from Plaintiff's accounts, which funds Meridian had not

11  earned and to which Defendants were not entitled, in order to obtain cash to meet Meridian's

12  financial obligations.  Between October 2003 and December 2005, Defendants Nautic,

13  Chisholm, Fleet Equity, Fleet Venture and Kennedy, through Defendant Hilinski, directly or

14  indirectly caused amounts in excess of $880,000 to be misappropriated from Plaintiff's accounts

15  in this manner.

16        90. Plaintiff is further informed and believes and thereon alleges that, commencing

17  sometime after October 2003, Defendants Nautic, Chisholm, Fleet Equity, Fleet Venture and

18  Kennedy, through Defendant Hilinski, and along with Defendants Alper and Sato, falsely

19  represented the financial condition, business operations and liabilities of Meridian, among other

20  means, by causing improper and false adjusting entries to be made to the accounts and records of

21  Meridian and concealing the actual balances in Plaintiff's fund accounts to hide the

22  misappropriations of Plaintiff's funds.

23        91. Commencing in or about October 2003, Meridian was insolvent in fact and,

24  consequently, Defendants Nautic, Chisholm, Fleet Equity, Fleet Venture and Kennedy, as

25  principal shareholders of Meridian, were charged with fiduciary duties for the benefit of

26  Meridian's creditors.

27        92. Commencing in or about October 2003 and continuing to the present, Plaintiff

28  was a creditor of Meridian by virtue of, among other things, the above-alleged misappropriations

18

COMPLAINT OF FAMILY/SENIORS MEDICAL GROUP

of Plaintiff's funds.

93. The above-described acts and conduct of Defendants Nautic, Chisholm, Fleet Equity, Fleet Venture and Kennedy constitute breach of their fiduciary duty to Plaintiff in that, among other things, (a) said Defendants directly or indirectly continued to misappropriate Plaintiff's funds after they knew or should have known that Meridian would be unable to repay the amounts owed to Plaintiff; and (b) said Defendants' cover-up of the misappropriation prevented Plaintiff from being able to protect its interests and minimize its damages.

94. As a result of the breach of fiduciary duty herein alleged, Plaintiff has been damaged in a sum not yet fully ascertained, but which Plaintiff is informed and believes and on that basis alleges, presently exceeds $880,000.

95. The wrongful acts of Defendants Nautic, Chisholm, Fleet Equity, Fleet Venture and Kennedy alleged herein constitute despicable conduct that was carried on in willful and conscious disregard of Plaintiff's rights, justifying an award of exemplary and punitive damages.

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

**As to the 1st and 2nd and 3rd Causes of Action Against All Defendants:**

1. For compensatory damages according to proof in an amount exceeding $880,000;

2. For an accounting;

3. For exemplary and punitive damages;

**As to the 4th Cause of Action Against All Defendants:**

4. For restitution of all sums wrongfully converted;

5. For imposition of a constructive trust;

6. For an accounting;

7. For interest as provided by law;

8. For exemplary and punitive damages;

**As to the 5th Cause of Action Against All Defendants:**

9. For restitution of all sums wrongfully obtained;

10. For imposition of a constructive trust;



CHRISTENSEN &
AUER
ATTORNEYS AT LAW
PASADENA, CA

19

COMPLAINT OF FAMILY/SENIORS MEDICAL GROUP

11. For an accounting;

16. For interest as provided by law

**As to the 6th Cause of Action Against Defendant Meridian:**

12. For damages according to proof in an amount in excess of $880,000;

13. For interest as provided by law;

14. For attorney's fees as provided by law;

15. For an accounting;

**As to the 7th Cause of Action Against the Nautic Defendants:**

16. For damages according to proof in an amount in excess of $880,000;

17. For exemplary and punitive damages;

**As to the 8th Cause of Action Against All Defendants:**

18. For money had and received in a sum exceeding $880,000;

19. For an accounting;

20. For interest as provided by law;

21. For attorney's fees as provided by law;

**As to the 9th Cause of Action Against Meridian:**

22. For damages according to proof in an amount in excess of $880,000;

23. For interest as provided by law;

24. For attorney's fees as provided by law;

25. For an accounting;

26. For exemplary and punitive damages;

**As to the 10th Cause of Action Against Defendants Hilinski, Alper and Sato:**

27. For damages according to proof in an amount in excess of $880,000;

28. For exemplary and punitive damages;

**As to the 11th Cause of Action Against Defendants Nautic, Chisholm, Fleet Equity, Fleet Venture and Kennedy:**

29. For damages according to proof in an amount in excess of $880,000;

30. For exemplary and punitive damages;

20

1

**As to All Causes of Action:**

2

31. For costs of suit herein incurred; and

3

26. For such other and further relief as the court may deem proper.

4

5   Dated: April 3, 2006

**CHRISTENSEN & AUER**

6

7   By: _____

8   Stephen G. Auer, Esq.
    Attorneys for Family/Seniors Medical Group

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   S:\DOCS\Family Seniors Med Group\Meridian\Complaint.033006.doc

28

CHRISTENSEN &
AUER
ATTORNEYS AT LAW
PASADENA, CA

21

**COMPLAINT OF FAMILY/SENIORS MEDICAL GROUP**

# EXHIBIT 1

# DEVELOPMENT AND MANAGEMENT AGREEMENT

This AGREEMENT is made and entered into this FIRST day of _____, 1999, by and between FAMILY/SENIORS MEDICAL GROUP, a professional corporation (hereinafter referred to as "Client"), with its primary place of business located at 4020 W. Florida Avenue, Suite H, Hemet, California 92545, and MERIDIAN HEALTH CARE MANAGEMENT, INC. a Delaware corporation (hereinafter referred to as "MHCM"), with its primary place of business located at 21045 Califa Street, Woodland Hills, California 91367.

## RECITALS

WHEREAS, Client is a professional corporation in the state of California engaged in the business of providing or arranging for the provision of medical and/or other health care services to its patients; and

WHEREAS, Client intends to contract with one or more Health Maintenance Organizations (HMO) and other third party payors (hereinafter referred to as "Payors") to provide medical services on a capitated and/or fee-for-service basis for patients (hereinafter referred to as "Patients") under such Payor contracts; and

WHEREAS, Client and MHCM recognize that Client has sole and complete responsibility for providing or arranging for the provision of medical and /or other health care services to its patients; and

WHEREAS, MHCM has certain experience in the management of independent practice association (IPA) models of physician organizations and of other risk-sharing health care provider networks; and

WHEREAS, Client is desirous of contracting with MHCM to provide management in the form of development, consulting, and administrative management services as specified herein; and

WHEREAS, MHCM desires to enter into this Agreement with Client to furnish and make available such development, consulting, and administrative management services as herein provided; and

WHEREAS, the parties hereto have reached an agreement for the division of labor necessary to most efficiently provide or arrange for the provision of the medical and/or health care services and managerial services (as described in Exhibit "B" attached hereto) necessary to render medical care to Patients;

Meridian Health Care Management, Inc. Management Agreement
FSMG Mgmt Proposal 111099.doc

_____ Client: FSMG
Initials

NOW, THEREFORE, in consideration of the above Recitals, the terms, covenants and conditions hereinafter set forth, and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

## I
## RELATIONSHIP OF PARTIES

A.    **Independent Contractor Relationship.** In the performance of the work, duties and obligations described hereunder, it is mutually understood and agreed that each party is at all times acting and performing as an independent contractor with respect to the other and that no relationship of partnership, joint venture or employment is created by this Agreement. Neither party, nor any other person performing services on behalf of either party pursuant to this Agreement, shall have any right or claim against the other party under this Agreement for social security benefits, workers' compensation benefits, disability benefits, unemployment insurance benefits, health benefits, vacation pay, sick leave or any other employee benefits of any kind.

B.    **Hold Harmless.** Client and MHCM shall hold each other free and harmless of any and all claims, demands and expenses of all kinds which may result or arise out of any alleged malpractice or neglect caused by Client and/or MHCM, its employees or representatives in the performance or omission of any act or responsibility of Client and/or MHCM pursuant to this Agreement.

## II
## COVENANTS AND OBLIGATIONS OF CLIENT

Client agrees and covenants:

A.    **Payor Contracts.** Client shall contract with Payors for the provision of medical and/or health care services pursuant to this Agreement.

B.    **Corporate Status.** Client covenants and agrees that it is presently and shall remain throughout this Agreement and each renewal and extension hereof, a corporation in good standing with the State of California.

C.    **Insurance.** Client covenants and agrees that it shall obtain and maintain in effect throughout the initial term of this Agreement and each renewal term thereof, such policies of comprehensive general liability insurance and professional liability insurance (including, but not limited to Directors & Officers and Errors & Omissions policies) with coverage as specified and amounts as required by Client's Payor contracts to insure it and its employees against liability for damage directly or indirectly related to the performance of any services provided, the use of any property and facilities provided by Client and activities performed by Client. Said coverage shall name MHCM as an additional insured and require notice to MHCM

of not less than thirty (30) days written notice of any reduction or cancellation of such insurance coverage by Client. Evidence of the insurance policies described above shall be provided to MHCM upon request.

D.   Medical Services. Client shall provide or arrange for all of the medical and/or health care services, including, but not limited to the services of, nurses, doctors, clinics and paraprofessionals requisite to fulfill Client's duties and obligations under its Payor contracts.

E.   Payment to MHCM. Client shall pay to MHCM those amounts set forth in Exhibit "A" hereto for services rendered by MHCM hereunder. Exhibit "A" is attached hereto and incorporated herein by this reference. Said compensation shall be made in accordance with the time frames set forth in Exhibit "A".

F.   Utilization and Quality Management. Client shall establish, with support and assistance of MHCM, a peer review procedure for effecting proper utilization and quality assessment of Client's providers and facilities.

G.   Confidentiality and Non-disclosure of Information. Client shall maintain as confidential all financial and other proprietary information of MHCM, including, as example but not limited to policy and procedure manuals, guidelines, etc. Upon termination of this Agreement, or any extensions thereof, all such information will be returned to MHCM and Client shall only retain copies of such information as may be required by law. Client's obligation to maintain the confidentiality of all information obtained from MHCM shall survive the termination of this Agreement.

H.   Compliance with Law. Client represents and warrants that the practice of medicine at Client's provider's office(s) through the term of this Agreement and any extensions and renewals hereof shall be conducted in accordance with all applicable provisions of federal and state laws and regulations and in a professional manner. Client further represents and warrants that during the term and any extensions and renewals hereof all physicians practicing with Client shall maintain on an unrestricted basis (i) such professional standards and skills as are in accordance with the standards of ethics and practice prevailing in Client's service area, (ii) a license to practice medicine in the State of California, (iii) a Medicare provider number and full participation, accepting assignment, with the Medicare program, and (iv) a federal DEA registration certificate.

I.   Board of Directors Meetings. Client shall hold regular Board of Director meetings.

J.   Cooperation. Client covenants and agrees that it shall provide MHCM with all information and the use of such facilities as is required by MHCM to perform its services hereunder. Client further covenants that it shall grant MHCM such authority as necessary to permit MHCM to perform its duties and services hereunder. Such authority shall include without limitation access to individual provider offices and signature authority on Client bank accounts.

## III
## COVENANTS & OBLIGATIONS OF MHCM

MHCM agrees and covenants:

A.  Operational Management Services. In consideration of the compensation described in Exhibit "A" hereof, MHCM shall provide those services described in Exhibit "B" to this Agreement. (Exhibit "B" is attached hereto and hereby incorporated by this reference herein).

B.  Administration of MHCM. MHCM shall be responsible for employing, training and managing all MHCM staff. Client shall have the right to periodically evaluate any on-site MHCM personnel and report such evaluations to MHCM. However, the hiring, compensation, firing and all other terms of employment for all on-site and off-site MHCM personnel shall be at the sole discretion of MHCM.

C.  Confidentiality and Non-disclosure of Information. MHCM shall maintain as confidential all financial and other proprietary information of Client. Upon termination of this Agreement, or any extensions thereof, all such information will be returned to Client and MHCM shall only retain copies of such information as may be required by law. MHCM's obligation to maintain the confidentiality of all information obtained from Client shall survive the termination of this Agreement.

D.  Insurance. MHCM covenants and agrees that it shall maintain in effect during the initial term and each renewal term thereof, adequate comprehensive general liability and other insurance coverage to cover any loss, liability or damage which may result due to the activities of MHCM or its officers, agents or employees.

## IV
## TERM AND TERMINATION OF AGREEMENT

A.  Term. Subject to Sections IV(B) and Exhibit A(1), the effective date of this Agreement shall commence on the first (1ˢᵗ) day of November, 1999, and shall continue in effect for two (2) years from such date. The Agreement shall automatically renew for additional periods, each of two (2) years; provided, however, either party may terminate this Agreement with or without cause by giving written notice to the other of its intent to terminate this Agreement at least six (6) months prior to the expiration of the initial two (2) year or prior to any two (2) year renewal period of this Agreement.

B.  Termination with Cause. Notwithstanding the foregoing, this Agreement may be terminated by either party (i.e., the non-defaulting party) by giving notice to the other party if the other party is in default of this Agreement. The following shall constitute events of default hereunder:

1.  Failure by either party to perform, keep or fulfill any material covenant, undertaking, obligation, condition, or service set forth in this Agreement and the continuance of any such default for a period of sixty (60) days after receipt of written notice of such failure by the defaulting party.

2. Failure of a party to pay any amount that may become due hereunder for a period of five (5) days after written notice of such failure.
3. Cancellation of insurance required by either party herein.
4. Client's practice of medicine is deemed unlawful by any state or federal agency.
5. Any representations or warranties made herein by either party are false or incorrect.
6. MHCM's legal counsel concludes that any provision of this Agreement is unlawful.
7. Either party files a voluntary petition for relief under the United States Bankruptcy Code, 11 U.S.C. § 101, et seq., as amended from time to time (the "Bankruptcy Code") or otherwise seeks relief under any similar federal or state statute for the protection of debtors; makes an assignment of its assets for the benefit of creditors; has its assets seized or encumbered by creditors under any federal or state law; or has an involuntary case commenced against it under the Bankruptcy Code or similar state or federal statute, provided however that the commencement of an involuntary case against such party shall not constitute a default hereunder if the involuntary case is dismissed within sixty (60) days of filing.

## V
## DISPUTES/ARBITRATION

A.    Arbitration. Any controversy or claim arising out of or relating to this Agreement or the breach thereof shall be settled by binding arbitration in accordance with the rules of commercial arbitration of the American Arbitration Association and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Such binding arbitration shall occur within the County of Los Angeles. The arbitrator(s) may in any such proceeding award attorneys' fees and costs to the prevailing party.

## VI
## MISCELLANEOUS

A.    Notices. All notices required to be given hereunder shall be in writing and shall be deemed delivered if personally delivered or dispatched by certified or registered mail, return receipt requested, postage prepaid, addressed to the parties as follows. Notice shall be deemed given on the date it is deposited in the mail in accordance with the foregoing. Any party may change the address to which to send notices by notifying the other party of such change of address in writing in accordance with the foregoing.

Client: Attn: President

Family/Seniors Medical Group

4020 W. Florida Avenue, Suite H

MHCM: Attn: President

Meridian Health Care Management

21045 Califa Street

Meridian Health Care Management, Inc. Management Agreement
FSMG Mgmt Proposal 111099.doc

_____ Client FSMG
Initials

Page 5 of 13

Hemet, CA 92545                           Woodland Hills, CA  91367

**B.**    **Amendment.** This agreement may be modified only by mutual agreement of the parties provided that, before any modification shall be operative or valid, it be reduced to writing and signed by both parties.

**C.**    **Management Services Exclusivity.** It is agreed and understood that Client will use MHCM exclusively for all services specified in Exhibit "B" of this Agreement.

It is further agreed and understood that prior to entering into an agreement with any other person or entity to provide services for Client in addition to any of those required to be performed by MHCM that are set forth in this Agreement, Client will notify MHCM of such intent, in writing, and MHCM will have the first right of refusal to provide these additional services, at additional compensation no less than the compensation proposed to Client in any bona fide offer from such other person or entity. Such right of first refusal shall expire sixty (60) days after Client presents to MHCM a bona fide offer from a third party qualified to provide such additional services.

**D.**    **Severability.** If any provision of this Agreement shall be determined to be illegal or invalid for any reason, the remaining provisions shall continue in full force and effect unless the illegality or invalidity prevents the accomplishments of the essential objectives and purposes of this Agreement.

**E.**    **Assignability.** This Agreement shall not be assigned, sublet or transferred by MHCM or Client without the prior written consent of the other. Such consent shall not be unreasonably withheld. Subject to the foregoing, this Agreement shall inure to the benefit of and be binding on Client and MHCM, their executors and administrators, including any person or entity which affiliates, merges or acquires substantially all of the assets of Client or MHCM, or into which Client may be consolidated or otherwise combined.

**F.**    **Change in Law.** In the event of any change of law, rule or regulation by Federal or State Governments which relate to the relationship, as outlined herein, by effect of such new law, rule or regulation or code changes in any way makes this Agreement in its entirety illegal or improper, this Agreement may be terminated by either party. In the event of such termination, the parties hereto expressly agree to renegotiate the terms of this Agreement in order to ensure compliance with any such change of law.

**G.**    **Transition.** In the event of termination, MHCM agrees to cooperate in an orderly transfer of management as prescribed by Client.

**H.**    **Non-Solicitation.** The parties agree that during the term of this agreement and for a period of one year following termination of this agreement, neither party will directly or indirectly solicit any employee or patients of the other to accept employment with that party or any of its affiliated entities or individuals.

**I.**    **Governing Law.** This Agreement shall be interpreted, construed and governed by and in accordance with the laws of the State of California.

**J.**    **Waiver.** The failure of either party to insist upon the strict adherence to any term of this Agreement on any occasion shall not be considered a waiver or deprive that

Meridian Health Care Management, Inc. Management Agreement
FSMG Mgmt Proposal 111099.doc

_____    Client: FSMG
Initials

party of the right thereafter from enforcing that term or any other term of this Agreement.

K.    Entire Agreement. This Agreement is the complete and exclusive statement of the agreement between the parties and supersedes all prior or contemporaneous proposals, oral or written, understandings, representations, conditions, covenants and all other circumstances between the parties relating to the subject matter of this Agreement.

L.    Captions and Headings. The captions and headings throughout this Agreement are for convenience of reference only and shall in no way be held or deemed to be a part of or affect the interpretation of this Agreement.

M.    No Third Party Beneficiaries. Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any person, firm or corporation other than the parties hereto and their respective successors or assigns, any remedy or claim under or by reason of this Agreement or any term, covenant or condition hereof, as third party beneficiaries or otherwise, and all of the terms, covenants and conditions hereof shall be for the sole and exclusive benefit of the parties hereto and their successors and assigns.

N.    Confidentiality of Terms. During the initial term and any renewal terms of this Agreement, the parties shall maintain all terms and conditions of this Agreement as confidential. No disclosure shall be permitted without the approval of the other party. Additionally, MHCM shall not disclose to any third party any confidential information regarding Client records, patients, or plans, except as required by Federal, California or local law/regulation, or as required by any Payor contract executed by Client. However, MHCM shall have the right to display Client name in listings of its clients.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on the day and year first hereinabove set forth.

CLIENT:

BY: _____    DATE: 12-27-99

TITLE: President

MHCM:

Meridian Health Care Management, Inc., a Delaware Corporation

BY: _____    DATE: 1/5/00
    Michael Alper

TITLE: President

Meridian Health Care Management, Inc. Management Agreement
FSMG Mgmt Proposal 111099.doc

_____    Client FSMG
Initials

Page 7 of 13

## EXHIBIT "A"
## COMPENSATION

MHCM shall be compensated as follows:

A.  Commencing on November 1, 1999 MHCM shall receive from Client monthly payment equal to:

- twelve percent (12%) of the initial $250,000.00 of Client gross monthly revenue, including but not limited to capitation payments, distributions from risk pools, risk sharing arrangements, and reinsurance recoveries; and

- eleven and one-half percent (11.5%) of Client gross monthly revenues greater than $250,000.00

B.  The monthly fee paid to MHCM for providing Operational Management Services as described in Exhibit "B" hereof shall be a minimum of Ten Thousand Dollars ($10,000.00) per month.

C.  All expenses directly related to the performance of services under Article III of this Agreement shall be borne by MHCM, excluding the following:

1.  Client legal expenses.
2.  Accounting expenses for year end taxes, such as preparation of 1099 forms, audits and special accounting services other than the day-to-day operation of Client.
3.  Client Board, committee and Medical Director fees
4.  Design, printing and duplication expenses for medical encounter and referral forms, Client stationery, newsletters and other marketing materials.
5.  Client insurance premiums, including but not limited to: reinsurance, directors and officers, professional or general liability, and as approved by Client.
6.  Costs incurred, with prior approval of Client, for Client's membership, Board or committee meetings, excluding costs for routine preparation of information packets, presentation materials and other routine items.
7.  Space rent, furnishings and equipment for office space located within Client's primary service area (as defined in Article III, Section B of this Agreement) and used by MHCM to perform the services required under this Agreement.
8.  Postage and other special handling expenses (e.g. certified mail or overnight mail) for provider and/or health plan required notification or per client request.
9.  A seventy-five dollar ($75.00) fee per Client provider every two years for primary source credentialing at appointment and reappointment.
10. A one hundred-fifty dollar ($ 150.00) fee per Client provider every two years for office site audits for purposes of credentialing or re-credentialing.

D.  Unless provided for otherwise herein, Client shall remit payment to MHCM within thirty (30) days of the close of the month in which services were rendered.

## REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK

EXHIBIT "B"

# OPERATIONAL MANAGEMENT SERVICES TO BE PROVIDED BY MHCM

A.    General Management and Administration.

1.    Supervising and coordinating day-to-day non-medical business aspects of Client.

2.    Providing administrative support for interface with physicians, including voice mail access to MHCM staff at any time. Making best efforts to return as quickly as possible Client voice mail messages, including voce mail messages received outside of normal business hours.

3.    Assist Client in the provision of medical, administrative, peer review and utilization management services to Client, including, but not limited to:

a.    Consulting on Payor/Client communications pertinent to medical matters.

b.    Assisting in resolving any grievances between Client and Payors pertinent to all medical matters.

c.    Consulting on resolving Client/Payor Member grievances pertinent to medical matters.

d.    Consulting on Client's medical and hospital referral authorization procedures.

e.    Interfacing with Client provider's office staff to monitor Client's medical and hospital referral authorization procedures.

f.    Coordinating medical administrative support prior to and at all Utilization Management and Quality Management Committee Meetings.

4.    Providing clerical and secretarial support adequate to meet functions of Client, its employees and its Board of Directors.

5.    Coordinating printing of all forms and correspondence.

6.    Processing all incoming and outgoing mail.

7.    Maintaining a liaison with Payors where necessary to obtain/submit data, etc.

8.    Preparing ad-hoc reports as requested by Client.

9.    On-going provision of computerized management information system.

B.    Financial Management.

1.    Establishing bookkeeping and accounting systems including the maintenance, custody and supervision of all of Client's business records and the preparation, distribution and recordation of all bills and statements for professional services rendered by Client, including billing and completion of reports and forms required by prepaid health plans, employers, insurance companies, governmental agencies and other third party payors.

2. Establishing a budget that reflects major operating objectives and anticipated revenues, expenses and cash flow.

3. Establishing and maintaining bank accounts and supervising short-term investments and money management.

4. Preparing financial statements on a monthly basis to include a balance sheet, statement of revenue and expenses, and cash flow for Client's operations for such month and a statement of accounts receivable. Such statements to be produced on both a cash and accrual basis of accounting.

5. Establishing and maintaining an accounts payable system.

6. Administering a claims processing system, including, but not limited to:

   a. Receiving completed claim forms from Client providers.

   b. Entering data in computerized database.

   c. Generating reports required by Payors.

   d. Adjudicating and paying claims pursuant to Client's instructions and policies.

   e. Reviewing available cash versus payable claims.

   f. Generating reports required by Client for utilization management and financial review.

7. Administering capitation distribution from prepaid Payors, including but not limited to:

   a. Receiving and depositing capitation payments.

   b. Reconciling capitation payments with eligibility lists and other pertinent reports.

   c. Preparing budgets for internal Client management.

   d. Distributing primary care physician ("PCP") capitation payments and explanation of benefits.

   e. Distributing specialty physician payment based upon authorized referrals and explanation of benefits.

   f. Producing reports and collecting reimbursement for insured and reinsured services.

   g. Providing third party payor information for coordination of benefits.

   h. Distributing payments to all ancillary and administrative providers.

   i. Preparing monthly, quarterly, and yearly financial statements and accounting protocols.

8. Assistance in developing bonus distribution methodologies.

C.   Risk Pool Administration (If data is provided by Payors or Providers).

   1.   Entering charges against risk pool(s) in computerized database.

   2.   Generating reports of charges against risk pool(s).

   3.   Verifying accuracy and validity of reports produced by Payors.

   4.   Reconciling risk pool(s) accounts with Payors and any internal arrangement between hospital and Client.

D.   Management Information System. Provide a management information system to include the handling of accounts receivable, accounts payable, patient tracking, claims processing, utilization analysis, and eligibility determination.

E.   Insurance and Risk Management.

   1.   Providing recommendations regarding professional liability insurance, comprehensive liability insurance, workers' compensation insurance and disability insurance.

   2.   Coordinating Client's risk management program.

F.   Patient Eligibility.

   1.   Obtaining eligibility lists from Payors.

   2.   Assisting with determination of eligibility of patients for health care coverage prior to provision of medical services.

   3.   Maintaining computerized eligibility database.

   4.   Reconciling retroactive denial of eligibility against provision of medical services and authorization process by Client against appropriate health care benefit agreement.

   5.   Administering system for retroactive eligibility determination.

   6.   Distributing eligibility reports to appropriate Client providers, hospital staff and Client.

G.   Provider Recruitment. Assist in recruiting and credentialing new providers who shall contract with or be employed by Client.

H.   Client Provider Data.

   1.   Obtaining approved Client provider applications from Client.

   2.   Negotiating agreements with Client providers.

   3.   Presenting complete provider applications and contracts for Client approval.

   4.   Maintaining data in computerized eligibility database.

   5.   Tracking client provider contract renewal dates.

   6.   Distribution of updated Client provider lists, as appropriate.

I.     Provider Relations.

1. Providing resources to train Client providers in Medical group's policies and procedures.

2. Distributing Client's forms to Client providers.

3. Assisting Client in development and updating of a Client manual.

J.     Education.

1. Educating physicians regarding Client's polices and procedures.

2. Educating of Patients of Client regarding third party payors.

3. Coordinating health education and wellness programs to Patients of Client.

K.     Managed Care Contracting.

1. Negotiating agreements with third party payors including, but not limited to, prepaid health plans, preferred provider organizations, exclusive provider organizations, self-insured employers, employee unions and indemnity carriers.

2. Negotiating agreements with hospital and ancillary providers within Client service area.

3. Tracking contract renewal dates for agreements with third party payors.

L.     Liaison with Third Party Payors Contracting with Client.

1. Coordinating communications with third party payors.

2. Providing third party payors with rosters of physicians in Client.

3. Informing third party payors of roster changes.

4. Coordinating Client network and office expansion to meet requirements of third party payors.

5. Assisting in resolving any grievances between Client and third party payors.

6. Assisting in resolving patient grievances.

M.     Utilization Management, Quality Management and Medical Policy Committee Functions.

1. Administering managed care medical and hospital referral authorization procedure.

2. Designing, developing and implementing a physician education program and claims analysis program.

3. Providing administrative assistance prior to and at all managed care Utilization Management, Quality Management and Medical Policy Committee Meetings (e.g. meeting schedules, set-up, agenda, minutes).

4. Providing administrative support when applicable at each managed care Utilization Management Committee meeting pertinent to health benefits, billing information, referral authorization process, referral and practice patterns,

compliance with referral authorization process, referral limitations, monitoring of coding procedures and utilization guidelines.

5. Providing administrative support for all managed care Quality Management activities as they relate to non-medical policy and procedure development, data collection, meeting administration, documentation of finds, monitoring of Client developed requirements for medical record documentation.

6. Designing, developing and implementing a comprehensive Client provider credentialing program subject to the fee set forth in Exhibit A, Section E.

7. Providing administrative support for the managed care Medical Policy Committee as it relates to non-medical policy and procedure development, meeting administration, documentation of finds, and consistent application of non-medical adopted polices.

## REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK



## Mutual Non-Disclosure Agreement

This MUTUAL NON-DISCLSOURE AGREEMENT (the "Agreement") entered into this THIRD day of OCTOBER, 2002 is by and between Meridian Health Care Management, Inc. (MHCM) with its principal place of business located at 6200 Canoga Avenue, Woodland Hills, CA 91367, Family/Seniors Medical Group, with its principal place of business located c/o MHCM 6200 Canoga Avenue, Woodland Hills, CA 91367, and Rancho Family Medical Group, Inc. with its principal place of business located at 41715 Winchester Road, Suite 101, Temecula, CA 92590.

Whereas, each party hereto has requested or may request information from the other party in connection with consideration of a possible transaction or relationship between the parties;

Whereas, in the course of consideration of the possible transaction or relationship, each party hereto has disclosed or may disclose confidential, important and/or proprietary trade secret information concerning that party's business and activities;

Therefore, the parties hereto agree to enter into a confidential relationship with respect to the disclosure by each of them of certain information as follows:

### 1. Definitions.

For purposes of this Agreement, "Confidential Information" shall include all information or material that has or could have commercial value or other utility in the business or prospective business of the Disclosing Party or its subsidiaries or affiliates. Confidential information also includes all information of which unauthorized disclosure could be detrimental to the interests of the Disclosing Party or its subsidiaries or affiliates whether or not such information is identified as Confidential Information. By example and without limitation, Confidential Information includes, but is not limited to, any and all information of the following or similar nature, whether or not reduced to writing: Customer lists, customer and supplier identities and characteristics, agreements, marketing knowledge and information, sales figures, pricing information, marketing plans and business plans, strategies, forecasts, financial information, budgets, software, research papers, projections, procedures, routines, quality control and manufacturing procedures, patents, patent applications, processes, formulas, trade secrets, innovations, inventions, discoveries, improvements, research or development and test results, data, know-how, formats, plans, sketches, specifications, drawings, models, and any other information or procedures that are treated as or designated secret or confidential by the Disclosing Party or its customers or potential customers.

For purposes of this Agreement, the term "the Disclosing Party" shall be the party that discloses Confidential Information to the Receiving Party.

1

**Meridian**
Health Care Management, Inc.

For purposes of this Agreement, the term "the Receiving Party" shall be the party that receives Confidential Information from the Disclosing Party_and shall include the Receiving Party, the company he or she represents, and all affiliates, subsidiaries, and related companies of the Receiving Party.

For purposes of this Agreement, the term "Representative" shall include each party's directors, officers, employees, agents, and financial, legal, and other advisors.

2. **Exclusions.** Confidential Information does not include information that the Receiving Party can demonstrate: (a) was in the Receiving Party's possession prior to its being furnished to the Receiving Party under the terms of this Agreement, provided the source of that information was not known by the Receiving Party to be bound by a confidentiality agreement with or other obligation of confidentiality to the Disclosing Party; (b) is now, or hereafter becomes, through no act or failure to act on the part of the Receiving Party, generally known to the public; (c) is rightfully obtained by the Receiving Party from a third party, without breach of any obligation to the Disclosing Party; or (d) is independently developed by the Receiving Party without use of or reference to the Confidential Information.

3. **Confidentiality.** The Receiving Party and its Representatives shall not disclose any of the Confidential Information in any manner whatsoever, except as provided in paragraphs 4 and 5 of this Agreement, and shall hold and maintain the Confidential Information in strictest confidence.

4. **Permitted Disclosures.** The Receiving Party may disclose the Disclosing Party's Confidential Information to the Receiving Party's responsible Representatives with a bona fide need to know such Confidential Information, but only to the extent necessary to evaluate or carry out the proposed transaction or relationship with the Disclosing Party and only if such employees are advised of the confidential nature of such Confidential Information and the terms of this Agreement and are bound to protect the confidentiality of such Confidential Information.

5. **Required Disclosures.** The Receiving Party may disclose the Disclosing Party's Confidential Information if and to the extent that such disclosure is required by court order, provided that the Receiving Party provides the Disclosing Party a reasonable opportunity to review the disclosure before it is made and to interpose its own objection to the disclosure.

6. **Use.** The Receiving Party and its Representatives shall use the Confidential Information solely for the purpose of evaluating the possible transaction or relationship with the Disclosing Party and shall not in any way use the Confidential Information to the detriment of the Disclosing Party. Nothing in this Agreement shall be construed as granting any rights to the Receiving Party, by license or otherwise, to any of the Disclosing Party's Confidential Information.

2



7. **Return of Documents.** If the Receiving Party does not proceed with the possible transaction or relationship with the Disclosing Party, the Receiving Party shall notify the Disclosing Party of that decision and shall, at that time or at any time upon the request of the Disclosing Party for any reason, return to the Disclosing Party any and all records, notes, and other written, printed or other tangible materials in its possession pertaining to the Confidential Information. The returning of materials shall not relieve the Receiving Party from compliance with the terms and conditions of this Agreement.

8. **Additional Agreements.** Neither the holding of discussions nor the exchange of material or information shall be construed as an obligation of either party to enter into any other agreement or prohibit either party from providing the same or similar information to others and entering into agreements with others. Each party reserves the right, in its sole discretion, to reject any and all proposals made by the other party or its Representatives with regard to a transaction between them and to terminate discussions and negotiations at any time. Additional agreements of the parties, if any, shall be in writing signed by both parties.

9. **Irreparable Harm.** The Receiving Party understands and acknowledges that any disclosure or misappropriation of any of the Confidential Information in violation of this Agreement may cause the Disclosing Party irreparable harm, the amount of which may be difficult to ascertain and therefore agrees that the Disclosing Party shall have the right to apply to a court of competent jurisdiction for specific performance and/or an order restraining and enjoining any such further disclosure or breach and for such other relief as the Disclosing Party shall deem appropriate.

10. **Survival.** The secrecy and non-use obligations under the terms of this Agreement shall, for a period of five (5) years, survive the expiration or termination of this Agreement.

11. **Successors and Assigns.** This Agreement and each party's obligations hereunder shall be binding on the representatives, assigns, and successors of such party and shall inure to the benefit of the assigns and successors of such party; provided, however, that the rights and obligations of the parties hereunder are not assignable.

12. **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of California.

13. **Attorney's Fees.** If any action at law or in equity is brought to enforce or interpret the provisions of this Agreement, the prevailing party in such action shall be awarded its attorneys' fees and costs incurred.

14. **Counterparts and Right.** This Agreement may be signed in counterparts, which together shall constitute one agreement.

3



**15. Entire Agreement.** This Agreement expresses the full and complete understanding of the parties with respect to the subject matter hereof and supercedes all prior or contemporaneous proposals, agreements, representations and understandings, whether written or oral, with respect to the subject matter. This Agreement is not, however, to limit any rights that either party may have under trade secret, copyright, patent or other laws. This Agreement may not be amended or modified except in writing signed by each of the parties to the Agreement. This Agreement shall be construed as to its fair meaning and not strictly for or against either party. The headings hereof are descriptive only and are not to be construed in interpreting the provisions hereof.

Accepted And Agreed To By:
Meridian Health Care Management, Inc.

By: _____

Title: _____Executive Vice President_____

Date: _____

Accepted And Agreed To By:
Family/Seniors Medical Group, Inc.

By: _____

Title: _____President_____

Date: _____

Accepted And Agreed To By:

By: _____DBRoss_____

Title: _____SVP_____

Date: _____10/2/02_____

4

*contract file*

## Amendment of Agreement

This Amendment is entered into this twenty-sixth (26th) day of July, 1999, between Meridian Health Care Management, Inc. a Delaware Corporation ("MHCM, Inc."), Meridian Health Care Management, LP, a Delaware Limited Partnership ("MHCM, LP"), Meridian Health Care Consulting, Inc. ("MHCC"), and Family Seniors Medical Group ("Client").

## RECITALS

WHEREAS, Client entered into an agreement with Medical Management Associates, Inc., a California Corporation ("MMA"), or MHCM, LP originally effective November 1, 1993, and amended as recorded, wherein MMA or MHCM, LP provides certain services specified in the agreement and its amendments, if any, ("MSA") to Client; and,

WHEREAS, the assets of MMA including the MSA and all rights, responsibilities and obligations thereto, were contributed to MHCM, LP as of June 1, 1996; and,

WHEREAS, the assets of MMA, including the MSA and all rights, responsibilities and obligations thereto, were acquired by MHCC as of January 29, 1999; and,

WHEREAS, MHCC and MHCM, LP, including the MSA and all rights, responsibilities and obligations thereto, were acquired by MHCM, Inc. as of July 26, 1999; and,

WHEREAS, the parties hereto desire to continue in full and effect the MSA and its amendments, if any, between Client and MHCM, Inc.

NOW, THEREFORE, in consideration of the above Recitals, the terms, covenants and conditions hereinafter set forth, and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

## ASSIGNMENT

1. Client hereby assigns the MSA, and its amendments, if any, including all rights, responsibilities and obligations thereto, to MHCM, Inc.

2. MHCM, Inc. hereby assumes all rights, responsibilities and obligations of the MSA, and its amendments, if any.

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment on the day and year first hereinabove set forth.

### SIGNATURES CONTINUED ON NEXT PAGE

## AMENDMENT #1
## TO MANAGEMENT AGREEMENT

This Amendment is entered into by and between MERIDIAN HEALTH CARE MANAGEMENT, LP (MHCM) and FAMILY/SENIORS MEDICAL GROUP, IPA (Client) as of the FIRST (1ˢᵗ) day of November, 1998 amending the Management Agreement entered into by the parties on November 1, 1996.

The parties hereby agree that:

1.    Exhibit A COMPENSATION is amended to include a new Section C.8. as follows:

C.8.  A one hundred twenty-five-dollar ($125.00) fee per Client provider office site visit audit as delegated and required by health plans.

2.    All other provisions not inconsistent herein shall remain in full force and effect.

By:

Meridian Health Care Management, LP:
a Delaware Limited Partnership
by Medical Management Associates, Inc.
a California Corporation, its General Partner

_Signature_
Dolores Blanco Ross
Executive Vice President

Date:  11/2/98

By:

FAMILY/SENIORS MEDICAL
GROUP, IPA

_Signature_
Larry C. Hughes, M.D.
President

Date:  10/30/01

Family Srs. Amendment #1
10/21/98

CLIENT:

BY: _~Larry C Hughes mD_____    DATE: _8-3-99_
Larry Hughes, MD

TITLE: _President_____

**MHCM, LP**
Meridian Health Care Management, LP, a Delaware Limited Partnership, by,
**MHCC**
Meridian Health Care Consulting, Inc., a California Corporation, its General Partner

And,

**MHCM, Inc.**
Meridian Health Care Management, Inc., a Delaware Corporation

BY: _Michael J. Alber_____    DATE: _8/6/99_
Michael J. Alber

TITLE: President

**REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK**

S 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**(a) PLAINTIFFS**

Nautic Partners LLC, Chisholm Partners IV, LP, Fleet Equity Partners VI, LP, Kennedy Plaza Partners II, LLC, and Scott Hilinski

**DEFENDANTS**

Zurich Insurance Company

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Cook County, Illinois
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM ADDRESS AND TELEPHONE NUMBER)
Alan J. Stone (#2677)
Jay N. Moffitt (#4742)
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Phone: 302-658-9200

ATTORNEYS (IF KNOWN)

(PLACE AN "X" IN ONE BOX FOR PLAINTIFF
AND ONE BOX FOR DEFENDANT)

**I. BASIS OF JURISDICTION** (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☐ 3 Federal Question
(U.S. Government Not a Party)

☒ 2 U.S. Government
Defendant

☒ 4 Diversity
(Indicate Citizenship of Parties
in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**V. NATURE OF SUIT**    (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgement<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury – Med Malpractice<br>☐ 365 Personal Injury – Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br><br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R R & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates/etc<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence<br>**HABEAS CORPUS:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor Mgmt. Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl Ret Inc Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br><br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS - Third Party 26 USC 7609 | |

**V. ORIGIN**    (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding    ☐ 2 Removed From State Court    ☐ 3 Remanded From Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred From another district (specify)    ☐ 6 Multidistrict Litigation    ☐ 7 Appeal to District Judge from Magistrate Judgement

**VI. CAUSE OF ACTION**    (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 U.S.C. § 1332 and 28 U.S.C. § 2201(a) - - Breach of Insurance Contract; parties are diverse.

**VII. REQUESTED IN COMPLAINT**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $1,200,000 plus interest    CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ YES    ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See Instructions)    JUDGE _____    DOCKET NUMBER _____

DATE
September 21, 2006

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____ 0 6 - 5 8 7 _____

# ACKNOWLEDGMENT
## OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____ COPIES OF AO FORM 85.

_____          _____
SEP 2 1 2006

(Date forms issued)                    (Signature of Party or their Representative)

Aaron Johnston

(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action